1   FRANK M. PITRE (SBN 100077)
    fpitre@cpmlegal.com
2   ALISON E. CORDOVA (SBN 284942)
    acordova@cpmlegal.com
3   **COTCHETT, PITRE & McCARTHY, LLP**
    San Francisco Airport Office Center
4   840 Malcolm Road
    Burlingame, CA 94010
5   Telephone: (650) 697-6000
    Facsimile: (650) 697-0577
6
    *Attorneys for Plaintiffs*
7

8                **UNITED STATES DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10  | **JAMES STEINLE**, individually and as | CASE NO. |
    heir to **KATHRYN STEINLE**, deceased;
11  **ELIZABETH SULLIVAN**, individually,      **COMPLAINT FOR DAMAGES:**
    and as heir to **KATHRYN STEINLE**,
12  deceased; and **JAMES STEINLE** and        1.   **GENERAL NEGLIGENCE –**
    **ELIZABETH SULLIVAN**, as co-                  **WRONGFUL DEATH (Cal. Govt.**
13  representatives of the Estate of **KATHRYN**    **Code §§ 815.2(a) and 820(a))**
    **STEINLE**,
14                                              2.   **PUBLIC ENTITY NEGLIGENCE –**
                       Plaintiffs,                   **WRONGFUL DEATH (Cal. Evid.**
15                                                   **Code § 669)**
                  v.
16                                              3.   **NEGLIGENCE – SURVIVOR**
    **THE UNITED STATES OF AMERICA,**               **CAUSE OF ACTION**
17  a governmental entity; **CITY AND**
    **COUNTY OF SAN FRANCISCO**, a
18  governmental entity; **ROSS MIRKARIMI**,    4.   **DEPRIVATION OF FEDERAL**
    an individual; and **JUAN FRANCISCO**           **CIVIL RIGHTS (48 U.S.C. § 1983)**
19  **LOPEZ-SANCHEZ**, an individual.

20                     Defendants.                        **JURY TRIAL DEMAND**

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

# TABLE OF CONTENTS

Page No.

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE ...........................................................................2

III.   PARTIES ...............................................................................................................3

    A.     Plaintiffs and Decedent .............................................................................3

    B.     Defendants ..................................................................................................3

    C.     Agency and Concert of Action ...................................................................4

IV.    STATEMENT OF THE RELEVANT FACTS .....................................................5

    A.     The Death of Kathryn Steinle .....................................................................5

    B.     Juan Francisco Lopez Sanchez's Prior Criminal History .........................5

    C.     The Sanctuary City Law was Never Intended to Halt Notification,
          Communication and/or Cooperation with ICE in the Detention and/or
          Deportation of Repeat Convicted Felons .................................................6

    D.     In Addition to Transgressing Local, State, and/or Federal Law, Mirkarimi
          and CCSF Brazenly Ignored History and Statistics..................................8

          1.     The Bologna Murders Notified CCSF And Mirkarimi of the Risk that
                Undocumented Convicted Felons Posed .........................................8

          2.     Since the Bologna Murders Statistically Significant Evidence of Crime
                by Undocumented Convicted Felons Mounted, Thereby, Heightening the
                Risks Posed ......................................................................................8

    E.     Mirkarimi Created Official Policy that Directly Contradicted Federal Law,
          Surpassed his Authority and Discretion as a Public Official, and Directly Led to the
          Release of Lopez-Sanchez onto the Streets of San Francisco ...................9

    F.     An ICE Officer, Official, Agent, and/or Employee Failed to Detain and Deport
          Lopez-Sanchez Upon His Release from SFSD Custody .........................10

    G.     A Ranger of the Bureau of Land Management Failed to Secure a .40 Caliber
          Government-Issued Firearm .....................................................................11

V.     CAUSES OF ACTION

          FIRST CAUSE OF ACTION
          GENERAL NEGLIGENCE – WRONGFUL DEATH .........................................12

    A.     Defendants Mirkarimi and CCSF .............................................................12

    B.     Defendant USA -  BLM.............................................................................14

    C.     Defendant USA – ICE ..............................................................................15

COMPLAINT                                                                                                      i

D. Defendant Lopez-Sanchez ...................................................................16

SECOND CAUSE OF ACTION
PUBLIC ENTITY NEGLIGENCE – WRONGFUL DEATH ............................16

A. Defendants Mirkarimi and CCSF .........................................................16

B. Defendant USA – BLM ..........................................................................17

C. Defendant USA – ICE ............................................................................19

THIRD CAUSE OF ACTION
NEGLIGENCE – SURVIVOR CAUSE OF ACTION.........................................20

FOURTH CAUSE OF ACTION
DEPRIVATION OF FEDERAL CIVIL RIGHTS ...............................................21

VI. PRAYER FOR RELIEF ...................................................................................23

VII. JURY DEMAND...............................................................................................23

## I.  INTRODUCTION

1.     Plaintiffs Kathryn Steinle, deceased, and James Steinle and Elizabeth Sullivan, individually, as heirs to Kathryn Steinle, and as co-representatives of the Estate of Kathryn Steinle (collectively **"PLAINTIFFS"**), bring this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 1402(b), 2401(b), and 2671-2680 ("FTCA"), and the California Government Tort Claims Act, California Government Code §§ 810 *et seq.* ("CGTCA"), against the City and County of San Francisco (**"CCSF"**), Ross Mirkarimi (**"MIRKARIMI"**), and the United States of America (**"USA"**) for their failures to perform mandatory duties and/or for the unconstitutional and/or negligent acts and/or omissions of their officers, officials, agents and/or employees that resulted in the fatal shooting of Kathryn Steinle (**"KATE"**) by Juan Francisco Lopez-Sanchez (**"LOPEZ-SANCHEZ"**), an undocumented immigrant and seven-time felon who was recently released from **CCSF** custody and who was in possession of a stolen .40 caliber government-issued firearm and used that weapon on July 1, 2015, at approximately 6:30 p.m., to shoot and kill **KATE** while she was walking with her father, James Steinle (**"JAMES"**), on Pier 14 of the Embarcadero in San Francisco.

