Pages 1 - 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Judge

| | | |
|---|---|---|
| JAMES STEINLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | NO. C 16-02859 JCS |
| | ) | |
| UNITED STATES OF AMERICA, et al, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Friday, December 2, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                 COTCHETT, PITRE & MCCARTHY LLP
                 San Francisco Airport Office Center
                 840 Malcolm Road
                 Burlingame, California  94010
        BY: **FRANK PITRE**
                 **ALISON CORDOVA**
                 **ATTORNEYS AT LAW**

For Defendants:

                 UNITED STATES DEPARTMENT OF JUSTICE
                 450 Golden Gate Avenue,
                 San Francisco, CA 94102
        BY: **ROBIN M. WALL**
                 **ASSISTANT UNITED STATES ATTORNEY**

Reported By:        Rhonda L. Aquilina, CSR #9956, RMR, CRR
                 Official Court Reporter

**APPEARANCES CONTINUED:**

For Defendant:

                              OFFICE OF THE CITY ATTORNEY
                              Sixth Floor - Fox Plaza
                              1390 Market Street
                              San Francisco, California  94102
                    BY:  **MARGARET W. BAUMGARTNER**
                         **DEPUTY CITY ATTORNEY**


**Friday - December 2, 2016**                          **9:51 a.m.**

              P R O C E E D I N G S

                   ---oOo---

          THE CLERK:  We're calling Case Number C16-2859,

Steinle versus United States of America.

          THE COURT:  Appearances, please.

          THE CLERK:  Appearances, please.

          MR. PITRE:  Good morning, Your Honor.  Frank Pitre

appearing on behalf of the Steinle family.

          THE COURT:  Good morning.

          MS. CORDOVA:  Good morning, Your Honor.  Alison

Cordova here on behalf of plaintiffs.

          THE COURT:  Good morning.

          MR. WALL:  Good morning, Your Honor.  Robin Wall on

behalf of the United States.

          THE COURT:  Good morning.

          MS. BAUMGARTNER:  Good morning, Your Honor.  Margaret

Baumgartner on behalf of the City defendants.

          THE COURT:  Good morning.

1          Good morning, everyone.  Thank you for the excellent

2     briefing in the case.  I have studied it and the cases with

3     great care, and I'm happy to hear, briefly, anything you want

4     to add to your submissions.

5          My only real question -- well, I have many questions, but

6     the ones I wanted to ask really have to do with the allegations

7     arising out of the conduct of the Bureau of Land Management.

8     And the questions that are one for each side, or maybe you can

9     both address these, and they are first how the Government

10    distinguishes the stolen vehicle cases.  The Federal Torts

11    Claim Act gives rise to liability to the extent -- same extent

12    as a private person, and the question arises how those stolen

13    vehicle cases in California, which would impose potential

14    liability at least, not dismiss it on a 12(b) motion -- summary

15    judgment is a different matter -- but at this stage of the case

16    how do you deal with those cases?

17         The second issue is sort of a -- I can't tell from the

18    pleadings, but I'm curious to know whether we know whether or

19    not Lopez-Sanchez stole the gun from the ranger's vehicle.

20    That would be my second question.

21         So the first question probably should be properly

22    addressed by the Government first.

23              **MR. WALL:**  Thank you, Your Honor.

24              **THE COURT:**  And anything else you want to say also as

25    well.

1          **MR. WALL:**  Your Honor, the Government agrees that

2   California courts would likely look to the stolen vehicle cases

3   *Palma*, and the *Palma* factors in particular, in evaluating

4   whether there was a potential duty with respect to the storage

5   of the firearm in the BLM ranger's car.

6      I think the more -- the direct case on point would be

7   *Reida -v- Lund*, which is the case that treats directly the

8   negligence tort and the firearm claim under California state

9   law.  Nonetheless, as we walk through, in the reply brief, or

10  in the motion, I'm sorry, the *Palma* factors here don't argue

11  that there was a foreseeable risk of harm that was

12  unreasonable.

13      The -- well, there's an open question, I guess, raised by

14  the pleading as to whether the car was unlocked or not.  I

15  think a fair inference from the pleadings is that the car was

16  locked.  The gun was in a backpack --

17          **THE COURT:**  I don't know.  They get whatever inference

18  is best for them from those pleadings; right?