2.     This tragic series of events was initiated when in March of 2015, **CCSF** and the Sheriff of **CCSF** at the time, **MIRKARIMI**, issued a memo creating and/or approving an official policy eliminating all communication regarding undocumented immigrants with U.S. Immigration and Customs Enforcement ("ICE") in direct contravention of federal and/or state law and in excess of their authority as public entities, agencies and/or officials ("The March Memo").  Within weeks of The March Memo, **LOPEZ-SANCHEZ**, an undocumented immigrant and career drug felon with at least seven prior felony convictions including heroin possession and narcotics manufacturing, arrived into **CCSF** custody after serving a federal prison sentence for felony re-entry into the United States.  Because of The March Memo, **LOPEZ-SANCHEZ** was released from **CCSF** custody without any notification to ICE, and this is despite ICE sending an immigration detainer request to **CCSF** wherein ICE specifically asked to be notified of **LOPEZ-SANCHEZ**'s release.

3.     The situation was further exacerbated when ICE and/or an ICE officer, official, agent, and/or employee, with an awareness of **CCSF**'s custody of **LOPEZ-SANCHEZ** and of **CCSF**'s new policy pursuant to The March Memo, failed to affirmatively intervene, detain and/or deport **LOPEZ-SANCHEZ** upon release from **CCSF** custody.

4.     **KATE**'s fate was sealed when a U.S. Department of the Interior, Bureau of Land Management Ranger failed to properly secure and/or store a government-issued firearm while it was left in an unoccupied vehicle in a high auto-theft neighborhood in the City and County of San Francisco, California. Due to this failure, **LOPEZ-SANCHEZ** was able to gain access to the firearm, which he then used to shoot and kill **KATE**.

5.     This tragedy was a by-product of the abuse of authority by **MIRKARIMI** and **CCSF**; the failure of ICE officials, officers and/or agents to carry out their required duties; and the failure of BLM officials, officers and/or agents to properly secure government issued firearms, which in combination, served to provide the means and opportunity for a repeat drug felon **LOPEZ-SANCHEZ** to secure a gun and kill **KATE**. **KATE**'s death was both foreseeable and preventable had the law enforcement agencies, officials and/or officers involved simply followed the laws, regulations and/or procedures which they swore to uphold.

## II.     JURISDICTION AND VENUE

6.     **CCSF** and **USA**, and each of them, were served with an administrative claim pursuant to the FTCA and/or the CGTCA on or around August 31, 2015. **PLAINTIFFS** received only one response from U.S. Immigration and Customs Enforcement on January 15, 2016, wherein the claim was denied.

7.     This Court has jurisdiction over all causes of action asserted against the federal government pursuant to 28 U.S.C. § 1346. Additionally, this Court has jurisdiction over all other claims pursuant to 28 U.S.C. § 1367 because all of the claims arise from a common nucleus of operative facts that are so intertwined that they cannot be reasonably separated.

8.     Venue is proper pursuant to 28 U.S.C. § 1402 because at all times relevant, all of the **PLAINTIFFS** resided in this district and all of the wrongful acts and/or omissions complained of herein occurred in this judicial district.

## III.   PARTIES

### A.   Plaintiffs and Decedent

9.     Kathryn Steinle ("**KATE**"), deceased, was at all times relevant to this claim a resident of the City and County of San Francisco. **KATE** was the daughter of James Steinle and Elizabeth Sullivan. At the time of her death, **KATE** was a kind, smart and hard-working 32 year old woman, a loving daughter and sister, and committed to socially just causes.

10.    James Steinle ("**JAMES**") is a natural person who is, and at all times relevant to this claim was, a resident of Livermore, California. **JAMES** was the father of **KATE**, and is a proper personal representative and heir pursuant to Code of Civil Procedure § 337.60(a).

11.    Elizabeth Sullivan ("**LIZ**") is a natural person who is, and at all times relevant to this claim was, a resident of Livermore, California. **LIZ** was the mother of **KATE**, and is a proper personal representative and heir pursuant to Code of Civil Procedure § 337.60(a).

### B.   Defendants

12.    The City and County of San Francisco ("**CCSF**") is an incorporated municipality and public entity responsible for the safety and welfare of residents and/or visitors of San Francisco. The San Francisco Sheriff's Department ("SFSD") is a **CCSF** public agency responsible for protecting the public, operating the system of county jails, managing supervised release programs, and providing security and law enforcement in **CCSF**.

13.    Ross Mirkarimi ("**MIRKARIMI**") is an individual who, at all times relevant, served as Sheriff of **CCSF** and was responsible for establishing, providing and/or enforcing policy, practices and/or procedures for operating the county jails, managing the supervised release of convicted felons into the community, and providing security and law enforcement, all for the purpose of promoting public safety and deterring crime.

14.    The United States of America ("**USA**") is the federal government, who is the proper defendant pursuant to 28 U.S.C. § 2679(b)(1) for claims for money damages arising from or out of a negligent or wrongful act and/or omission of any federal employee committed within the course and scope of their employment. The United States Department of Homeland Security is a cabinet department of the **USA** with Immigration and Customs Enforcement ("ICE") acting as its law

1   enforcement agency. ICE, through its officers, officials, agents and/or employees, is responsible

2   for enforcing the nation's immigration laws and ensuring the departure of undocumented

3   immigrants from the United States. Further, the United States Department of the Interior, Bureau

4   of Land Management ("BLM") helps administer, maintain and oversee certain public lands owned

5   or in the possession of **USA**. BLM, acting through its Office of Law Enforcement & Security, also

6   functions as a federal law enforcement agency of **USA**. Pursuant to that role, BLM has uniformed

7   rangers that enforce laws and regulations that govern BLM lands and resources. BLM rangers

8   carry firearms, defensive equipment, make arrests, execute search warrants, complete reports and

9   testify in court.

10          15.    Juan Inez Garcia-Zarate, a.k.a. Juan Francisco Lopez-Sanchez (**"LOPEZ-**

11   **SANCHEZ"**) is an individual who, at all times relevant, was residing in the City and County of

12   San Francisco, California, and was arrested and criminally charged by the San Francisco District

13   Attorney with the murder of **KATE**.

14          **C.    Agency and Concert of Action**

15          16.    At all times herein mentioned, Defendants, and each of them, hereinabove, were the

16   agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of

17   each of the other Defendants named herein and were at all times operating and acting within the

18   purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or

19   joint venture, and each Defendant has ratified and approved the acts of each of the remaining

20   Defendants. Each of the Defendants aided and abetted, encouraged, and rendered substantial

21   assistance to the other Defendants in breaching their obligations to Plaintiffs, as alleged herein. In

22   taking action to aid and abet and substantially assist the commission of these wrongful acts and

23   other wrongdoings complained of, as alleged herein, each of the Defendants acted with an

24   awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would

25   substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

26   / / /

27   / / /

28   / / /

## IV.   STATEMENT OF THE RELEVANT FACTS

### A.   The Death of Kathryn Steinle

17.   On July 1, 2015, at approximately 6:30 p.m. **LOPEZ-SANCHEZ,** a repeat convicted felon and undocumented immigrant, used a stolen government-issued .40 caliber SIG Sauer handgun to shoot **KATE** in the chest, piercing her aorta.