19          **MR. WALL:**  That's right.  But they don't get the

20  plaintiff -- plaintiff doesn't get the benefit of unreasonable

21  inferences.

22          **THE COURT:**  No, it's not an unreasonable inference

23  that since the allegation is the backpack was taken from the

24  car, that perhaps it was unlocked.

25          **MR. WALL:**  Well, the pleading is also that it was

1  unreasonable to leave the backpack visible in a manner that a

2  smash-and-grab could occur.

3          **THE COURT:**  Okay.  It seems to me of marginal

4  consequence, because I don't think I would dismiss the case on

5  that basis.  Certainly I wouldn't dismiss the case -- well, let

6  me put it this way.  I wouldn't dismiss the case without leave

7  to amend.

8          **MR. WALL:**  Well, I guess then the question arises

9  whether or not --

10          **THE COURT:**  And so what's the question?

11          **MR. WALL:**  Sure.

12          **THE COURT:**  I want you to address specifically.

13  California cases, there's several of them, say that if you

14  leave your keys in the car and it's unlocked, it was unlocked,

15  and some unknown person steals it and injures some unknown

16  person, there can be liability.  Why isn't this a similar

17  situation?

18          **MR. WALL:**  It's not a similar situation, because there

19  are at least two intervening criminal acts in this case.  The

20  first criminal act is the theft of the firearm from the car.

21  The second criminal act --

22          **THE COURT:**  And that's not the same criminal act as

23  stealing the car?

24          **MR. WALL:**  So that would be analogous to stealing the

25  car.  However, here there's a second criminal act, or at least

1  a negligent or reckless act, because there may be a question as

2  to whether Mr. Lopez-Sanchez discharged --

3          **THE COURT:**  That's not the running into other people

4  with a stolen car?

5          **MR. WALL:**  It's four days later, it's the discharge of

6  the firearm in a criminal or criminally reckless manner, that's

7  the second criminal act.  There may be intervening criminal

8  acts.  And I can't answer Your Honor's question regarding

9  whether Mr. Lopez-Sanchez was the thief in question or whether

10  there were intervening criminal acts in connection with the

11  transfer of the firearm from the thief to Mr. Lopez-Sanchez.

12  But I don't think that --

13          **THE COURT:**  You can't answer that because we don't

14  know.

15          **MR. WALL:**  I don't know, Your Honor.

16          **THE COURT:**  I see.

17          **MR. WALL:**  And -- but I don't think it matters whether

18  there were two or more criminal acts.  The fact that there were

19  at least two independent superseding criminal acts takes this

20  out of the application of the stolen car cases, where someone

21  steals a car and then drives it into something or someone.

22          **THE COURT:**  Yeah, but in those -- okay.  I understand

23  what you're saying.  That's fine.

24      Did you want to respond to that?

25          **MS. CORDOVA:**  Yes, Your Honor.  Thank you.

1          First of all, I would agree with Your Honor that the

2    characterization of a stolen vehicle -- it's the same idea as

3    what you said.  There is the criminal act of stealing the

4    weapon and the stolen vehicle, and then the stolen vehicle is

5    used to commit another criminal act injuring somebody,

6    involuntary manslaughter or something along those lines.  We

7    have the same thing here, that the gun is then used to commit a

8    crime, and so we have causation in those other cases.

9          I would also like to say under California --

10         THE COURT:  Well, under those cases the second conduct

11   is a criminal act?  I didn't understand that to be the case,

12   but maybe you can correct me on that.

13         MS. CORDOVA:  And I guess -- I don't think that the --

14   what I would say, Your Honor, is that I don't think the cases

15   foreclose that from happening, whether or not --

16         THE COURT:  So that's the distinction, that those

17   cases were negligent operation of a vehicle, a civil matter,

18   that caused an injury or property damage, et cetera, that's the

19   second intervening act.

20         What the United States is saying -- I'm not necessarily

21   saying I agree with it or disagree with it -- is that the --

22   and there may be more intervening acts, and those will come out

23   in discovery, et cetera, et cetera.  We'll figure that out.