18.   **KATE** and her father, **JAMES,** had been walking together along the San Francisco waterfront nearby Pier 14 of the Embarcadero when she was shot. **JAMES** held **KATE** in his arms while she struggled to survive, and attempted to keep **KATE** alive by performing emergency cardiopulmonary resuscitation. **JAMES** held her as she fought for her life and begged for his help, crying, "Help me Daddy!" with her last words.

19.   Despite JAMES' best efforts, and those of the emergency responders who were called to **KATE**'s aid, **KATE** succumbed to her injuries approximately two (2) hours later at San Francisco General Hospital.

### B.   Juan Francisco Lopez Sanchez's Prior Criminal History

20.   **LOPEZ-SANCHEZ** had been convicted of at least seven felonies, four being serious drug felonies, and was deported at least five times prior to the shooting of **KATE**. Indeed, on the date in question, **LOPEZ-SANCHEZ** admitted to being under the influence of narcotics, including but not limited to, marijuana and sleeping pills. He also claims he does not remember any of the events that took place, and witnesses observed **LOPEZ-SANCHEZ** acting bizarrely moments before the shooting of **KATE**.

21.   **LOPEZ-SANCHEZ**'s prior criminal convictions and/or deportations, include but are not limited to the following:

      a.   **Convicted** of felony heroin possession on or about, February 2, 1993;

      b.   **Convicted** of felony narcotics manufacturing on or about, May 12, 1993;

      c.   **Convicted** of felony heroin possession on or about, November 2, 1993;

      d.   **Convicted** of misdemeanor imitation controlled substance on or about, June 9, 1994;

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

e.   **Convicted** of a controlled substance violation and aggravated felony on or about, June 10, 1994;

f.   **Deported** to Mexico on or about, June 20, 1994;

g.   **Convicted** of felony heroin possession on or about, July 11, 1996;

h.   **Deported** to Mexico on or about, April 4, 1997;

i.   **Deported** to Mexico on or about, February 2, 1998;

j.   **Convicted** of felony re-entry on or about, September 3, 1998;

k.   **Deported** to Mexico on or about, March 6, 2003;

l.   **Convicted** of criminal re-entry and violation of supervised release on or about, November 7, 2003;

m.   **Deported** to Mexico on or about, June 29, 2009; and

n.   **Convicted** of felony re-entry and probation violations on or about, May 12, 2011.

22.   On or around March 26, 2015, **LOPEZ-SANCHEZ** finished serving a 46 month sentence at Victorville federal prison in Los Angeles. ***Pursuant to a request made by SFSD***, **LOPEZ-SANCHEZ** was released to SFSD custody to appear for an outstanding felony warrant for the sale of marijuana. Charges were dismissed and/or dropped the following day, but for reasons unknown, SFSD continued to hold **LOPEZ-SANCHEZ** in custody until April 15, 2015 -- 19 days after all criminal charges had been extinguished.

23.   **LOPEZ-SANCHEZ** was arrested and charged with the murder of **KATE** on July 6, 2015.

C.   **The Sanctuary City Law was Never Intended to Halt Notification, Communication and/or Cooperation with ICE in the Detention and/or Deportation of Repeat Convicted Felons**

24.   **CCSF** passed the City and County of Refuge ordinance, commonly referred to as the Sanctuary City law, in 1989 for the purpose of encouraging the reporting of crime among immigrants, and certainly not to encourage the harboring of known felons. The law prohibits the use of **CCSF** funds and/or resources "to assist in the enforcement of federal immigration law or to

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

gather or disseminate information regarding the immigration status of individuals" ___unless___

___required by federal or state law___. Notably, ___the Sanctuary City law was amended in 1992 to___

___explicitly allow for reporting information to and/or cooperating with federal immigration___

___officials when an individual has been previously convicted of a felony___, and there is no

requirement that the felony be serious or violent or have occurred in the past seven years.[1]

25.     This is why **CCSF** Mayor Ed Lee courageously released a statement on July 6,
2015 following the death of **KATE** acknowledging that "[t]his is a tragic incident that never
should have happened. __San Francisco's Sanctuary City ordinance allows for communication__
__with federal law enforcement regarding convicted felons.__ The primary responsibility of our law
enforcement agencies in San Francisco is to protect the public. Communicating with federal law
enforcement agencies in these cases is simply common sense and in the best interest of public
safety. Once again, __there is nothing in our Sanctuary City law that prohibits such__
__communication__."[2]

26.     The laws of the State of California reflect the same approach toward undocumented
immigrant felons and/or drug offenders. According to California Health and Safety Code § 11369,
government officials "shall notify the appropriate agency of the United States having charge of
deportation matters" when a suspected undocumented immigrant is arrested for a drug offense.
Furthermore, California Government Code § 7282.5 goes so far as to allow government officials to
cooperate with ICE and/or detain an undocumented immigrant based solely on one prior felony
conviction.

---

[1] According to San Francisco Administrative Code Chapter 12H.2-1 (a.k.a. Sanctuary City Law): "[N]othing in this Chapter shall preclude any City and County department, agency, commission, officer or employee from (a) __reporting information__ to the INS regarding an individual who has been booked at any county jail facility, and who __has previously been convicted of a felony__ committed in violation of the laws of the State of California, which is still considered a felony under State law; (b) __cooperating with an INS request for information__ regarding an individual who __has been convicted of a felony__ committed in violation of the laws of the State of California, which is still considered a felony under state law; or (c) __reporting information__ as required by federal or state statute, regulation or court decision, regarding an individual who __has been convicted of a felony__ committed in violation of the laws of the State of California, which is still considered a felony under state law."
[2] Cestone, Vince, "Pier 14 Shooting: San Francisco Mayor Ed Lee Responds to Sheriff Ross Mirkarimi's Criticism," KRON4.com, p. 2 (July 10, 2015 at 4:00 PM) available at: http://kron4.com/2015/07/10/pier14shootingsanfranciscomayoredleerespondstosheriffrossmirkarimiscriticism/.