24   There are or there aren't.  But as to the one we know about,

25   that the criminal discharging of a firearm in a fashion that

resulted in this horrible result is materially different from
driving a car into a post and hurting someone.

     **MS. CORDOVA:**  So Your Honor, there's two points I
guess I would make on that, and one is that in the defendant's
brief the defendant does point out in a footnote that there is
facts here that make it seem as if this was not an intentional
act, that the gun, according to the defendant, went off after
he picked it up, without an intent to shoot it, which I would
say would be very similar to someone driving a car negligently.

    I would also say that under California law whether or not
a criminal act is a superseding intervening cause is actually a
question of fact for a jury.  Under the California civil jury
instructions --

     **THE COURT:**  Well, it can be; right?  It can be.

     **MS. CORDOVA:**  Yes.

     **THE COURT:**  The question is whether or not in this
situation the conduct is so extreme that it, as a matter of
law, has a superseding cause.

     **MS. CORDOVA:**  Exactly.

     **THE COURT:**  Why isn't this one then?

     **MS. CORDOVA:**  I would say that it is, because I think
the question comes to in terms of the defendant's liability,
was it -- the question is was it reasonably foreseeable from
what the defendant did wrong that this kind of -- the injury at
the end of the day would have been foreseeable, would have been

1   reasonably foreseeable under the circumstances.  And I believe

2   that leaving a gun with the ammunition in it, not in a locked

3   case, that's not secure to the car, that's not in the glove

4   compartment, it is not in the center console, it's not under a

5   seat, it's simply in a backpack in a high break-in neighborhood

6   in San Francisco where either it could be smashed and grabbed

7   or, as Your Honor said, there's a reasonable inference that the

8   car could have been unlocked, from our pleadings as well.

9   Those are egregious facts for somebody who is a law enforcement

10  officer, understands the risks at play here, understands what a

11  weapon can be used for.

12          THE COURT:  Is it -- it's not -- I'm not sure.  Is it

13  relevant that it's a law enforcement officer's understanding.

14  The question is whether it's reasonably foreseeable.  Does the

15  law enforcement officer's particular understanding matter for

16  that test?

17          MS. CORDOVA:  I believe that it's a reasonable person

18  in like circumstances.  So the idea would be he's been trained

19  on law enforcement safety -- he's -- on how to secure his

20  weapon.  He has specific guides and policy manuals telling him

21  how he should secure his weapon, so he has a greater

22  understanding than an everyday ordinary person.

23          THE COURT:  So does that take him out of the Federal

24  Tort Claims Act, because the only liability that sovereign

25  immunity is waived as to is one who would be liable as a

 1   private citizen would be.

 2          **MS. CORDOVA:**  I would say no, Your Honor, as there's a

 3   case cited in our brief, and I'm sorry that I don't have it in

 4   front of us, but it's a case cited other than the *Palm* case

 5   that says that a police officer can also be negligent for

 6   leaving his vehicle unattended and having --

 7          **THE COURT:**  No, I understand that.  But the question

 8   is about test for foreseeability.  It seems to me that you have

 9   raised an issue if you think that foreseeability for this case,

10   in order to take yourself -- make your point, you have to rely

11   on what a law enforcement officer would know that you may take

12   yourself out of the Tort Claims Act.

13          **MS. CORDOVA:**  And, Your Honor, I guess I would -- my

14   characterization would be that, one, without the law

15   enforcement officer's knowledge, this is still reasonably

16   foreseeable.  Everyone knows what a weapon can be used for.

17          **THE COURT:**  That's the next part, the argument that

18   you wanted to make.

19          **MS. CORDOVA:**  Yes.  Thank you, Your Honor.

20          And I think that *Bigbee* would be the standard on

21   foreseeability.  And according to *Bigbee*, it's not the general

22   character of the event or harm that's important, it's -- it's

23   the general character of the event or harm that's important,

24   not the precise nature of the manner or occurrence.