**COMPLAINT**                                                                                      7

27.     Congress also mandated the free flow of communication with immigration enforcement officials pursuant to 8 U.S.C. § 1373(a) which passed in 1996, and proscribes that a local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending information to immigration enforcement officials. This statute has been held by the courts to invalidate all restrictions on the voluntary exchange of immigration information between public entities and federal immigration authorities.

### D.     In Addition to Transgressing Local, State, and/or Federal Law, Mirkarimi and CCSF Brazenly Ignored History and Statistics

#### 1.     The Bologna Murders Notified CCSF and Mirkarimi of the Risk that Undocumented Convicted Felons Posed

28.     In 2008, **CCSF** released a known undocumented immigrant felon who had previously committed violent crimes and drug offenses onto the streets without notifying and/or cooperating with immigration enforcement officials, and the felon proceeded to fatally shoot three innocent bystanders, Mr. Bologna and his two teenage sons. This was a highly publicized incident that also led to a lawsuit against **CCSF**, which made it to the court of appeal and was decided on January 31, 2011. Notably, **MIRKARIMI** served as a San Francisco County Supervisor at that time and less than a year later was elected to SFSD Sheriff.

#### 2.     Since the Bologna Murders Statistically Significant Evidence of Crime By Undocumented Convicted Felons Mounted, Thereby, Heightening the Risks Posed

29.     Around this same time, several government agencies were researching, publishing, and/or discussing the violent and statistically significant recidivism rate of undocumented immigrant felons. Indeed, in July of 2012, the United States House Judiciary Committee found that from 2008 to 2011, 46,734 undocumented immigrant criminals were released from jail and/or prison and went on to commit 1,000 major criminal offenses and violent crimes—almost one a day for three years.[3] Altogether, undocumented immigrant criminals had a recidivism rate of 16%.[4] In

---

[3] Goodlatte, Bob, "House Judiciary Report Finds Administration's Lax Immigration Policies are Deadly," (July 31, 2012) available at: _http://judiciary.house.gov/index.cfm/2012/7/housejudiciaryreportfindsadministrationslax immigrationpoliciesaredeadly.
[4] Id.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

March of 2011, the United States Government Accountability Office ("GAO") made a report to Congress finding that "our study population of about 249,000 criminal aliens were arrested about 1.7 million times, averaging about 7 arrests per criminal alien . . . ."[5] The GAO had released a similar report in 2005 finding the average arrest rate to be even higher, at 8 per criminal alien.[6] Recidivism among undocumented immigrant criminals is not new either. From 1955 to 2010, 28% of criminal aliens were arrested between 6 to 10 times.[7]

> **E.   Mirkarimi Created Official Policy that Directly Contradicted Federal Law, Surpassed his Authority and Discretion as a Public Official, and Directly Led to the Release of Lopez-Sanchez onto the Streets of San Francisco**

30.     As Sheriff of CCSF, **MIRKARIMI** issued a memorandum on March 13, 2015 (" The March Memo") mandating an agency-wide official policy prohibiting SFSD staff from providing and/or reporting information on undocumented immigrants in custody to ICE, regardless of the criminal, violent, drug, and/or mental health history of the individual. This included not providing ICE with any information on citizenship/immigration status, release date, and/or release time.

31.     Pursuant to The March Memo, the only person with authority to provide and/or report the aforementioned information to ICE was **MIRKARIMI** himself, thereby putting himself in control of all communication with ICE. On or around the same time, **MIRKARIMI** made it known to ICE that he would not contact them under any circumstances, effectively foreclosing all contact, communication, notification and/or coordination with ICE regarding undocumented immigrant felons.

32.     According to the San Francisco Sheriff's Deputies Association, the official, longstanding policy and procedure of SFSD prior to The March Memo was for all SFSD deputies, employees, and/or staff to freely provide information to ICE regarding undocumented immigrant felons in custody in order to safeguard law abiding citizens.

---

[5] GAO-11-187, "Criminal Alien Statistics: Information on Incarcerations, Arrests, and Costs," US Govt. Accountability Office, p. 17 (March 2011) available at: http://www.gao.gov/assets/320/316959.pdf.
[6] *Id.*
[7] See *Id.* at figure 8, "Number of Arrests and Offenses per Criminal Alien from August 1955 to April 2010".

33.   Approximately two weeks after The March Memo was issued, **LOPEZ-SANCHEZ** was brought into SFSD custody on or around March 26, 2015.

34.   On or around March 27, 2015, ICE sent a detainer request to SFSD for **LOPEZ-SANCHEZ**.

35.   Immigration detainer requests are issued pursuant to §§ 236 and 287 of the Immigration and Nationality Act and Chapter 1 of the Code of Federal Regulations, 8 C.F.R. § 287.7. An immigration detainer request asks the receiving agency to perform two tasks in regard to an undocumented immigrant in custody: (1) to notify ICE forty-eight (48) hours prior to the release of the undocumented immigrant so that ICE can assume custody; and (2) to detain the individual until the time at which ICE can assume custody of the undocumented immigrant.

36.   Despite this request, **MIRKARIMI and CCSF, and each of them, released LOPEZ-SANCHEZ from custody on April 15, 2015 without contacting, notifying, communicating and/or cooperating with ICE**. This is also despite detaining **LOPEZ-SANCHEZ** for nineteen (19) days after all criminal charges were dropped, providing ample time to coordinate with ICE. Less than three months later, **KATE** was shot and killed by **LOPEZ-SANCHEZ**.