25          In *Bigbee*, it was someone who was drunk driving careened

1  up onto a sidewalk and hit a telephone booth and hurt and

2  injured the person inside that telephone booth.  It was a

3  criminal act.  They were drunk driving.  But *Bigbee* still found

4  foreseeability and said the person who placed that telephone

5  booth there close to the roadway, it was reasonably foreseeable

6  in light of modern events that that would be what would happen,

7  that somebody could drive up onto the sidewalk and hurt

8  somebody.  They didn't need to predict that that person would

9  be drunk, that there would be a criminal act, just that it

10  could occur, the general character.

11       Here, it's the same idea, the general character that a

12  lethal weapon that's left in an unintended vehicle, unsecured

13  in plain sight, could be used in a dangerous manner or would be

14  used in a way that would not be beneficial to society.

15            THE COURT:  Okay.  Thank you.

16            MR. WALL:  Your Honor, may I address a couple points?

17            THE COURT:  Yes, please.

18            MR. WALL:  First, you know, generally, with respect to

19  foreseeability, this is not a case like *Reida -v- Lund*, which

20  is a negligent storage case, in which the Court found that the

21  act of leaving a lethal weapon in a place accessible to the

22  defendant's children amounted to a proper exercise of due care

23  or whether it amounted to negligent safeguard of a deadly

24  weapon.

25       We don't have a case in California where a negligent

1   firearm is stored and is stolen by a third party in connection

2   with a criminal act, and the gun owner is then held liable for

3   whatever subsequent criminal activity the thief or someone else

4   commits with the stolen weapon.  That is a far cry from the

5   case where a gun is left in a home accessible to children and

6   so as a result someone gets injured.

7         While it's not a California case, a case analyzing a very

8   similar incident, under the same general negligence principles,

9   is *Estate of Strever*, where the Supreme Court in Montana found

10  that it was reasonably unforeseeable that an injury arising

11  from the use of a stolen gun, that was stolen from an unlocked

12  pickup truck parked on the street, was -- it was unreasonably

13  foreseeable by the defendant who left the loaded gun in the

14  car.  And in that case the kids who stole the gun stole it and,

15  in the course of the theft, negligently discharged the gun, and

16  someone was injured at that moment.

17        Here, we have a case where the gun was stolen and, as pled

18  by plaintiffs, four days later the crime was committed in which

19  Ms. Steinle was unfortunately killed.  There is no California

20  case finding that a gun owner becomes liable for those events

21  once the gun has been stolen and is now in the world of

22  criminal commerce.

23              **THE COURT:**  So the cases that you're talking about,

24  are they on motions to dismiss on the pleadings or on summary

25  judgment?

1          **MR. WALL:**  I believe *Estate of Strever* was on a motion

2     to dismiss.  But there are a number of cases that are cited

3     related to liability by gun owners for stolen firearms, and

4     some of them are on summary judgment.

5          **THE COURT:**  Almost all of them are on summary

6     judgment.

7          **MR. WALL:**  That may be true, Your Honor.

8          **THE COURT:**  Yeah.  Okay.

9          **MS. CORDOVA:**  And, Your Honor, I'd also like to point

10    out that under the sovereign immunity, the liability has to be

11    on California state law.  It's very specific that it has to be

12    California substantive law.  So I would ask the Court that the

13    Montana cases, and the other out-of-state cases that they are

14    trying to say that liability would be dismissed on, would not

15    be applicable here, because it must be California state law.

16         **THE COURT:**  Well, I can look to them for guidance;

17    right?

18         **MS. CORDOVA:**  Yes.

19         **THE COURT:**  Anyone else like to say anything else?

20         **MR. PITRE:**  Your Honor, briefly.  One of the things

21    that troubled me when I first had this case was a case that was

22    cited in our briefs called the *Bologna* decision, and it deals

23    with whether or not the mandatory duty that was alleged there,

24    which was the 8 U.S.C. 1373(a), was designed to prevent against

25    the type of harm that occurred.

1        Now, tragically, we're here today because we had

2   undocumented immigrants that were involved in crimes previously

3   that ended up taking the lives of people.

4        I just want to stress that this case, the Steinle case, is

5   dramatically different from the *Bologna* decision.  And I'd like

6   to ask the Court, when it's reviewing this, to take a look at a

7   distinction that I don't think was really addressed in *Bologna*,

8   and that's the interplay between the ordinance here, the

9   amendment in 1992 to what people have called the Sanctuary City

10  Law, which has been often misinterpreted.  Many people think

11  that Sanctuary --

12           **THE COURT:**  So let's stick to this case, and what

13  we're actually talking about.