37.   In a statement by ICE spokeswoman Gillian Christensen, ICE corroborated that if **MIRKARIMI** and **CCSF**, and each of them, had simply contacted, notified, communicated and/or cooperated with ICE, **LOPEZ-SANCHEZ** would have been detained and deported: "[i]f the local authorities had merely notified [U.S. Immigration and Customs Enforcement] that they were about to release this individual into the community, ICE could have taken custody of him and had him removed from the country — thus preventing this terrible tragedy."[8]

**F.   An ICE Officer, Official, Agent, and/or Employee Failed to Detain and Deport Lopez-Sanchez Upon His Release from SFSD Custody**

38.   On or around February 12, 2015, **MIRKARIMI** met with U.S. Department of Homeland Security Deputy Director Alejandro Mayorkas during which time **MIRKARIMI**

---

[8] Brooks, Jon, "Kate Steinle Shooting Puts San Francisco Immigration Policy Under Microscope," KQED News, p. 3 (July 6, 2015) available at: http://ww2.kqed.org/news/2015/07/06/kate-steinle-shooting-opens-can-of-worms-on-san-francisco-immigration-policy.

**COMPLAINT** 10

informed **USA** (and by extension, ICE) that SFSD would not honor ICE detainer requests and/or notify ICE of the pending release of any undocumented immigrant unless a judicial order or warrant was issued for deportation. Therefore, ICE was aware prior to the release of **LOPEZ-SANCHEZ** that unless affirmative steps were taken, SFSD would as a matter of course permit the unsupervised release of undocumented immigrant felons that were in SFSD custody and would do so without giving ICE any forewarning or notification.

39.     After issuing the immigration detainer request to SFSD on March 27, 2015 for **LOPEZ-SANCHEZ**, ICE officers, officials, agents and/or employees failed to take any action to affirmatively detain and/or deport **LOPEZ-SANCHEZ**, including but not limited to, failing to obtain a judicial order or warrant for deportation. As a result, **LOPEZ-SANCHEZ** was not deported and instead allowed to roam the streets of **CCSF** and shoot **KATE**.

**G.     A Ranger of the Bureau of Land Management Failed to Secure a .40 Caliber Government-Issued Firearm**

40.     All BLM rangers are equipped with government-issued firearms.

41.     BLM rangers are also required to attend special firearm training held by the Federal Law Enforcement Training Center ("FLETC"). After FLETC training is complete, BLM rangers complete a second field training and evaluation program where they learn the job in several duty locations across the western States. Annual and quarterly training is also required for firearms, defensive tactics, physical fitness, and other job skills.

42.     The Department of the Interior Departmental Manual, Part 446, Chapter 10 requires that: "Each law enforcement officer is responsible for ensuring the security of his/her assigned firearm and other defensive equipment while on or off duty."

43.     Further, BLM's Manual Handbook 1112-2 on Safety and Health for Field Operations, Topic 17.6 requires that "[a]ll firearms, when not in active use, shall be stored in a secure place, out of sight, under lock and key. Firearms will be unloaded prior to storage," and Topic 17.5 requires that "Bureau employees are prohibited at all times from using Government-owned vehicles or equipment for the express or incidental purpose of hunting, shooting, or transporting of game, hunters, firearms, or ammunition."

44.     On or around June 27, 2015, a BLM Ranger left a loaded and government-issued .40 caliber SIG Sauer P239 handgun unlocked in an unattended vehicle parked in the downtown area of San Francisco. The firearm was left in a backpack in plain sight of passersby's and within reach of someone smashing a window of the vehicle. The firearm was stolen from the vehicle, and less than five (5) days later it was used to kill **KATE**.

45.     On or around July 10, 2015, the .40 caliber SIG Sauer handgun was retrieved from the water just off of Pier 14 of the Embarcadero in San Francisco. After comparing the ballistics from the handgun that was found to the round that killed **KATE**, the San Francisco Police Department's forensic crime laboratory confirmed that it was the gun used by **LOPEZ-SANCHEZ** to shoot and kill **KATE**. BLM also confirmed that it was same handgun that had been taken from the Ranger's vehicle.

**V.    CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**GENERAL NEGLIGENCE – WRONGFUL DEATH**
**(Cal. Govt. Code §§ 815.2(a) and 820(a))**
**(Against All Defendants by Plaintiffs JAMES and LIZ individually and as heirs of KATE)**

46.     **PLAINTIFFS** hereby re-allege and incorporate by reference each and every allegation contained above as if fully set forth in detail herein.

**A.     Defendants Mirkarimi and CCSF**

47.     **PLAINTIFFS** allege, that at all times relevant herein, **MIRKARIMI** and **CCSF**, and each of them, acted negligently, carelessly, recklessly, and/or unlawfully by including but not limited to: (1) creating and/or issuing The March Memo; (2) mandating an official policy forbidding all employees from contacting ICE regarding undocumented immigrants; (3) ignoring ICE's immigration detainer request; and/or (4) failing to notify, communicate, cooperate, assist, and/or provide information to ICE regarding the release of **LOPEZ-SANCHEZ** from SFSD custody.

48.     The aforementioned acts and/or omissions by **MIRKARIMI** and **CCSF**, and each of them, were not the result of the exercise of discretion as **MIRKARIMI** and **CCSF** are not

**COMPLAINT**                                                                                    12

1   vested with discretion to contravene federal law and/or state law, including but not limited to

2   8 U.S.C. § 1373(a), California Health and Safety Code § 11369, and/or California Government

3   Code § 7282.5.

4      49. Further, the aforementioned acts and/or omissions by **MIRKARIMI** and **CCSF**,

5   and each of them, did not pertain to a decision whether to release **LOPEZ-SANCHEZ** nor to any

6   terms and conditions of **LOPEZ-SANCHEZ's** release, but rather involved ministerial acts and/or

7   omissions in the implementation of the decision to release **LOPEZ-SANCHEZ.**

8      50. **PLAINTIFFS** allege, that at all times relevant herein, **MIRKARIMI** and **CCSF**,

9   and each of them, were on notice of the potentially violent and tragic consequences of the failure

10   to report undocumented immigrants with prior felonies to ICE for several reasons, including but

11   not limited to: (1) the Bologna murders and resulting lawsuit; and/or (2) well-published statistics

12   regarding the recidivism rate of undocumented immigrant felons. Further, it was reasonably

13   foreseeable that an undocumented immigrant with a twenty-two year criminal record that consisted

14   of seven felony offenses, including the possession, manufacture, and/or sale of narcotics, would

15   continue to engage in criminal behaviors, including violent acts, once released from custody.