14           **MR. PITRE:**  Sure.  Correct.

15           **THE COURT:**  So go ahead and make your point.

16           **MR. PITRE:**  My point very simply is when that

17  amendment was made in 1992 to add the provision 12H.2-1, the

18  specific intent was to carve out individuals who were

19  undocumented who had been convicted of felonies.

20        Now, when you look at the statutory scheme, the statutory

21  scheme in terms of what was done, you can -- to me, the

22  reasonable conclusion is in the saying who was this designed to

23  protect?  If you look at it also in the context of the same

24  section 12H5, which says that this was designed for the general

25  welfare, when you put everything together, the conclusion that

1   at least I come out with, Your Honor, that I'd ask the Court to

2   review, is that these amendments were not just to enforce

3   administrative immigration policy.  This was designed to

4   preclude individuals who had previously been convicted of a

5   felony who were undocumented from being out on the street.

6       San Francisco said there's no refuge for you if you're a

7   convicted felon and you're undocumented.  You are being taken

8   off the street to protect the general public from being the

9   victim of a crime.  And that's why if you look at the decision

10  in *Bologna*, they didn't look at that interplay.  The only

11  conclusion one can reach is that San Francisco, by its

12  enactment in 1992, said we don't want people convicted of

13  crimes who are undocumented to be here.  The privilege is

14  revoked.

15      And I look at it as very similar to a license.  If

16  somebody had gotten six tickets in a year and got involved in

17  an accident, there's a mandatory requirement that that license

18  be revoked.  They can't drive.  Now, if that person gets behind

19  a car and they hurt somebody, the state of California

20  Department of Motor Vehicles is liable for the failure to have

21  revoked that license.  They don't have a privilege to drive

22  anymore.

23      Similar thinking here, Your Honor.  If this ordinance, by

24  looking at that language, reasonably interpreting the way you

25  have to interpret it under law, is designed to prohibit

 1   undocumented immigrants who have been convicted of crimes --

 2   and in this particular case somebody who had been convicted of

 3   seven felonies, five of which are related to drugs -- if this

 4   is designed to keep those people out of the Bay Area and to be

 5   deported, which we have said in our complaint, that ICE by its

 6   own admission said had we been notified, we would have been

 7   there, grabbed him, and deported him.

 8       This issue has never been addressed and I think warrants

 9   scrutiny, because in our view this ordinance was designed to

10   protect the public against harm from convicted felons who are

11   undocumented, and I think that's a major distinction that

12   answers a lot of questions that were never addressed by

13   *Bologna*.

14       And I appreciate the time, Your Honor, unless you have

15   further questions.

16       **THE COURT:**  I don't.  But if you want to respond to

17   that, and then we'll wrap up.

18       **MS. BAUMGARTNER:**  Thank you, Your Honor.

19       I think -- *Bologna* is a California case, but I do think

20   that the result is the same, which is an interpretation of

21   federal law with respect to its application to this exact

22   scenario.  In *Bologna*, the Court found that there was nothing

23   about the legislative history of the federal law regulated to

24   this matter, the 18 U.S.C. 13 -- I forget the number off the

25   top of my head -- that indicated that it was designed to

1    provide any kind of private right of action for somebody who is

2    ultimately injured by somebody who had been deported and was an

3    illegal immigrant.  There's nothing different between this case

4    and the *Bologna* case with respect to that.

5         There's also absolutely nothing in 12H or 12I that -- the

6    subsequent administrative code section -- that indicates that

7    this -- that the City and County of San Francisco ever adopted

8    this provision to allow for recovery by a third party who

9    ultimately is injured by somebody who is released.  The

10    legislative history and the language of the statute indicates

11    that its purpose was to create a sanctuary city in which

12    illegal immigrants felt comfortable reporting crimes, for

13    example, to the police department and not have the consequence

14    of particularly being deported just by reporting a crime.  That

15    was the purpose of the statute.  It's quite clear in its

16    legislative history.  In addition, there's nothing in the

17    complaint that suggests that actually the plaintiff is

18    attempting to use our administrative code as sort of the source

19    of a mandatory duty with respect to this.