16      51. As a direct and legal result of the wrongful acts and/or omissions of **MIRKARIMI**

17   and **CCSF**, and each of them, ICE was not given the opportunity to take custody of **LOPEZ-**

18   **SANCHEZ,** and he was released into the City and County of San Francisco where he obtained a

19   firearm and pursued a criminal course of conduct, killing **KATE.**

20      52. As a further direct and legal result of the wrongful acts and/or omissions of

21   **MIRKARIMI** and **CCSF**, and each of them, **JAMES** contemporaneously witnessed his daughter

22   being shot and struggling for life while in his arms, and thereby suffered extreme emotional

23   distress, including nervousness, grief, anxiety, worry, mortification, shock, indignity,

24   apprehension, terror or ordeal, all in an amount to be determined.

25      53. As a further direct and legal result of the wrongful acts and/or omissions of

26   **MIRKARIMI** and **CCSF**, and each of them, Plaintiffs **JAMES** and **LIZ**, suffered and continue to

27   suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection,

28   society, and moral support, all in an amount to be determined.

1    54.    As a further direct and legal result of the wrongful acts and/or omissions of

2    **MIRKARIMI** and **CCSF**, and each of them, Plaintiffs **JAMES** and **LIZ** incurred funeral and

3    burial expenses, all in an amount to be determined.

4    **B.    Defendant USA – BLM**

5    55.    **PLAINTIFFS** allege, that at all times relevant herein, a BLM Ranger acted

6    negligently, carelessly, recklessly, and/or unlawfully in the course and scope of his/her

7    employment by including but not limited to: (1) failing to properly secure his/her firearm and/or

8    ammunition; (2) failing to properly store his/her firearm and/or ammunition; (3) leaving his/her

9    firearm and/or ammunition in plain view; (4) leaving his/her firearm and/or ammunition in close

10   enough proximity to the window of a vehicle that a passerby could smash the window and obtain

11   the firearm and/or ammunition; (5) leaving the firearm loaded with ammunition while not in use

12   and/or in an unattended vehicle; (6) failing to carry the firearm on his/her person at all times;

13   and/or (7) using a vehicle to transport a firearm and/or ammunition.

14   56.    **PLAINTIFFS** allege, that at all times relevant herein, a BLM Ranger knew or

15   should have known that leaving a loaded, unlocked, and/or unsecured firearm in an unattended

16   vehicle could result in theft of the firearm, especially in a dense, highly-populated location with a

17   high rate of auto break-ins.  Further, it was reasonably foreseeable that a loaded firearm, once

18   stolen, would be used to pursue a criminal course of conduct.

19   57.    The aforementioned wrongful acts and/or omissions of the BLM Ranger were not

20   the result of the exercise of discretion vested in the BLM Ranger as he/she does not have the

21   discretion to disregard mandatory duties proscribed by BLM and/or U.S. Department of the

22   Interior manuals and/or handbooks.

23   58.    As a direct and legal result of the wrongful acts and/or omissions of the BLM

24   Ranger, **LOPEZ-SANCHEZ** was allowed to gain access to a loaded weapon that he used to kill

25   **KATE.**

26   59.    As a further direct and legal result of the wrongful acts and/or omissions of the

27   BLM Ranger, **PLAINTIFFS** suffered the damages as herein above set forth.

28   / / /

## C.    **Defendant USA – ICE**

60.    **PLAINTIFFS** allege, that at all times relevant herein, an ICE officer, official, agent, and/or employee acted negligently, carelessly, recklessly, and/or unlawfully in the course and scope of his/her employment by including but not limited to: (1) failing to detain **LOPEZ-SANCHEZ**; (2) failing to deport **LOPEZ-SANCHEZ**; (3) failing to obtain a judicial order or warrant for the deportation of **LOPEZ-SANCHEZ**; and/or (4) failing to take custody of **LOPEZ-SANCHEZ** during the nineteen days he was held in SFSD custody after all criminal charges were dropped.

61.    **PLAINTIFFS** allege, that at all times relevant herein, ICE officers, officials, agents, and/or employees knew or should have known that SFSD would not notify ICE prior to the unsupervised release of **LOPEZ-SANCHEZ**. ICE officers, officials, agents, and/or employees further knew or should have known that **LOPEZ-SANCHEZ** had a long criminal history of felony offenses and deportations. It was reasonably foreseeable that an undocumented immigrant with a 22 year criminal record that consisted of seven felony offenses would continue to engage in criminal behaviors, including violent acts, once released from custody.

62.    The aforementioned wrongful acts and/or omissions of the ICE officer, official, agent, and/or employee were not the result of the exercise of discretion vested in the ICE officer, official, agent, and/or employee as he/she does not have the discretion to disregard mandatory duties defined by federal statutes.

63.    As a direct and legal result of the wrongful acts and/or omissions of the ICE officer, official, agent and/or employee, **LOPEZ-SANCHEZ** was not deported and allowed to reside in the City and County of San Francisco where he gained access to a loaded weapon that he used to kill **KATE**.

64.    As a further direct and legal result of the wrongful acts and/or omissions of the ICE officer, official agent, and/or employee, **PLAINTIFFS** suffered the damages as herein above set forth.

/ / /

/ / /

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**D.**     <u>**Defendant Lopez-Sanchez**</u>

65.     **LOPEZ-SANCHEZ** negligently, recklessly, carelessly, and/or unlawfully shot **KATE** with a loaded .40 caliber SIG Sauer handgun while she was walking the Embarcadero in San Francisco with her father, **JAMES**.

66.     It was reasonably foreseeable that a loaded firearm when shot could kill someone.

67.     As a direct and legal result of the wrongful acts and/or omissions of **LOPEZ-SANCHEZ**, **PLAINTIFFS** suffered the damages as herein above set forth.

WHEREFORE Plaintiffs pray for relief set forth below.

**SECOND CAUSE OF ACTION**
**PUBLIC ENTITY NEGLIGENCE – WRONGFUL DEATH**
**(Cal. Evid. Code § 669)**
**(Against MIRKARIMI, CCSF and USA By Plaintiffs JAMES and LIZ individually and as heirs of KATE)**

68.     **PLAINTIFFS** hereby re-allege and incorporate by reference each and every allegation contained above as if fully set forth in detail herein.