20         **THE COURT:**  But we have to -- I'll address that

21    anyways, because they've raised it, and they raised it in the

22    motion and brief --

23         **MS. BAUMGARTNER:**  There's nothing in 12H or 12I that

24    mandates any particular person from reporting the release date

25    of any particular person.  That's not a mandatory duty with

1    respect to that.  It creates an exception in certain

2    circumstances, but it does not actually require any specific

3    acts.  And legislative history, as I said, certainly doesn't

4    support a private cause of action or for damages, particularly

5    given the lack of causation, you know, the various breaks in

6    the link, in this particular case.

7            **MR. PITRE:**  Your Honor, if I may briefly respond.

8            **THE COURT:**  Just briefly, because this has all been

9    briefed to a fair degree.  Both points have actually been

10   briefed to a fair degree.  But go ahead, just briefly.

11           **MR. PITRE:**  This is brief.

12    I don't need a private right of action.

13           **THE COURT:**  No, I know that.  I skipped over that to

14   the mandatory duty.

15           **MR. PITRE:**  Thank you.

16           **THE COURT:**  The question is a mandatory duty.

17           **MR. PITRE:**  Yes.  And in terms of a mandatory duty,

18   that's found in the Government Code 815.6 that says if you have

19   an enactment, and ordinance is an enactment for that purpose,

20   and you violate that enactment -- and in this case this is one

21   that is prohibitionary, which is fitting with the *Clausing*

22   case, which recognizes you could have a prohibitionary

23   statute -- all we're saying is that if you look at the

24   combination of 1373 and in the context of the amendment in 1992

25   to 12H.2-1, when you read both together you then see that the

1    protection, including H5 which specifically mentions the

2    general welfare, can only be read that the City and County of

3    San Francisco said if you're a convicted felon, there can be no

4    prohibition on communicating information about the status of

5    that individual when you're in custody.  You cannot interfere

6    with that.  It has made a specific exception for people

7    convicted of felonies who are undocumented.  Now, the only

8    reason you do that is not because you want to promote what I

9    want to call immigration.  The reason you do that is you

10   recognize they present a particular increased risk of harm, and

11   they want those people to be reported to ICE so you get them

12   off the streets.  You can't have that exception except if the

13   ordinance recognized that these folks present a particular

14   danger to the public because they engage in repeat crimes.

15        We have alleged in the complaint all of the statistics of

16   recidivism, of individuals who are undocumented --

17             **THE COURT:**  I understand.

18             **MR. PITRE:**  You put that all together, Judge, you can

19   only read it --

20             **THE COURT:**  I don't want you to read me your brief.

21   You're reading me your brief over and over again.

22             **MR. PITRE:**  I'm trying not to, Your Honor.  I just

23   wanted to distinguish *Bologna*, that you never reach these

24   decisions, that's all I'm saying.

25        I appreciate the time, Your Honor.

1          **MS. CORDOVA:**  And Your Honor, I'm sorry to take us

2    back to The USA's point.  But on the BLM case that they were

3    discussing, the *Strever* case, I just want to note for the Court

4    to distinguish from our case that, one, there's no allegations

5    in the facts here that it was left in a high crime

6    neighborhood, the gun inside of a vehicle, that the vehicle was

7    in a high crime neighborhood; and, two, the allegations are

8    that the gun was in a bag underneath the seat, so it was not in

9    plain view.  And I would say that the facts alleged in our

10   complaint are very different from that and more egregious, much

11   more in line with *Palma*, and also much more in line with their

12   own administrative decision that's been presented to you in the

13   briefs.

14          **THE COURT:**  Anything else?

15          **MR. PITRE:**  No, your Honor.

16          **THE COURT:**  Okay.  Thank you, all.  I will take it

17   under submission and issue an order in due course.

18          **MR. PITRE:**  Very well, Your Honor.

19          **MR. WALL:**  Thank you, Your Honor.

20              (Proceedings adjourned at 10:17 a.m.)

21                        ---oOo---

22

23

24

25

1

2

3                      <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, December 8, 2016

8

9

10

11    _____

12         Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                        Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25