**A.**     <u>**Defendants Mirkarimi and CCSF**</u>

69.     **PLAINTIFFS** allege, that at all times relevant herein, **MIRKARIMI** and **CCSF**, and each of them, were under a mandatory duty to not restrict the voluntary exchange of immigration information between SFSD deputies, employees, and/or staff and federal immigration authorities pursuant to 8 U.S.C. § 1373(a), which specifically states: "a local government entity or official **may not prohibit, or in any way restrict**, any government entity or official from sending to, or receiving from, [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."

70.     **PLAINTIFFS** allege, that at all times relevant herein, **MIRKARIMI** and **CCSF**, and each of them, were under a mandatory duty, pursuant to California Government Code § 7282.5(a)(2), to allow law enforcement officials the discretion to cooperate with federal immigration officials if the individual in question has previously been convicted of a felony. Specifically, 7282.5(a)(2) states: "A law enforcement official **shall have discretion to cooperate** with federal immigration officials by detaining an individual on the basis of an immigration hold

**COMPLAINT**                                                                    16

1  after that individual becomes eligible for release from custody only if the continued detention of

2  the individual on the basis of the immigration hold would not violate any federal, state, or local

3  law, or any local policy, and only under any of the following circumstances: . . . the individual has

4  been convicted of a felony punishable by imprisonment in the state prison."

5        71.    The aforementioned statutes were intended to protect against the type of harm

6  suffered by **PLAINTIFFS**, and **KATE** was one of the class of persons for whose protection the

7  aforementioned statutes were adopted.

8        72.    The aforementioned mandatory duties was breached when **MIRKARIMI** and

9  **CCSF**, and each of them, mandated an official policy forbidding all SFSD deputies, employees,

10  and/or staff from contacting and/or cooperating with ICE regarding undocumented immigrants in

11  SFSD custody, including drug felons with long criminal histories.

12        73.    As a direct and legal result of the wrongful acts and/or omissions of **MIRKARIMI**

13  and **CCSF**, and each of them, ICE was not given the opportunity to take custody of **LOPEZ-**

14  **SANCHEZ**, and he was released into the City and County of San Francisco where he later killed

15  **KATE**.

16        74.    As a further direct and legal result of the wrongful acts and/or omissions of

17  **MIRKARIMI** and **CCSF**, and each of them, **PLAINTIFFS** suffered the damages as herein above

18  set forth.

19      B.    **Defendant USA – BLM**

20        75.    **PLAINTIFFS** allege, that at all times relevant herein, BLM Rangers had a

21  mandatory duty to (a) secure firearms in a lockable, hard-side, gun case that is pre-approved by the

22  State Firearms Officer; (b) ensure that all firearms are unloaded at all times except when actually

23  needed; and (c) not use government-owned vehicles for the express or incidental purpose of

24  transporting firearms and/or ammunition, all pursuant to the Department of the Interior

25  Departmental Manual, Part 446, Chapter 10 and BLM's Manual Handbook 1112-2 on Safety and

26  Health for Field Operations, Topics 17.5 and 17.6.

27  / / /

28  / / /

76.     The Department of the Interior Departmental Manual, Part 446, Chapter 10 specifically states that: "Each law enforcement officer is responsible for ensuring the security of his/her assigned firearm and other defensive equipment while on or off duty."

77.     BLM's Manual Handbook 1112-2 on Safety and Health for Field Operations, Topic 17.6 specifically states that "[a]ll firearms, when not in active use, shall be stored in a secure place, out of sight, under lock and key. Firearms will be unloaded prior to storage."

78.     BLM's Manual Handbook 1112-2 on Safety and Health for Field Operations, Topic 17.5 specifically states that "Bureau employees are prohibited at all times from using Government-owned vehicles or equipment for the express or incidental purpose of hunting, shooting, or transporting of game, hunters, firearms, or ammunition."

79.     **PLAINTIFFS** allege, that at all times relevant herein, the BLM Ranger who was assigned the .40 caliber SIG Sauer handgun that was later used to kill **KATE** failed to carry out his/her mandatory duties by (1) failing to properly secure his/her firearm; (2) failing to properly store his/her firearm; (3) leaving the firearm in plain view; (4) leaving the firearm in close enough proximity to the window of a vehicle that a passerby could smash the window and grab the firearm; (5) leaving the firearm loaded with lethal bullets; (6) failing to carry the firearm on his/her person at all times; and/or (7) using a government-owned vehicle to transport a firearm and/or ammunition.

80.     The aforementioned manuals were intended to protect against the type of harm suffered by **PLAINTIFFS**, and **KATE** was one of the class of persons for whose protection the aforementioned manuals were adopted.

81.     As a direct and legal result of the wrongful acts and/or omissions of the BLM Ranger, **LOPEZ-SANCHEZ** was allowed gain access to a loaded weapon that he later used to kill **KATE.**

82.     As a further direct and legal result of the wrongful acts and/or omissions of the BLM Ranger, **PLAINTIFFS** suffered the damages as herein above set forth.

/ / /

/ / /

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**C.    Defendant USA – ICE**

83.    **PLAINTIFFS** allege, that at all times relevant herein, ICE and/or ICE officers, officials, agents and/or employees, and each of them, had a mandatory duty to affirmatively detain and/or deport **LOPEZ-SANCHEZ**, a convicted drug felon, pursuant to 8 U.S.C. § 1226(c)(1) and/or 8 U.S.C. § 1357(d).

84.    8 U.S.C. § 1226(c)(1) specifically states: "The Attorney General **shall take into custody any alien** who—(A) is inadmissible by reason of having committed any offense covered in section 212(a)(2), or (B) is deportable by reason of having committed any offense covered in section 237(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) . . . **when the alien is released**, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense."

85.    8 U.S.C. § 1357(d) specifically states: "In the case of an alien who is arrested by a Federal, State, or local law enforcement official for a violation of any law relating to controlled substances, if the official (or another official)—(1) has reason to believe that the alien may not have been lawfully admitted to the United States or otherwise is not lawfully present in the United States, (2) expeditiously informs an appropriate officer or employee of the Service authorized and designated by the Attorney General of the arrest and of facts concerning the status of the alien, and (3) requests the Service to determine promptly whether or not to issue a detainer to detain the alien, the officer or employee of the Service shall promptly determine whether or not to issue such a detainer. **If such a detainer is issued and the alien is not otherwise detained by Federal, State, or local officials, the Attorney General shall effectively and expeditiously take custody of the alien**."

86.    **PLAINTIFFS** allege, that at all times relevant herein, ICE and/or an ICE officer, official, agent, and/or employee, and each of them, failed to carry out their mandatory duties by including but not limited to: (1) failing to detain **LOPEZ-SANCHEZ**; (2) failing to deport **LOPEZ-SANCHEZ**; (3) failing to obtain a judicial order or warrant for the deportation of

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1    **LOPEZ-SANCHEZ**; and/or (4) failing to take custody of **LOPEZ-SANCHEZ** during the

2    nineteen days he was held in SFSD custody after all criminal charges were dropped.

3          87.     The aforementioned statutes were intended to protect against the type of harm

4    suffered by **PLAINTIFFS**, and **KATE** was one of the class of persons for whose protection the

5    aforementioned statutes were adopted.

6          88.     As a direct and legal result of the wrongful acts and/or omissions of ICE and/or an

7    ICE officer, official agent and/or employee, and each of them, **LOPEZ-SANCHEZ** was not

8    deported and allowed to reside in the County and City of San Francisco where he gained access to

9    a loaded weapon that he used to kill **KATE.**

10         89.     As a further direct and legal result of the wrongful acts and/or omissions of ICE

11    and/or an ICE officer, official, agent and/or employee, and each of them, **PLAINTIFFS** suffered

12    the damages as herein above set forth.

13         WHEREFORE Plaintiffs pray for relief set forth below.

14

15

**THIRD CAUSE OF ACTION**
**NEGLIGENCE – SURVIVOR CAUSE OF ACTION**
**(Against All Defendants By Plaintiffs JAMES and LIZ, as co-representatives of the Estate of**
**KATE)**

16

17         90.     **PLAINTIFFS** hereby re-allege and incorporate by reference each and every

18    allegation above as if fully set forth in detail herein.

19         91.     On July 1, 2015 and prior to her death, the foregoing cause of action arose in

20    **KATE**'s favor. Since her death, **LIZ** and **JAMES** have served as representatives for **ESTATE**

21    and are authorized as successor in interest with respect to their interest in the property that was

22    damaged, lost or destroyed in this tragic incident, to pursue any and all legal claims for damages

23    related thereto, and to recover damages for expenses incurred related to medical and/or emergency

24    services related to this incident.

25         92.     At all times prior to this incident, Defendants, and each of them, negligently,

26    carelessly, recklessly, and/or unlawfully acted and/or failed to act, including but not limited to

27    failing to perform mandatory duties so as to cause the death of **KATE.**

28

1    93.    As a direct and legal result of the wrongful acts and/or omissions of Defendants,

2    and each of them, on July 1, 2015, and immediately prior to **KATE**'s death, expenses were

3    incurred for emergency and medical services.

4    94.    As a further direct and legal result of the wrongful acts and/or omissions of

5    Defendants, and each of them, **KATE** also endured great pain and suffering from the bullet wound

6    before dying at the hospital approximately two (2) hours later.

7    WHEREFORE Plaintiffs pray for relief set forth below.

8    

**FOURTH CAUSE OF ACTION**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS**
(48 U.S.C. § 1983)
**(Against MIRKARIMI and CCSF By Plaintiffs JAMES and LIZ individually and as heirs of KATE)**

9

10

11    95.    **PLAINTIFFS** hereby re-allege and incorporate by reference each and every

12    allegation above as if fully set forth in detail herein.

13    96.    **PLAINTIFFS** allege, that at all times herein mentioned, **KATE** possessed a

14    constitutional right to not be deprived of life or liberty without due process.

15    97.    Through The March Memo, which was not reviewed, presented, approved, and/or

16    voted on by a governing body and/or the electorate, **MIRKARIMI** unilaterally mandated an

17    official policy that abridged and/or lowered the safety and security conferred on **KATE** under

18    federal, state, and/or local laws without due process and/or proper governmental purpose, thereby

19    creating the danger to which **KATE** fell victim and doing so with deliberate indifference to the

20    known or obvious danger posed by **LOPEZ-SANCHEZ**.

21    98.    When **MIRKARIMI** issued The March Memo he was acting and/or purporting to

22    act in the performance of his official duties, and at all times relevant, **MIRKARIMI** was a

23    policymaking official of **CCSF**.

24    99.    The March Memo became official policy of **CCSF**, and the failure of

25    **MIRKARIMI** and/or any officer, official, agent, and/or employee of SFSD to notify, contact,

26    communicate, and/or cooperate with ICE regarding **LOPEZ-SANCHEZ**'s release from SFSD

27

28

1   custody occurred as a result of the official policy. Further, the failure was approved by

2   **MIRKARIMI** and/or **CCSF**.

3          100.    By prohibiting the notification to ICE necessary for custody, detention, deportation

4   and/or removal of undocumented convicted felons, the March Memo deprived **KATE** of life and

5   liberty without due process, as required under the United States Constitution. The March Memo

6   amounts to deliberate indifference to federal, state, and/or local law which safeguarded **KATE**'s

7   constitutional rights and is the moving force behind the constitutional violation of her rights.

8          101.    As a direct and legal result of the wrongful acts and/or omissions of **MIRKARIMI**

9   and **CCSF**, and each of them, **PLAINTIFFS** suffered the damages as herein above set forth.

10         WHEREFORE Plaintiffs pray for relief set forth below.

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1   VI.   **PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiffs pray judgment against Defendants as hereinafter set forth:

3          1.      For compensatory and general damages in an amount according to proof;

4          2.      For past and future medical, incidental, and service expenses according to proof;

5          3.      For pre- and post-judgment interest on all damages as allowed by the law;

6          4.      For costs of suit incurred herein;

7          5.      For attorney fees under existing law; and

8          6.      For such other and further relief as the Court may deem just and proper.

9

10  Dated: May 26, 2016          **COTCHETT, PITRE & McCARTHY, LLP**

11

12

13          By: _____

14                      FRANK M. PITRE
                        ALISON E. CORDOVA
15                      *Attorneys for Plaintiffs*

16

17  VII.  **JURY DEMAND**

18          Plaintiffs demand trial by jury on all issues so triable.

19

20  Dated: May 26, 2016          **COTCHETT, PITRE & McCARTHY, LLP**

21

22          By: _____

23                      FRANK M. PITRE
                        ALISON E. CORDOVA
24                      *Attorneys for Plaintiffs*

25

26

27

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**                                                          23