1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7    JAMES STEINLE, et al.,                    Case No.  16-cv-02859-JCS

              Plaintiffs,
8
                                               **ORDER REGARDING MOTIONS TO**
9         v.                                   **DISMISS**

10   CITY AND COUNTY OF SAN                     Re: Dkt. Nos. 21, 36
     FRANCISCO, et al.,
11
              Defendants.

## I.    INTRODUCTION

This action arises from the tragic death of Kathryn Steinle ("Steinle") on July 1, 2015.
Plaintiffs James Steinle and Elizabeth Sullivan—individually, as heirs to Steinle, and as
representatives of Steinle's estate—bring several claims against Defendants Ross Mirkarimi, the
City and County of San Francisco ("San Francisco" or the "City"), and the United States of
America, alleging that but for Defendants' actions and inactions, non-party Juan Francisco Lopez-
Sanchez[1] would not have been in a position to obtain a handgun and shoot Steinle.  Mirkarimi and
the City (collectively, the "City Defendants") and the United States each move to dismiss all
claims against them.  The Court held a hearing on December 2, 2016.

The senseless killing of Ms. Steinle was preceded by a series of actions by various
government actors that have been subject to much criticism.  The job of the Court, however, is
narrow: to determine whether the law permits Plaintiffs to proceed on the legal theories alleged.
For the reasons discussed below, the City Defendants' motion is GRANTED, and the United
States' motion is GRANTED in part and DENIED in part.[2]

---

[1] Plaintiffs originally included Lopez-Sanchez as a defendant, but have since voluntarily dismissed
all claims against him without prejudice.  *See* Notice of Voluntary Dismissal (dkt. 31).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
purposes pursuant to 28 U.S.C. § 636(c).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.       BACKGROUND

### A.       Allegations of the Complaint

A plaintiff's factual allegations are generally assumed to be true at the pleading stage.  This section therefore summarizes the allegations of Plaintiffs' complaint.  Nothing in this Order, including the following summary of Plaintiffs' allegations, should be interpreted as deciding that Plaintiffs' allegations are true or as resolving any issue of fact.

### 1.  Sanctuary City Ordinance and March 13, 2015 Memorandum

Chapter 12H of the San Francisco Administrative Code limits the information that San Francisco and its officers and employees share with federal immigration officials.  Compl. (dkt. 1) ¶ 24; *see also* Pls.' Req. for Judicial Notice in Supp. of Pls.' Opp'n to City Defs.' Mot. to Dismiss ("RJN re Opp'n to City," dkt. 30) Ex. A (Chapter 12H).[3]  Chapter 12H includes an exception for cooperation as required by state or federal law, and it was amended in 1992 to add an exception allowing communication and cooperation with federal authorities regarding individuals previously convicted of felonies.  Compl. ¶ 24; RJN re Opp'n to City Ex. A § 12H.2-1.[4]

On March 13, 2015, then-Sheriff Mirkarimi issued a memorandum to all San Francisco Sheriff's Department personnel regarding protocols for communication with federal Immigration and Customs Enforcement ("ICE") representatives.  Compl. ¶ 30; City Defs.' Req. for Judicial Notice in Supp. of Mot. to Dismiss ("City RJN") Ex. A.[5]  Citing Chapter 12H, the memorandum stated that Sheriff's Department employees "shall not provide" several categories of information

---

[3] To the extent that it is required—as opposed to merely treating Chapter 12H as a source of law—the Court takes judicial notice of Chapter 12H both as a public record not reasonably subject to dispute and also as explicitly relied on and thus incorporated by reference by Plaintiffs' complaint. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Lee v. City of Los Angeles*, 250 F.3d 668, 688−89 (9th Cir. 2001).

[4] The Court notes that Chapter 12H has since been amended to alter the circumstances under which San Francisco resources may be used to assist with enforcement of federal immigration law. *See* S.F. Ordinance No. 96-16, File No. 160022 (approved June 17, 2016), *available at* http://www.sfbos.org/ftp/uploadedfiles/bdsupvrs/ordinances16/o0096-16.pdf.  This Order addresses Chapter 12H as it appeared at the time of the events at issue, before the 2016 amendments.

[5] The Court considers the March 13 memorandum under the incorporation by reference doctrine, as a document "'whose contents are alleged in a complaint and whose authenticity no party questions, but which [is] not physically attached to the [plaintiffs'] pleading.'" *Knievel*, 393 F.3d at 1076 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).

to ICE, including "citizenship/immigration status of any inmate" and "release dates or times."
City RJN Ex. A; *see also* Compl. ¶ 30.  The memorandum instructed employees to provide other
categories of information in response to ICE requests pursuant to state and local law, including
"current charges," "arrest date and location," and "location in custody."  City RJN Ex. A.
Disclosure of any additional information beyond the categories explicitly authorized would require
consultation with the Sheriff's Department's legal counsel, confirmation by counsel that
disclosure was required by law or court order, and authorization by Mirkarimi.  *Id.*; Compl. ¶ 31.
Mirkarimi separately "made it known to ICE that he would not contact them under any
circumstances."  Compl. ¶ 31.

The memorandum included no exception for individuals convicted of a felony.  City RJN
Ex. A.  Before Mirkarimi issued the March 13 memorandum, the Sheriff's Department had freely
"provide[d] information to ICE regarding undocumented immigrant felons in custody."  Compl.
¶ 32.  Mirkarimi had previously met with a Department of Homeland Security official and
informed him that the San Francisco Sheriff's Department would not honor ICE detainer requests
or inform ICE when undocumented immigrants were being released except as required by a court
order or warrant.  *Id.* ¶ 38.

### 2. Release of Lopez-Sanchez

Lopez-Sanchez has been convicted of "at least seven felonies," including several related to
controlled substances and others related to supervised release violations or criminal reentry after
deportation.  *Id.* ¶¶ 21–21.  He has been deported to Mexico at least five times.  *Id.*  After
completing a 46-month sentence at a federal prison on March 26, 2015, Lopez-Sanchez was
released to the custody of the San Francisco Sheriff's Department to face additional felony charges
for selling marijuana.  *Id.* ¶¶ 22, 33.  The charges against him were dropped on March 27, 2015.
*Id.* ¶ 22.  That same day, ICE sent a detainer request asking that the Sheriff's Department notify
ICE forty-eight hours before releasing Lopez-Sanchez and continue to hold him until ICE could
take custody of him.  *Id.* ¶¶ 34–35.  The Sheriff's Department did not respond to the detainer
request or otherwise communicate with ICE, and released Lopez-Sanchez on April 15, 2015,
nineteen days after the charges against him had been dropped.  *Id.* ¶¶ 22, 36.  ICE took no further

United States District Court
Northern District of California

1   action to detain or deport Lopez-Sanchez other than issuing the detainer request.  *Id.* ¶ 39.

2           **3.  Death of Steinle**

3           At some point after his release, Lopez-Sanchez acquired a government-issued handgun.

4   *See id.* ¶¶ 1, 44−45.  Despite training and policies requiring rangers to ensure the security of their

5   firearms and to leave them "in a secure place, out of sight, under lock and key" and unloaded

6   when not in use, on June 27, 2015 a U.S. Bureau of Land Management ("BLM") ranger left his

7   handgun loaded and unlocked in a backpack in an unattended vehicle in downtown San Francisco,

8   "in plain sight of passersby's [sic] and within reach of someone smashing the window of the

9   vehicle."  *Id.* ¶¶ 40−44.  The handgun was stolen from the vehicle.  *Id.* ¶ 44.  The Complaint does

10  not specify whether Lopez-Sanchez himself stole the handgun or acquired it later.

11          The evening of July 1, 2015, four days after the handgun was stolen and approximately

12  two and a half months after Lopez-Sanchez was released by the Sheriff's Department,  Lopez-

13  Sanchez was under the influence of narcotics and "acting bizarrely" near Pier 14 of the San

14  Francisco Embarcadero.  *Id.* ¶ 17, 20.  Steinle was walking in the area with her father.  *Id.* ¶ 17.

15  Lopez-Sanchez shot and killed Steinle  *Id.* ¶ 19.

16          Plaintiffs contend that Defendants should have been aware of the risk that Lopez-Sanchez

17  would engage in violence based on: (1) a 2008 incident in which an undocumented immigrant

18  with a history of violent felonies killed three people after he was released from custody in San

19  Francisco, leading to a lawsuit against the City; and (2) studies demonstrating recidivism rates for

20  undocumented immigrant criminals ranging from 16% to 28%.  *Id.* ¶¶ 28−29.

21          **4.  Claims**

22          Plaintiffs' first claim is for "general negligence" against all Defendants, citing sections

23  815.2(a) and 820(a) of the California Government Code.  *See id.* ¶¶ 46−64.  Plaintiffs contend that

24  the City Defendants acted negligently by issuing the March 13 memorandum, failing to share

25  information with ICE and forbidding employees from doing so, and ignoring the detainer request

26  from ICE regarding Lopez-Sanchez.  *Id.* ¶ 47.  According to Plaintiffs, such actions were outside

27  the scope of the City Defendants' discretion because they violated state and federal law,

28  specifically 8 U.S.C. § 1373(a), section 11369 of the California Health and Safety Code, and

United States District Court
Northern District of California

4

section 7282.5 of the California Government Code.  Compl. ¶ 48.  Plaintiffs also contend that the United States is responsible for the BLM ranger's negligence in leaving a loaded firearm where it could easily be stolen, and for ICE's negligence in failing to detain and deport Lopez-Sanchez.  *Id.* ¶¶ 55−64.

Plaintiffs' second claim is for "public entity negligence" against all Defendants, citing section 669 of the California Evidence Code, which sets forth the standard for negligence per se. *See id.* ¶¶ 68−89.  Plaintiffs contend that the City Defendants were negligent under that standard because they restricted Sheriff's Department employees' discretion to cooperate with ICE in violation of state and federal law.  *Id.* ¶¶ 69−72.  Plaintiffs also argue that agents of the United States were negligent under that standard because the BLM agent did not follow certain provisions of BLM and Department of the Interior manuals regarding firearm security and storage, *id.* ¶¶ 75−82, and because ICE did not take custody of Lopez-Sanchez despite federal laws requiring the Attorney General of the United States to take custody of certain aliens, *id.* ¶¶ 83−86.

Plaintiffs' third claim, brought by Plaintiffs in their capacity as representatives of Steinle's estate, is for basic negligence against all Defendants.  *Id.* ¶¶ 90−94.  Plaintiffs' fourth and final claim is under 42 U.S.C. § 1983 against the City Defendants, alleging that the March 13 memorandum "deprived [Steinle] of life and liberty without due process" by prohibiting Sheriff's Department employees from notifying ICE when Lopez-Sanchez was released.  *Id.* ¶¶ 95−101.

**B.   Arguments**

**1.  The City Defendants' Motion to Dismiss**

The City Defendants move to dismiss all claims against them.  *See generally* City Mot. (dkt. 21).  First, they contend that Plaintiffs' negligence claims rest on a supposed duty to protect Steinle from Lopez-Sanchez's criminal act, and that California law does not recognize such a duty except where "the government had a direct relationship with the victim and placed the victim in a position of danger."  *Id.* at 5−7 (citing, *e.g.*, *Zelig v. County of Los Angeles*, 27 Cal. 4th 1112 (2002); *Wallace v. City of Los Angeles*, 12 Cal. App. 4th 1385 (1993)).  According to the City Defendants, they had no such relationship with Steinle.  *Id.* at 7.  The City Defendants contend that similar principles bar Plaintiffs' § 1983 due process claim.  *Id.* at 13−14.

The City Defendants also argue that the statutes regarding communication with federal immigration authorities cited in Plaintiffs' complaint—specifically, 8 U.S.C. § 1373 and section 7282.5(a)(2) of the California Government Code—do not create the sort of mandatory duty actionable under California law, and that those statutes do not by their terms require a county sheriff to permit his or her subordinates either to detain an individual based on a federal immigration hold or to inform ICE of a detainee's release date.  *Id.* at 7−10.  Moreover, according to the City Defendants, violating a statutory duty only gives rise to liability if the statute was intended to protect people in the position of the person injured, and a California appellate court has held that at least one of the statutes at issue here, § 1373, was not intended to protect members of the public from violence at the hands of released immigrants.  *Id.* at 10.

Next, the City Defendants contend that sections 845.8(a) and 846 of the Government Code, which immunize public employees and entities from liability for harm resulting from decisions regarding the release of prisoners, as well as section 820.2 of the Government Code, which immunizes public employees from liability for harm resulting from exercises of discretion vested in them, apply here to bar Plaintiffs' claims.  *Id.* at 10−11.

Finally, the City Defendants argue that "the chain of causation is too attenuated and speculative to establish proximate cause," because "several other entities and persons (including Lopez-Sanchez himself) would have had to take actions outside of [the City Defendants'] control to effect Lopez-Sanchez's removal."  *Id.* at 12−13.

## 2.  Plaintiffs' Opposition to the City Defendants' Motion

According to Plaintiffs, their claims against the City Defendants should be allowed to proceed based on Mirkarimi's "blatant disregard for the mandate imposed by San Francisco Administrative Code Section 12[H].2-1," which Plaintiffs contend "created a mandatory duty not to prohibit employees from communicating with ICE."  Opp'n to City Mot. (dkt. 29) at 1−2.  Plaintiffs make clear that their claims against the City Defendants are not based on "failure to warn or making the decision to release Lopez-Sanchez," but instead rest on "Mirkarimi's decisions [sic] to issue the March Memo, which forbid employees from contacting ICE, ignored ICE's detainer request, and failed to notify ICE regarding Lopez-Sanchez's release on April 15."  *Id.* at

1, 5 (capitalization altered).

Plaintiffs argue that a mandatory duty sufficient to support a claim can arise from prohibitory language in statutes—if a statute forbids a certain action, then public officials have a mandatory duty not to take that action.  *See id.* at 6−9.  Plaintiffs focus their argument on section 12H.2-1 of the San Francisco Administrative Code, which at the time of the events at issue provided that "[n]othing in this Chapter shall preclude any City and County department, agency, commission, officer or employee from" reporting information about or cooperating with a federal request for information regarding individuals convicted of felonies.  *Id.* at 9; *see also* RJN re Opp'n to City Ex. A § 12H.2-1.  According to Plaintiffs, that language was intended to "prohibit all restrictions on the use of [San Francisco] resources to assist ICE in the apprehension of undocumented felons."  Opp'n to City Mot. at 10; *see also id.* at 12 (noting the use of the word "shall" in section 12H.2-1).  Plaintiffs also contend that section 12H.2-1 is consistent with 8 U.S.C. § 1373(a), California Government Code section 7282.5, and California Health and Safety Code section 11369, all of which, according to Plaintiffs, "prohibit all restrictions on voluntary communications with ICE regarding undocumented felons."  *Id.*  Plaintiffs cite *Bologna v. City & County of San Francisco*, 192 Cal. App. 4th 429, 438 (2011), as support for this interpretation of § 1373, and note that the California Attorney General issued an opinion in 1992 stating that local governments may not bar their employees from cooperating with federal immigration officials.  Opp'n to City Mot. at 11 (citing 75 Ops. Cal. Att'y Gen. 270 (1992)).[6]

Plaintiffs next turn to the question of whether the duty at issue was designed to protect against the injury suffered.  *Id.* at 13−14.  Acknowledging the *Bologna* court's holding that 8 U.S.C. § 1373 and Health and Safety Code section 11369 were *not* intended to protect members of the public from violence, Plaintiffs instead rely on Chapter 12H, the purpose of which was not addressed in *Bologna*, arguing that the exemption of felons from San Francisco's general sanctuary city policy "clearly demonstrates the purpose behind this amendment was to protect the

---

[6] Although Plaintiffs note the California Attorney General's position in passing, neither their complaint nor their opposition brief argues that the March 13 memorandum or any portion of Chapter 12H violates the Supremacy Clause of the United States Constitution.  Nor does any defendant attack the constitutional validity of § 1373 or any other statute at issue.

United States District Court
Northern District of California

safety of the community." *Id.*

Plaintiffs also argue that their claim for general negligence should proceed, even absent a statutory duty, because the harm to Steinle was a reasonably foreseeable result of both the March 13 memorandum, which established a policy of not providing certain information to ICE, and Mirkarimi's own failure to contact ICE himself regarding Lopez-Sanchez's release. *Id.* at 14. Citing the test of *Rowland v. Christian*, 69 Cal. 2d 108 (1968), Plaintiffs contend that basic principles of California negligence law support their claim. Opp'n to City Mot. at 14−17. According to Plaintiffs, their claim is not based on "failure to warn or failure to protect," but rather on "fail[ure] to use reasonable care to prevent harm to others." *Id.* at 14. Plaintiffs also argue that although several intervening steps would have had to take place after the Sheriff's Department contacted ICE before Lopez-Sanchez would have been removed from the country, their allegations that such steps would have occurred must be taken as true at the pleading stage, and the causal chain of this case is not so attenuated as in the cases cited by the City Defendants. *Id.* at 17−18.

Plaintiffs contend that the City Defendants cannot claim immunity under sections 845.8(a) and 846 of the Government Code because Plaintiffs are not challenging a decision to release Lopez-Sanchez, but rather the decision to issue the March 13 memorandum prohibiting Sheriff's Department employees from providing certain information to ICE, including release dates. *Id.* at 18−19. Plaintiffs also argue that the City Defendants cannot claim immunity for discretionary acts under section 820.2 of the Government Code because "the acts were mandatory not discretionary," and the City Defendants "are not vested with authority to contravene the law." *Id.* at 19.

Finally, Plaintiffs argue that their § 1983 claim should proceed based on theories of both procedural and substantive due process violations. *Id.* at 19−23. With respect to procedural due process, Plaintiffs contend that "the Constitution requires some kind of a hearing before the State deprives a person of life or liberty," and the March 13 memorandum—which Mirkarimi implemented without a hearing or public notice—deprived Steinle of her "right to life and liberty." *Id.* at 20−21. With respect to substantive due process, Plaintiffs acknowledge that the Constitution does not generally create an affirmative duty to protect, but argue that they should be allowed to proceed on this claim based on decisions recognizing an exception to that rule where affirmative

8

1   state actions created or increased danger to a plaintiff.  *Id.* at 21−23.

2   ### 3.  The City Defendants' Reply

3   The City Defendants' reply brief reiterates their position that the City cannot be held liable

4   for negligent failure to protect Steinle absent a breach of some statutory duty.  City Reply (dkt. 32)

5   at 2−3 (citing, *e.g.*, *Zelig*, 27 Cal. 4th 1112).  They also argue that they breached no actionable

6   statutory duty, because 8 U.S.C. § 1373 and Health and Safety Code section 11369 were not

7   intended to protect the public from criminal violence, *id.* at 3 (citing *Bologna*, 192 Cal. App. 4th

8   429), and because neither those statutes nor Government Code section 7282.5 address sharing

9   detainees' release dates with federal immigration officials, *id.* at 4.  According to the City

10  Defendants, policies and practices regarding the Sheriff's Department's response to detainer

11  requests from federal officials fall within the discretionary authority of the sheriff.  *Id.* at 4−5.

12  The City Defendants next address Plaintiffs' argument that Chapter 12H of the San

13  Francisco Administrative Code created a mandatory duty and civil liability for breach of that duty.

14  *Id.* at 6−8.  According to the City Defendants, Plaintiffs rely on the word "shall" in that ordinance

15  without context, and the language of the statute, i.e., "Nothing in this Chapter shall preclude . . . ,"

16  "does not require that an employee act in a specific or mandatory way—it simply means that in

17  certain situations an employee would not violate the particular ordinance by providing

18  information."  *Id.* at 7; *see* RJN re Opp'n to City Ex. A § 12H.2-1.  The City Defendants also

19  argue that Plaintiffs have not demonstrated that any part of Chapter 12H was intended to protect

20  the public from criminal acts, and note that section 12H.5 states that Chapter 12H is not intended

21  to create civil liability.  City Reply at 8.

22  The City Defendants contend that Plaintiffs' allegations regarding causation are too

23  speculative to be taken as true under the *Twombly* pleading standard, and that even if the steps

24  leading to Steinle's death can be traced back to the City Defendants' decisions, the connection is

25  too attenuated to establish proximate causation under California law.  *Id.* at 8−9.  They also argue

26  that discretionary immunity under Government Code section 820.2 applies "[i]f any part of the

27  acts plaintiffs claim creates [sic] liability includes discretionary decisions," and therefore applies

28  here.  *Id.* at 9.

United States District Court
Northern District of California

1     As for Plaintiffs' § 1983 claim, the City Defendants argue that the cases Plaintiffs cite for

2  substantive due process violations based on creating a risk of harm all involve actions that "placed

3  a specific, identifiable persons [sic] in a greater position of danger than without the affirmative

4  actions of law enforcement." *Id.* at 9−10.  The City Defendants also contend that Plaintiffs have

5  not stated a procedural due process claim because no law required a public hearing before

6  Mirkarimi issued a directive to his staff such as the March 13 memorandum.  *Id.* at 10.

### 4.  The United States' Motion to Dismiss

8     The United States structures its motion to address separately Plaintiffs' claims regarding

9  ICE's failure to detain Lopez-Sanchez and Plaintiffs' claims regarding the gun stolen from the

10 BLM ranger's vehicle.  To the extent that the United States' motion is based on sovereign

11 immunity, it is a motion to dismiss for lack of jurisdiction rather than for failure to state a claim.

12 *See* U.S. Mot. (dkt. 36) at 1.

13    With respect to claims regarding ICE, the United States first argues that it is protected by

14 sovereign immunity under the discretionary function exception, a statutory rule providing that

15 waiver of immunity under the Federal Tort Claims Act ("FTCA") does not apply to claims based

16 on a federal employee or agency's "'exercise or performance or . . . failure to exercise or perform

17 a discretionary function or duty . . . whether or not the discretion involved be abused.'"  *Id.* at 6

18 (quoting 28 U.S.C. § 2680)).  According to the United States, the decision to detain and deport

19 aliens falls within ICE's prosecutorial discretion, even under the ostensibly mandatory language of

20 8 U.S.C. § 1226(c).  *Id.* at 7−10.  The United States cites decisions by other courts acknowledging

21 that ICE cannot detain every alien who is subject to removal.  *See, e.g.*, *id.* at 10 (citing *Lora v.*

22 *Shanahan*, 804 F.3d 601, 612 (2d Cir. 2015)).  The United States also argues that the decision of

23 whether to detain and deport a given alien depends on "the type of judgment that the [discretionary

24 function] exception was intended to shield, *i.e.*, . . . considerations of public policy."  *Id.* at 11.

25 The United States relies in part on a declaration by Christopher Shanahan, Acting Assistant

26 Director for Enforcement and Removal Operations at ICE, discussing ICE's resource constraints

27 and decision making processes.  *Id.*; Shanahan Decl. (dkt. 36-1).

28    The United States also argues that even if the discretionary function exception does not

United States District Court
Northern District of California

10

United States District Court
Northern District of California

apply, the FTCA does not waive sovereign immunity for violations of federal law, and Plaintiffs therefore cannot pursue a claim for breach of duties set by federal law even where such a claim is framed as negligence per se under California law. *Id.* at 13–14. In a footnote, the United States suggests that Plaintiffs' claims for "public entity negligence" by ICE may not proceed under the FTCA because that statute only waives sovereign immunity for claims "where the United States, *if a private person*, would be liable," 28 U.S.C. § 1346(b)(1) (emphasis added), not for circumstances where local law would impose liability on a public entity, and because "it is not clear that there are any private analogs under California state law applicable to ICE's conduct at issue here, which involved decisions regarding detention and deportation." U.S. Mot. at 13–14 n.5 (citing *United States v. Olson*, 546 U.S. 43, 44 (2005)). The United States also contends that Plaintiffs cannot state a claim under California law because California does not recognize a duty to protect others absent a special relationship with the victim, which Plaintiffs do not allege here. *Id.* at 14–17. Finally, the United States argues that, based on Plaintiffs' allegations, ICE's failure to detain Lopez-Sanchez was not sufficiently connected to Steinle's death to be a proximate cause under California law. *Id.* at 17–18.

Turning to the claims based on the stolen gun, the United States again argues that it has not waived sovereign immunity for claims based on federal law, and that Plaintiffs therefore cannot base a claim on the BLM ranger's failure to follow firearm storage procedures set forth in a BLM handbook. *Id.* at 19. The United States also contends that although California recognizes liability in some circumstances for negligent storage of firearms and requires "a high degree of care" from gun owners, *id.* at 19–20 (citing *Reida v. Lund*, 18 Cal. App. 3d 698, 704 (1971); *Warner v. Santa Catalina Island Co.*, 44 Cal. 2d 310, 317 (1955)), the circumstances for imposing liability are not present here, and the Court should follow numerous decisions from other jurisdictions declining to impose liability on gun owners for acts committed with stolen firearms, *id.* at 20–23. According to the United States, the BLM ranger did not owe a duty to persons such as Steinle who might be injured by his stolen gun, and the alleged failure to secure the gun was not a legal proximate cause of Steinle's death. *Id.*

United States District Court
Northern District of California

### 5.  Plaintiffs' Opposition to the United States' Motion

Plaintiffs begin their opposition brief with the argument that the Court should not consider Shanahan's declaration, citing the rule that motions under Rule 12(b)(6) are based only on the allegations of the complaint and certain exceptions such as documents subject to judicial notice. Opp'n to U.S. Mot. (dkt. 38) at 5.

Next, Plaintiffs argue that ICE is not immune to suit based on an exercise of discretion, although Plaintiffs focus on California Government Code section 820.2 and California court decisions interpreting that statute, rather than on the discretionary function exception to the FTCA's waiver of sovereign immunity on which the United States relies in its motion.  *See id.* at 5–6, 8–10.  According to Plaintiffs, 8 U.S.C. § 1226(c) imposes a mandatory, not discretionary, duty on ICE to detain certain aliens.  *Id.* at 6–8 (citing, *e.g.*, *Demore v. Kim*, 538 U.S. 510, 520–21 (2003)).  Plaintiffs also contend that, under California law, whether a decision actually qualifies for discretionary immunity is often, and is here, a question of fact inappropriate for resolution on the pleadings.  *Id.* at 8–10.  Plaintiffs argue that even if the decision of *whether* to detain Lopez-Sanchez was discretionary, "the lower-level 'ministerial' or 'operational' decisions made to carry out that detention were not immunized from liability."  *Id.* at 10.  Plaintiffs contend that the detainer request that ICE sent to the Sheriff's Department demonstrates that ICE had already made the decision to detain Lopez-Sanchez, and that its failure to do so is therefore attributable to shortcomings in the execution of that decision, not to a discretionary policy decision.  *Id.* at 9–10.

Plaintiffs also argue that the United States is subject to a negligence claim under California law because it was reasonably foreseeable that Lopez-Sanchez would engage in crime if ICE failed to detain him, and that proximate causation is a question of fact inappropriate for resolution at this stage of the case.  *Id.* at 11–13, 15–17.  According to Plaintiffs, their claim that ICE failed to carry out a mandatory duty to detain Lopez-Sanchez is not a claim that ICE failed to provide police protection, which would be barred by California Government Code section 845.  *Id.* at 13–15.

As for their claims based on the BLM ranger's failure to secure his firearm, Plaintiffs argue that general negligence principles apply because it was foreseeable that the gun could be stolen

United States District Court
Northern District of California

and used in a manner that would lead to harm. *Id.* at 17–19.  Plaintiffs cite a California Supreme Court decision holding summary judgment inappropriate where the defendant's employees left the key in the ignition of a truck and the plaintiff was injured by a thief who stole the truck, and an administrative decision holding that a BLM agent acted negligently in leaving a gun accessible in his home when he hosted a gathering of friends after drinking at a bar. *Id.* at 17–19 (citing *Palma v. U.S. Indus. Fasteners*, 26 Cal. 3d 171 (1984); *In re Cain*, 48 OHA 85 (2015) (included in the record as Exhibit C to Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Opposition to the United States' Motion, dkt. 38-1)).  Plaintiffs also argue that proximate cause is a question of fact, and that they have adequately alleged that the BLM ranger's failure to secure his firearm was a substantial factor in causing Steinle's death. *Id.* at 19.

Finally, Plaintiffs argue that the United States' motion to dismiss for lack of jurisdiction must be denied because the FTCA waives sovereign immunity, and claims for negligence per se under California law, as described in Evidence Code section 669, fall within the scope of that waiver. *Id.* at 20–21.  Plaintiffs note that Evidence Code section 669.1 provides that federal agency manuals adopted pursuant to the Administrative Procedure Act can give rise to a duty under section 669, and argue that noncompliance with the Department of the Interior manual which governs proper storage of BLM firearms therefore supports a claim for negligence per se under California law. *Id.*  Plaintiffs do not address 28 U.S.C. § 2680, which creates an exception for discretionary acts to the FTCA's waiver of sovereign immunity, or the United States' argument that the FTCA does not waive sovereign immunity for state negligence claims premised on violations of duties established by federal law. *See id.*; U.S. Mot. at 6, 13–14.

### 6.  The United States' Reply

The United States argues in its reply that the Court may consider Shanahan's declaration in resolving the question of sovereign immunity, because sovereign immunity is a jurisdictional question and extrinsic evidence is appropriate on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, as opposed to a motion to dismiss for failure to state a claim under Rule 12(b)(6).  U.S. Reply (dkt. 39) at 1–2.

The United States also contends that the discretionary function exception to the FTCA's

1    waiver of sovereign immunity is a question of federal law, and that the authorities Plaintiffs cite

2    interpreting section 820.2 of the California Government Code are therefore irrelevant.  *Id.* at 3.

3    The United States notes that, contrary to a rule that Plaintiffs cite under California law, analysis of

4    the FTCA discretionary function exception depends not on "'"'the agent's subjective intent in

5    exercising the discretion conferred by statute or regulation, but on the nature of the actions taken

6    and whether they are susceptible to policy analysis.'"'"  *Id.* (quoting U.S. Mot. at 6–7 (quoting

7    *United States v. Gaubert*, 499 U.S. 315, 325 (1991))).  According to the United States, no statute

8    imposed a nondiscretionary duty on ICE to take the particular actions that Plaintiffs claim it

9    should have, because "[e]ven assuming for the sake of argument that Section 1226(c) required ICE

10   to detain Mr. Lopez-Sanchez, plaintiffs have failed to identify any federal statute or regulation that

11   mandated <u>how</u> ICE was supposed to do so."  *Id.* at 4.

12           The United States notes that Plaintiffs' opposition does not respond to the United States'

13   argument that the FTCA does not allow claims based on a duty imposed by federal law, or to its

14   argument that the FTCA does not allow claims based on theories of liability specific to public

15   entities rather than applicable to private persons.  *Id.* at 5−6.  The United States also reiterates its

16   argument that the discretionary function exception applies.  *Id.* at 6.  According to the United

17   States, Plaintiffs fail to identify any applicable source of liability under state law, because—

18   despite Plaintiffs' assertions to the contrary—their claims are best viewed as alleging a failure to

19   prevent crime, and California law only recognizes such claims where the defendant has a "special

20   relationship" with either the perpetrator or the victim.  *Id.* (citing *Vu v. Singer Co.*, 706 F.2d 1027,

21   1029 (9th Cir. 1983)).  The United States again argues that the causal chain from ICE's failure to

22   detain Lopez-Sanchez to Steinle's death is too attenuated to constitute proximate cause, that

23   Lopez-Sanchez's criminal conduct serves as a superseding cause and bars liability, and that a case

24   on which Plaintiffs rely, *Braman v. State of California*, 28 Cal. App. 4th 344 (1994), is

25   distinguishable because the chain of causation was more direct and did not include criminal

26   conduct by a third party.  U.S. Mot. at 7.

27           As for the BLM ranger's failure to secure his handgun, the United States again contends

28   that the sequence of events was too attenuated to impose liability on the United States for Steinle's

United States District Court
Northern District of California

14

1   death, *id.* at 9, and argues that the manual on which Plaintiffs rely cannot serve as a basis for

2   negligence per se because it was not adopted pursuant to the Administrative Procedure Act as

3   required by Evidence Code section 669.1 (although the United States offers no evidence or

4   authority to support this assertion), and because the FTCA does not waive sovereign immunity for

5   claims based on a duty imposed by federal law, including a duty set by a federal agency manual.

6   *Id.* at 9–10.

7   **III.    ANALYSIS**

8       **A.    Legal Standard**

9         A complaint may be dismissed for failure to state a claim on which relief can be granted

10  under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss

11  under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp.*

12  *Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a plaintiff's burden at the pleading stage

13  is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading

14  which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim

15  showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

16        In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

17  takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

18  non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

19  Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

20  would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

21  1990).  A complaint must "contain either direct or inferential allegations respecting all the material

22  elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v.*

23  *Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

24  1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

25  of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

26  (quoting *Twombly*, 550 U.S. at 555).  "[C]ourts 'are not bound to accept as true a legal conclusion

27  couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S.

28  265, 286 (1986)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of

United States District Court
Northern District of California

15

'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

When a defendant moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff, as the party seeking to invoke the court's jurisdiction by filing the complaint, bears the burden of establishing subject matter jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A defendant may attack the court's jurisdiction as it appears on the face of the complaint or by presenting affidavits and other evidence. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A court considering a motion under Rule 12(b)(1) "need not presume the truthfulness of the plaintiffs' allegations" if a defendant submits extrinsic evidence. *Id.*

### B.   Claims Against the City Defendants

As noted above, Plaintiffs' complaint asserts four claims against the City Defendants: "General Negligence - Wrongful Death," citing California Government Code sections 815.2(a) and 820(a), "Public Entity Negligence - Wrongful Death," citing California Evidence Code section 669, "Negligence - Survivor Cause of Action," citing no specific statutory provision, and "Deprivation of Federal Civil Rights," citing "48 [sic] U.S.C. § 1983" (presumably referring to 42 U.S.C. § 1983). *See* Compl. ¶¶ 46−101. The parties' arguments generally group the first three claims into two theories of liability: negligence per se, which depends on the violation of a specific duty imposed by statute, and general negligence, which depends on a duty of care under the common law. The analysis is therefore addresses three theories of liability: (1) negligence per se; (2) general negligence; and (3) deprivation of civil rights under § 1983.

#### 1.   Negligence Per Se

Plaintiffs' negligence per se claims against the City Defendants depend on the theory that the March 13 memorandum violated a specific duty imposed by federal, state, or local law. Section 669 of the California Evidence Code, which Plaintiffs cite as the basis of their second claim, *see* Compl. ¶¶ 68−89, provides that failure to exercise due care is presumed where "(1) [a

United States District Court
Northern District of California

1    defendant] violated a statute, ordinance, or regulation of a public entity; (2) The violation

2    proximately cause death or injury to a person or property; (3) the death or injury resulted from an

3    occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

4    (4) the person suffering the death or injury . . . was one of the class of persons for whose

5    protection the statute, ordinance, or regulation was adopted."  Cal. Evid. Code § 669(a).

6        "Except as provided by statute . . . [a] public entity is not liable for any injury, whether

7    such injury arises out of an act or omission of the public entity or a public employee or any other

8    person."  Cal. Gov't Code § 815.  In order to proceed on claims against the City, Plaintiffs must

9    therefore identify a statute specifically authorizing public entity liability as an exception to section

10   815 of the Government Code.  One such statute parallels the negligence per se standard: "Where a

11   public entity is under a mandatory duty imposed by an enactment that is designed to protect

12   against the risk of a particular kind of injury, the public entity is liable for an injury of that kind

13   proximately caused by its failure to discharge the duty" unless it reasonably attempted to do so.

14   *Id.* § 815.6.  As discussed in more detail in the context of Plaintiffs' general negligence claims,

15   public entities can also be vicariously liable for injuries caused by their employees.  *Id.* § 815.2;

16   *see also Zelig*, 27 Cal. 4th at 1127.

17       Before the Court addresses the statutes and ordinance that Plaintiffs invoke, one principle

18   that is *not* at issue here warrants a brief explanation.  Plaintiffs do not claim that any federal law

19   *requires* state or local law enforcement to assist with the administration of federal immigration

20   law.  Rather, Plaintiffs argue that the state and federal statutes at issue here limit government

21   entities' ability to *restrict* cooperation with federal immigration authorities.  According to

22   Plaintiffs, all of these statutes "prohibit all restrictions on voluntary communication with ICE

23   regarding undocumented felons," and Mirkarimi's memorandum therefore violated the law by

24   instructing his subordinates not to share certain information with ICE except under specific

25   circumstances.  Opp'n to City Mot. at 10.  The Court disagrees.  As discussed below, none of the

26   statutes that Plaintiffs cite have so broad a scope—as is relevant here, none address restrictions on

27   informing ICE of a detainee's release date.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

a. <u>8 U.S.C. § 1373(a)</u>

The only federal statute at issue, 8 U.S.C. § 1373(a), reads as follows:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service[7] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a).

The question at issue here is whether § 1373(a) prohibits a local law enforcement official from significantly restricting the circumstances in which his subordinates can share an undocumented inmate's release date with ICE. Although the March 13 memorandum also restricted providing the "citizenship/immigration status of any inmate" to ICE, *see* City RJN Ex. A, Plaintiffs' theory of liability relies on Sheriff's Department employees' inability to communicate Lopez-Sanchez's release date to ICE, not his citizenship status, *see* Compl. ¶ 37. Given that ICE issued a detainer request for Lopez-Sanchez well before his release, there is no question that ICE was aware of Lopez-Sanchez's immigration status. *Id.* ¶ 34.

Plaintiffs rely on *Bologna*, a California state appellate decision, which characterized § 1373(a) as "invalidat[ing] all restrictions on the voluntary exchange of immigration information between federal, state and local government entities and officials and federal immigration authorities." *Bologna*, 192 Cal. App. 4th at 438. The court of appeal apparently reached that conclusion based on the statute's legislative history, noting a House of Representatives conference report that described the purpose of the statute as to "'prevent any State or local law . . . that prohibits or in any way restricts any communication between State and local officials and the INS,'" and somewhat similar language in a Senate report. *Id.* at 439 (quoting without citation H.R. Conf. Rep. No. 104-725, at 383 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2649, 2771; also discussing S. Rep. No. 104-249, at 19 (1996)) (ellipsis in original). The *Bologna* court ultimately held that neither § 1373(a) nor Health and Safety Code section 11369 supported a cause of action against the City because neither was intended to prevent violent crime. *Id.* at 437−40.

---

[7] Since the enactment of § 1373, ICE is among the agencies that have succeeded the role of the former Immigration and Naturalization Service, commonly known as the INS.

1    This Court is not bound by the state court's interpretation of federal law,[8] and respectfully

2    disagrees with the *Bologna* court's characterization of the scope of § 1373(a).  "As [the Supreme

3    Court has] repeatedly held, the authoritative statement is the statutory text, not the legislative

4    history or any other extrinsic material.  Extrinsic materials have a role in statutory interpretation

5    only to the extent they shed a reliable light on the enacting Legislature's understanding of

6    otherwise ambiguous terms."  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568

7    (2005).  The Ninth Circuit has explained in some detail why the Constitution does not permit

8    giving legislative effect to language found only in congressional reports that is not consistent with

9    the language of a statute itself:

10           The principle that committee report language has no binding legal
11       effect is grounded in the text of the Constitution and in the structure
         of separated powers the Constitution created. Article I, section 7,
12       clause 2 of the Constitution is explicit about the manner in which
         Congress can take legally binding action. Members of Congress
13       cannot use committee report language to make an end run around
         the requirements of Article I. If Congress wishes to alter the legal
14       duties of persons outside the legislative branch, including
         administrative agencies, it must use the process outlined in Article I.
15       *See INS v. Chadha*, 462 U.S. 919, 952, 103 S. Ct. 2764, 77 L. Ed. 2d
         317 (1983); *see also Clinton v. City of New York*, 524 U.S. 417,
16       439–40, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) (holding that
         "the power to enact statutes may only be exercised in accord with a
17       single, finely wrought and exhaustively considered, procedure"
         outlined in Article I (internal quotation omitted)). . . .

18           Treating legislative reports as binding law also undermines our
19       constitutional structure of separated powers, because legislative
         reports do not come with the traditional and constitutionally-
20       mandated political safeguards of legislation. As noted above,
         legislative reports are not acts of law satisfying the precise
21       requirements of Article I, which were devised by the Framers to
         ensure separation of powers and a careful legislative process. By
22       contrast, legislative reports may in some cases be written by an
         individual legislator, congressional staffers, or even lobbyists.
23       Giving binding effect to passages in legislative reports may thus
         give binding legal effect to the unchecked will of a lone person, and
24       that is not what our Constitution envisions.

25

26   [8] Although not relevant to the outcome here, this Court is also not strictly bound by a state
     intermediate appellate court's interpretation of state law.  Federal district courts confronted with
27   questions of state law must follow precedent set by the state's highest court or, where no such
     precedent exists, predict how that court would decide the issue.  *Ticknor v. Choice Hotels Int'l,*
28   *Inc.*, 265 F.3d 931, 939 (2001).  Holdings of lower state courts are often persuasive authority in
     conducting the latter inquiry.

United States District Court
Northern District of California

1   *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 684−85 (9th Cir. 2007) (footnotes

2   omitted).

3          Nothing in 8 U.S.C. § 1373(a) addresses information concerning an inmate's release date.

4   The statute, by its terms, governs only "information regarding the citizenship or immigration

5   status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a).  If the Congress that enacted

6   the Omnibus Consolidated Appropriations Act of 1997 (which included § 1373(a)) had intended to

7   bar *all* restriction of communication between local law enforcement and federal immigration

8   authorities, or specifically to bar restrictions of sharing inmates' release dates, it could have

9   included such language in the statute.  It did not, and no plausible reading of "information

10  regarding . . . citizenship or immigration status" encompasses the release date of an undocumented

11  inmate.  Because the plain language of the statute is clear on this point, the Court has no occasion

12  to consult legislative history.

13         In light of the Court's holding regarding the scope of § 1373(a), the March 13

14  memorandum violated that statute only, if at all,[9] by restricting the provision of inmates'

15  citizenship and immigration status to ICE, not by restricting the provision of release dates.  Based

16  on the facts alleged, the former restriction did not cause Steinle's death, because ICE was already

17  aware of Lopez-Sanchez's immigration status.  Plaintiffs therefore cannot state a claim for

18  negligence based on violation of a duty imposed by § 1373(a).

19         Moreover, Plaintiffs do not meaningfully dispute the *Bologna* court's holding that

20  § 1373(a) was not intended to prevent harm caused by violent crime.[10]  *See Bologna*, 192 Cal.

21  _____

22  [9] The Court need not and does not reach, for example, the City Defendants' argument that "[n]ot
    all government employees are 'officials,'" and that § 1373(a) and the other statutes at issue
23  therefore do not limit a sheriff's authority to set "policies regarding the manner in which his
    employees speak on behalf of the Department in response to ICE's voluntary requests."  *See* City
24  Mot. at 9.
    [10] In their discussion of legislative intent, Plaintiffs note that the "Bologna plaintiffs challenged the
25  [Chapter 12H] sanctuary policy itself, rather than the MIRKARIMI March Memo."  Opp'n to City
    Mot. at 13.  It is not entirely clear whether Plaintiffs seek to distinguish the holding of *Bologna* on
26  that basis.  To the extent that they do, the Court finds that argument unpersuasive.  The specific
    policy being challenged does not alter the conclusion that Congress intended § 1373(a) "to
27  facilitate the enforcement of federal immigration law," not "to protect the public from violent
    crimes."  *See Bologna*, 192 Cal. App. 4th at 439.  Plaintiffs' counsel also suggested at the hearing
28  that the *Bologna* court did not address the interplay between § 1373(a) and section 12H.2-1 of the
    San Francisco Administrative Code.  Plaintiffs have not suggested, however, that Congress looked

United States District Court
Northern District of California

App. 4th at 439−40.  That court examined the text of §1373(a), as well as the legislative history, and concluded that the statute was designed to facilitate the enforcement of federal immigration laws, not to prevent violent crimes against individuals.  *Id.*  This Court agrees.  Accordingly, even if § 1373(a) could be read to prevent Mirkarimi from restricting the circumstances in which Sheriff's Department employees provided inmates' release dates to ICE, that statute still would not support a claim by a plaintiff injured by someone who remained in the country as a result of Mirkarimi's policy.  *See* Cal. Evid. Code § 669(a)(3)−(4) (requiring that "the death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and . . . the person suffering the death or injury . . . was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted"); Cal. Gov't Code § 815.6 (authorizing public entity liability for injuries caused by violations of "a mandatory duty imposed by an enactment that is designed to protect against the risk of [that] particular kind of injury").

### b.  California Health & Safety Code Section 11369

Section 11369 of the California Health and Safety Code reads as follows:

> When there is reason to believe that any person arrested for a violation of [certain laws regarding controlled substances] may not be a citizen of the United States, the arresting agency shall notify the appropriate agency of the United States having charge of deportation matters.

Cal. Health & Safety Code § 11369.  As with § 1373(a), this law does not, by its terms, govern the transmission of an inmate's release date to ICE.  The plain language of the statute requires only that "the arresting agency" must "notify" ICE when a person who has been arrested might not be a citizen.  *Id.*

Based on the allegations of the complaint, it is clear that the San Francisco Sheriff's Department was not the "arresting agency" under section 11369 with respect to Lopez-Sanchez.

---

to that section of San Francisco municipal law in crafting § 1373.  As for the legislative purpose of section 12H.2-1, the Court need not resolve the harm that the Board of Supervisors intended to address by adding that section because—as discussed below—Chapter 12H creates no mandatory duty relevant to this case.  The Court can say with confidence, however, that § 1373 did not influence the Board of Supervisors' deliberations when amending Chapter 12H to add section 12H.2-1 in 1992, approximately four years *before* Congress enacted § 1373.  *See* Pub. L. No. 104-228, § 642, 110 Stat. 3009 (1996) (enacting 8 U.S.C. § 1373).

Plaintiffs allege that the federal government transferred Lopez-Sanchez to the custody of the Sheriff's Department after he completed a federal prison sentence.  Compl. ¶ 22.  The complaint therefore does not allege any violation of section 11369.  Further, even if the Sheriff's Department had arrested Lopez-Sanchez, notifying ICE of his arrest would not have altered the course of events, because—as demonstrated by the detainer request that ICE issued the day after the Sheriff's Department took custody of him—ICE already knew that Lopez-Sanchez was undocumented and that the Sheriff's Department was holding him.  *See id.* ¶ 34.  Finally, Plaintiffs again present no significant argument to rebut the *Bologna* court's holding, based on a detailed review of precedent and legislative history, that section 11369 was not intended to prevent violent crime.  *See Bologna*, 192 Cal. App. 4th at 436−38.  Accordingly, even if Plaintiffs could allege that the City Defendants violated section 11369 and that such violation led to Lopez-Sanchez remaining in San Francisco rather than being detained or deported by ICE, they nevertheless could not base a negligence claim on such a violation because Steinle's death was not the sort of harm that the statute was intended to prevent.

### c.   California Government Code Section 7282.5(a)

Plaintiffs' opposition brief suggests that section 7282.5(a) of the California Government Code, in conjunction with the statutes discussed above, "prohibit[s] all restrictions on voluntary communication with ICE regarding undocumented felons."  Opp'n to City Mot. at 10; *see also* Compl. ¶¶ 26, 48, 70.  That statute reads as follows:

> A law enforcement official shall have discretion to cooperate with federal immigration officials by detaining an individual on the basis of an immigration hold after that individual becomes eligible for release from custody only if the continued detention of the individual on the basis of the immigration hold would not violate any federal, state, or local law, or any local policy, and only under any of the following circumstances: [listing certain conditions, including conviction of felonies related to controlled substances.]

Cal. Gov't Code § 7282.5(a).

According to Plaintiffs, section 7282.5(a) creates "a mandatory duty . . . to allow law enforcement officials the discretion to cooperate with federal immigration officials if the individual in question has previously been convicted of a felony."  Compl. ¶ 70.  The only

22

cooperation specifically discussed in the statute is "detaining an individual on the basis of an immigration hold," *see* Cal. Gov't Code § 7282.5(a), while the crux of Plaintiffs' claim is restrictions on communication, not detention, *see* Opp'n to City Mot. at 8 ("The mandatory duty here is prohibitory—that restrictions on communication with ICE regarding undocumented felons are strictly prohibited."). In any event, even if "cooperation" in this statute could be construed more broadly, the Court is not persuaded that section 7282.5(a) creates any mandatory duty.

As noted above, Plaintiffs do not claim that section 7282.5(a) creates a duty to actually cooperate with ICE. In describing officials' "discretion" to cooperate, the statute makes clear that such cooperation is not mandatory. Instead, Plaintiffs argue that by establishing that law enforcement officials—which Plaintiffs interpret to include all Sheriff's Department employees— have discretion to detain individuals based on requests from ICE, the statute imposes a duty on local policymakers, such as Mirkarimi, not to restrict such discretion. *See* Opp'n to City Mot. at 8−13. This view of section 7282.5(a) would negate an explicit limitation of the statute: that law enforcement officials may detain individuals "only if the continued detention of the individual on the basis of the immigration hold would not violate any . . . local law, or any local policy." Cal. Gov't Code § 7282.5(a). Reading the statute as a whole, it grants law enforcement officials discretion to detain individuals based on immigration holds, but also grants local policymakers authority to limit such discretion. In that context, Mirkarimi had no mandatory duty under § 7282.5(a) to refrain from setting limits on cooperation with ICE detainer requests, and Plaintiffs therefore cannot base a claim on breach of such a duty.

### d. San Francisco Administrative Code Chapter 12H

Although Plaintiffs' complaint does not identify Chapter 12H as a source of any duty, *see* Compl. ¶¶ 48, 69−70, their opposition brief rests largely on the argument that Mirkarimi violated that ordinance by issuing the March 13 memorandum, *see* Opp'n to City Mot. at 9−10, 12−14. Specifically, Plaintiffs focus on section 12H.2-1, which at relevant times included the following language:

> Nothing in this Chapter shall prohibit, or be construed as prohibiting, a Law Enforcement Officer from identifying and reporting any adult pursuant to State or Federal law or regulation

1

who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws. . . .

2

3

Nothing in this Chapter shall preclude any City and County department, agency, commission, officer or employee from (a) reporting information to the Federal agency charged with enforcement of the Federal immigration law regarding an individual who has been booked at any county jail facility, and who has previously been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law; (b) cooperating with a request from the Federal agency charged with enforcement of the Federal immigration law for information regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law; or (c) reporting information as required by Federal or State statute, regulation or court decision, regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law. . . .

4

5

6

7

8

9

10

11

RJN re Opp'n to City Ex. A § 12H.2-1.

12

According to Plaintiffs, this section of the ordinance imposed a mandatory duty on

13

Mirkarimi to allow officers to share information with ICE based on its use of the word "shall,"

14

based on "the federal government's pervasive regulation over immigration policy coupled with the

15

necessity of cooperation by state and local governments," and based on legislative intent,

16

specifically language in the implementing ordinance stating that section 12H.2-1 was added "'to

17

clarify that Chapter 12H does not apply to individuals who have been convicted of certain

18

crimes.'" Opp'n to City Mot. at 10, 12 (quoting RJN re Opp'n to City Ex. B (S.F. Ordinance No.

19

282-92, File No. 97-92-46 (approved Sept. 4, 1992))).

20

The language of section 12H.2-1 is not consistent with Plaintiffs' view that this section

21

imposed a duty on Mirkarimi. A provision of an ordinance which clarifies that it does not apply in

22

certain circumstances does not create a mandatory duty. In providing that "[n]othing in this

23

Chapter shall preclude" certain cooperation with ICE, section 12H.2-1 simply limited the scope of

24

the remainder of Chapter 12H. In other words, if an individual met the criteria of section

25

12H.2-1—e.g., someone held at a county jail and previously convicted of a felony under

26

California law—then Chapter 12H would have no bearing on whether City employees report

27

information about that person to ICE. Plaintiffs essentially ask the Court to skip over the words

28

"in this Chapter," and hold that section 12H.2-1 prohibits *any* preclusion of cooperation for certain

United States District Court
Northern District of California

individuals, whether imposed by Chapter 12H or otherwise.  The Court declines to do so; the language of section 12H.2-1 limits the scope of Chapter 12H, not the authority of the sheriff.  This is consistent with the statement of intent that Plaintiffs cite from the implementing ordinance, clarifying "that Chapter 12H *does not apply* to individuals who have been convicted of certain crimes."  RJN re Opp'n to City Ex. B (emphasis added).  Because Chapter 12H did not create a duty, Plaintiffs cannot base a claim on violation of such a duty.[11]

* * *

The Court concludes that Plaintiffs' complaint does not plausibly allege that Steinle's death resulted from a violation of any of the sources of law that Plaintiffs cite: 8 U.S.C. § 1373(a), Section 11369 of the California Health and Safety Code, section 7282.5(a) of the California Government Code, or Chapter 12H of the San Francisco Administrative Code.  The complaint therefore does not state a claim against the City Defendants for negligence per se under Evidence Code section 669 or for public entity liability under Government Code sections 815 and 815.6, and such claims must be DISMISSED under Rule 12(b)(6).  The Court further concludes that the defects of these claims could not be cured by amending the complaint.

### 2.  General Negligence

Plaintiffs also argue that they have stated a claim under general negligence principles because the "foreseeable result of allowing felons with serious documented drug histories to avoid deportation is that they will act erratically and dangerously in a manner that compromises the safety of the rest of the San Francisco community."  *See* Opp'n to City Mot. at 14–19; *see also* Compl. ¶¶ 46–54, 90–94.  "The elements of a negligence action are duty, breach of duty, causation, and damages."  *Carrera v. Maurice J. Sopp & Son*, 177 Cal. App. 4th 366, 377 (2009) (citing, *e.g.*, *Paz v. California*, 22 Cal. 4th 550, 559 (2000)).

Although California law does not generally permit a public entity to be held liable for its

_____

[11] Applying section 12H.2-1 to the allegations of Plaintiffs' complaint, Lopez-Sanchez qualified as "an individual who has been booked at any county jail facility, and who has previously been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law."  See RJN re Opp'n to City Ex. A § 12H.2-1; Compl. ¶¶ 21–22.  As such, "Chapter 12H d[id] not apply" to him.  See RJN re Opp'n to City Ex. B.  Because Chapter 12H did not apply, it did not create any duty.

25

own negligence, *see* Cal. Gov't Code § 815, a public entity may be held vicariously liable for actions of its employees, within the scope of those employees' duties, if an employee's conduct would give rise to a cause of action against the employee himself or herself, *id.* § 815.2(a).  Public employees are generally liable for their actions to the same extent as private persons.  *Id.* § 820(a).  Section 820.2 of the Government Code, however, provides that public employees are generally immune from liability for exercising discretion granted to them by law, and section 815.2(b) provides that, in the context of vicarious liability, public entities share any immunity that would apply to their employees.  *Id.* §§ 815.2(b), 820.2.

Without reaching the City Defendants' other arguments, including whether the March 31 memorandum was a legally sufficient proximate cause of Steinle's death and whether immunity under Government Code sections 845.8(a) or 846 applies, the Court concludes that Mirkarimi is immune under section 820.2 of the Government Code and that the City is therefore also immune under section 815.2(b) of the Government Code.

"Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."  Cal. Gov't Code § 820.2.

> A discretionary act requires a conscious balancing of risks and advantages when making basic policy decisions, *see Bell v. State of California,* 63 Cal. App. 4th 919, 929, 74 Cal. Rptr. 2d 541 (1998); it does not protect operational or ministerial decisions that implement policies. *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1379 (9th Cir. 1998) (citing *Johnson v. State of California,* 69 Cal. 2d 782, 796, 73 Cal. Rptr. 240, 447 P.2d 352 (1968)). A ministerial act is an act pursuant to an order, or an act where a person had no choice. *McCorkle v. City of Los Angeles*, 70 Cal. 2d 252, 261, 74 Cal. Rptr. 389, 449 P.2d 453 (1969). An operational act is one in which the person who made the decision, implemented the decision. *See id.*

*Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1123 (C.D. Cal. 2006), *aff'd sub nom. Bernhard v. City of Ontario*, 270 F. App'x 518 (9th Cir. 2008).  Sheriffs are among the public employees subject to immunity under section 820.2.  *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 836 (2004).

The parties do not address whether Mirkarimi's issuance of the March 13 memorandum

United States District Court
Northern District of California

qualifies as a discretionary act for the purpose of section 820.2.  The Court concludes that it does.  The memorandum on its face indicates that Mirkarimi issued it after consulting with the Sheriff's Department's legal counsel to determine how best to implement section 12H.2 of the San Francisco Administrative Code.  *See* City RJN Ex. A.  The memorandum delineated categories of information that Sheriff's Department employees could presumptively provide to ICE, as well as categories (such as release dates) that employees could not share with ICE absent a court order or warrant, consultation with the legal department, and authorization by Mirkarimi.  *Id.*  The Court is therefore satisfied that the memorandum was a policy decision resulting from "a conscious balancing of risks and advantages," and not a mere "operational or ministerial" act.  *See Trujillo*, 428 F. Supp. 2d at 1123.  Establishing such a policy falls within a county sheriff's broad authority to regulate the personnel within his or her department.  *See* Cal. Govt' Code § 26605 (providing that the sheriff is "the sole and exclusive authority to keep the county jail and the prisoners in it"); *Brandt v. Bd. of Supervisors*, 84 Cal. App. 3d 598, 602 (1978) (holding that a sheriff has exclusive authority to control the operation of a jail); *see also, e.g.*, *Gordon v. Horsley*, 86 Cal. App. 4th 336, 344 (2001) (holding that a "Sheriff has the inherent authority to control [a deputy's] off-duty use of a concealed weapon and exercise of peace officer powers"); Compl. ¶ 98 (alleging that "[w]hen MIRKARIMI issued The March Memo he was acting and/or purporting to act in the performance of his official duties, and at all times relevant, MIRKARIMI was a policymaking official of [the City]").

Plaintiffs' only argument against the application of section 820.2 here is that "the acts were mandatory not discretionary," or in other words, that the City Defendants "are not vested with authority to contravene the law."  Opp'n to City Mot. at 19.  As discussed above in the context of negligence per se, no law required the Sheriff's Department to share Lopez-Sanchez's release date with ICE, nor did any law forbid Mirkarimi establishing a policy against such cooperation.  Plaintiffs' argument here is therefore unavailing.  Section 820.2 bars liability against Mirkarimi for the decision to issue the March 13 memorandum, and 815.2(b) of the Government Code, which provides that "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability," therefore bars

27

1   liability against the City.  Plaintiffs' negligence claims against the City Defendants must therefore

2   be DISMISSED.  The Court finds that leave to amend these claims would be futile.

3               **3.  42 U.S.C. § 1983**

4        Plaintiffs' claim under § 1983 alleges that the City Defendants deprived Steinle of her life

5   and liberty without due process of law.  Compl. ¶¶ 95–101.  Section 1983 provides "a method for

6   vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 393–94 (1989)

7   (citation omitted).  Thus, analysis of a civil rights claim brought under § 1983 begins with the

8   identification of the "specific constitutional right allegedly infringed by the challenged [state

9   action]."  *Id.* at 394 (citation omitted).  The claim is then evaluated under the constitutional

10  standards that apply to that constitutional right.  *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22

11  (1985)).  Plaintiffs' opposition brief clarifies that Plaintiffs seek to pursue a claim based on the

12  Fourteenth Amendment's guarantee of both procedural and substantive due process.  Opp'n to

13  City Mot. at 19–23.

14               a.   Substantive Due Process

15       The substantive component of the Due Process Clause "forbids the government from

16  depriving a person of life, liberty, or property in such a way that shocks the conscience or

17  interferes with rights implicit in the concept of ordered liberty."  *Nunez v. City of Los Angeles*, 147

18  F.3d 867, 871 (9th Cir. 1998) (internal quotation marks omitted).  It "protects individual liberty

19  against 'certain government actions regardless of the fairness of the procedures used to implement

20  them.'"  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quoting *Daniels v. Williams*,

21  474 U.S. 327, 331 (1986)).  Substantive due process "forbids the government to infringe certain

22  'fundamental' liberty interests at all, no matter what process is provided, unless the infringement

23  is narrowly tailored to serve a compelling state interest."  *Reno v. Flores*, 507 U.S. 292, 302

24  (1993).

25       Substantive due process does not, however, create a "constitutional right to be protected by

26  the state from attack by private third parties, absent some special relationship between the state

27  and the victim or the criminal and the victim that distinguishes the victim from the general

28  public."  *Ketchum v. County of Alameda*, 811 F.2d 1243, 1247 (9th Cir. 1987); *see also DeShaney*

United States District Court
Northern District of California

28

*v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 195–96 (1989).  This limitation applies

"'even if the state was remiss in allowing the third person to be in a position in which he might

cause harm to a member of the public.'"  *Ketchum*, 811 F.2d at 1247 (quoting *Wright v. City of

Ozark*, 715 F.2d 1513, 1515 (11th Cir. 1983)).

Here, Plaintiffs rely on a line of cases recognizing that harm caused by third parties can

support a substantive due process claim where the defendant state actor's "conduct 'affirmatively

placed the plaintiff in a position of danger.'"  *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir.

1989) (quoting *Ketchum*, 811 F.2d at 1257).  Plaintiffs characterize this as a separate exception to

the rule against a constitutional duty to protect, distinct from the "special relationship" exception.

*See* Opp'n to City Mot. at 22.  According to Plaintiffs, Mirkarimi's issuance of the March 13

memorandum was an affirmative act that placed Steinle in a position of danger, because the failure

to deport undocumented immigrants with felony convictions "foreseeably would result in the loss

of innocent lives."  *Id.* at 23.  The City Defendants argue that "the [state-created danger] cases

cited by plaintiffs all involve the acts of a law enforcement officer that affirmatively placed a

*specific, identifiable* persons [sic] in a greater position of danger."  City Reply at 10 (emphasis

added).  The Court agrees that the doctrine requires a more particularized danger than is alleged in

this case.

"Under the state-created danger doctrine, a state actor can be held liable for failing to

protect a person's interest in his personal security or bodily integrity when the state actor

affirmatively and with deliberate indifference placed that person in danger."  *Pauluk v. Savage*,

836 F.3d 1117, 1122 (9th Cir. 2016).

> To prevail on a state-created danger due process claim, a plaintiff
> must show more than merely a failure to create or maintain a safe
> work environment. First, a plaintiff must show that the state engaged
> in "affirmative conduct" that placed him or her in danger. [*Patel v.
> Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).] This
> "affirmative conduct" requirement has several components. A
> plaintiff must show not only that the defendant acted
> "affirmatively," but also that the affirmative conduct placed him in a
> "worse position than that in which he would have been had [the
> state] not acted at all." [*Johnson v. City of Seattle*, 474 F.3d 634, 641
> (9th Cir. 2007)] (quoting *DeShaney*, 489 U.S. at 201, 109 S. Ct.
> 998); *accord* [*Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063
> (9th Cir. 2006)]. The affirmative act must have exposed the plaintiff

United States District Court
Northern District of California

to "an actual, particularized danger," *Kennedy*, 439 F.3d at 1063, and the resulting harm must have been foreseeable, *see* [*Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003)]. Second, the state actor must have acted with "deliberate indifference" to a "known or obvious danger." *Patel*, 648 F.3d at 974 (quoting *L.W. v. Grubbs (Grubbs II)*, 92 F.3d 894, 900 (9th Cir. 1996)). "Deliberate indifference" requires a "culpable mental state" more than "gross negligence." *Id.*; *see Grubbs II*, 92 F.3d at 898.

*Id.* at 1124–25 (second alteration in original).

In the Ninth Circuit, the state-created danger doctrine originated in *Wood*, a case where a state trooper arrested an intoxicated driver and impounded the vehicle, but, according to the plaintiff's testimony, left the plaintiff (who had been a passenger in the vehicle) to walk home late at night in a high-crime area, ignoring her request for assistance getting home. *Wood*, 879 F.2d at 586; *see also Pauluk*, 836 F.3d at 1122 (noting that the Ninth Circuit "first recognized the state-created danger doctrine in *Wood*"). After beginning the five-mile walk to her home in cold weather, the plaintiff eventually accepted a ride from a stranger, who raped her. *Wood*, 879 F.2d at 586. The Ninth Circuit reversed the district court's entry of summary judgment for the defendant and held instead that the plaintiff "raised a triable issue of fact as to whether [the state trooper's] conduct 'affirmatively placed the plaintiff in a position of danger.'" *Id.* at 589–90 (quoting *Ketchum*, 811 F.2d at 1247).

One aspect of the Ninth Circuit's reasoning, not specifically discussed by either party here, is significant: "The fact that [the state trooper] arrested [the driver], impounded his car, and apparently stranded [the plaintiff] in a high-crime area at 2:30 a.m. *distinguishes [the plaintiff] from the general public* and triggers a duty of the police to afford her some measure of peace and safety." *Id.* at 590 (emphasis added). It follows that the state-created doctrine does not encompass claims that policy decisions increased danger to the public as a whole, rather than to specific individuals or groups. *See also Paulak*, 836 F.3d at 1125 (stating that the government's "affirmative act must have exposed the plaintiff to 'an actual, *particularized* danger'" (quoting *Kennedy*, 439 F.3d at 1063) (emphasis added)). One way to look at the state-created danger doctrine is therefore as a particular application of the special relationship rule: when state action places a person or particular group of people at risk of harm, the state creates a special relationship with the affected person or group sufficient to impose a duty to mitigate that risk.

Subsequent Ninth Circuit decisions imposing liability under the state-created danger doctrine comport with that view of the rule.  In *Kennedy*, for example, a police officer informed the family of a teenager with a known history of violence that a neighbor had accused the teenager of sexually assaulting her daughter, without warning the accuser that he had done so despite previously assuring her that he would provide such a warning, and without providing police patrols in the neighborhood despite promising that as well.  *Kennedy*, 439 F.3d at 1057–58.  The teenager then broke into the accuser's house and shot her and her husband, severely wounding the accuser and killing her husband.  *Id.*  The Ninth Circuit held that by informing the family of the teenager without first warning the accuser so that she could take precautions, the officer "affirmatively created an actual, particularized danger [the accuser] would not otherwise have faced."  *Id.* at 1063.  In *Munger v. City of Glasgow Police Department*, police officers ejected an intoxicated, lightly dressed man from a bar in Montana in subfreezing temperatures and prevented him from reentering the bar or driving his truck; the man was found dead from hypothermia the next day.  227 F.3d 1082, 1084–85, 1087 (9th Cir. 2000).  The Ninth Circuit held that the officers could be held liable for having "placed Munger 'in a more dangerous position than the one in which they found him.'"  *Id.* at 1087 (quoting *Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997) (per curiam)).  In *Penilla*, neighbors called 911 after observing Juan Penilla seriously ill on his front porch, but the police officers who responded, despite finding Penilla "to be in grave need of medical care, cancelled the request for paramedics, broke the lock and door jamb on the front door of Penilla's residence, moved him inside the house, locked the door, and left."  *Penilla*, 115 F.3d at 708.  The Ninth Circuit affirmed the district court's holding that "by cancelling the 911 call, removing Penilla from public view, and locking the front door," the defendant officers "clearly placed Penilla in a more dangerous position than the one in which they found him" and thus could be held liable on a theory of state-created danger.  *Id.* at 710.  And in *L.W. v. Grubbs*, the Ninth Circuit held that a nurse at a custodial institution could proceed on a state-created danger claim against supervisors who assigned her to work alone with "a violent sex offender who had failed all treatment programs" with "an extraordinary history of unrepentant violence against women and girls," who then "assaulted, battered, kidnapped and raped her."  974

F.2d 119, 120–22 (9th Cir. 1992).  In each of these cases, the danger that the defendants created was specific to identifiable individuals or groups, and thus "distinguishe[d] [them] from the general public and trigger[ed] a duty . . . to afford [them] some measure of peace and safety."  *See Wood*, 879 F.2d at 590.

Plaintiffs here do not cite any authority, from the Ninth Circuit or elsewhere, holding that a policy decision that increases danger to the public as a whole can give rise to a due process claim based on the state-created danger doctrine.  Such a rule, which is not supported by the reasoning of *Wood*, would represent a significant expansion of the doctrine and would subject virtually any decision by policymakers in the field of public safety, who often must weigh known risks to public safety on either side of a decision, to post-hoc second guessing.  Because nothing in this case distinguished Steinle from the general public at the time of the City Defendants' alleged wrongful conduct—i.e., when Mirkarimi issued the March 13 memorandum—the City Defendants cannot be held liable for a due process violation on a theory of state-created danger.  Plaintiffs' substantive due process claim must therefore be DISMISSED.  The Court finds that leave to amend this claim would be futile.

b.   <u>Procedural Due Process</u>

The procedural guarantee of the Due Process Clause "is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation and internal quotation marks omitted).  The Supreme Court has "described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant [protected] interest."  *Id.* (citation and internal quotation marks omitted).

Plaintiffs allege that a hearing, or some other procedural safeguard, should have been required before Mirkarimi issued the March 13 memorandum because it "affected . . . [Steinle's] right to life and liberty."  *See* Opp'n to City Mot. at 20–21.[12]  The City Defendants respond only

---

[12] Plaintiffs also characterize the option of making a telephone call to inform ICE of Lopez-Sanchez's release date as an alternative "adequate procedural safeguard" available to the City

1    that "[n]o law requires elected officials to hold public hearing [sic] before adopting policies such

2    as the one here."  City Reply at 10.  Neither party cites authority addressing whether the Due

3    Process Clause requires the head of a local law enforcement agency to hold a hearing before

4    making decisions that might affect public safety in general.

5            In the Court's view, the issue comes down to the particular interest affected by Mirkarimi's

6    policy.  Plaintiffs characterize that interest as Steinle's right to life and liberty, but the more direct

7    effect was on the degree of protection from crime that Steinle and other members of the

8    community received.  As discussed above in the context of substantive due process, the

9    Constitution does not create a right to protection from crime except in special circumstances.

10   Accordingly, the Due Process Clause does not require a hearing before local law enforcement

11   officials set policies that reduce aspects of such protection.  That such a decision sets in motion a

12   chain of events ultimately leading to a plaintiff's death, as is alleged here, does not alter the

13   outcome.

14           To hold otherwise would have far reaching implications.  Under Plaintiffs' proposed

15   framework—that the right to procedural due process requires a hearing or other safeguards before

16   any decision that could foreseeably increase the risk of death to members of the public at large—

17   police commanders could not alter shift schedules without a hearing, fire chiefs could not decrease

18   readiness levels without a hearing, and parole boards would be required to solicit public input

19   before authorizing the release of prisoners, among other consequences.  In the absence of any

20   authority so holding, the Court declines to so expand the scope of constitutional due process.

21   Plaintiffs' procedural due process claim is therefore DISMISSED.  The Court finds that leave to

22   amend this claim would be futile.

23           **C.    Claims Against the United States**

24           Under the doctrine of sovereign immunity, the United States "'is immune from suit save as

25

26   Defendants.  Opp'n to City Mot. at 21.  As discussed above, procedural due process generally
     addresses whether the state must provide a hearing or some other process by which the person
27   whose rights are affected may be heard.  The Court is aware of no authority requiring coordination
     between local and federal law enforcement as a component of procedural due process.  The lack of
28   such coordination is more appropriately addressed as a failure to protect in the context of
     substantive due process, discussed above.

1    it consents to be sued . . . and the terms of its consent to be sued in any court define that court's

2    jurisdiction to entertain the suit.'"  *United States v. Testan*, 424 U.S. 392, 399 (1976) (quoting

3    *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).  Any analysis of claims against the United

4    States therefore begins with the jurisdictional question of whether sovereign immunity has been

5    waived as to the claims at issue.  "[A] waiver of the traditional sovereign immunity 'cannot be

6    implied but must be unequivocally expressed.'"  *Id.* (quoting *United States v. King*, 395 U.S. 1, 4

7    (1969)).

8         Here, Plaintiffs' complaint invokes the Federal Tort Claims Act ("FTCA").  *See* Compl.

9    ¶ 1.  "The FTCA, a limited waiver of the United States' sovereign immunity, provides that the

10   United States shall be liable 'in the same manner and to the same extent as a private individual

11   under like circumstances' under applicable state law."  *Dugard v. United States*, 835 F.3d 915,

12   918–19 (9th Cir. 2016) (quoting 28 U.S.C. § 2674).  "Although the federal government 'could

13   never be exactly like a private actor, a court's job in applying the standard is to find the most

14   reasonable analogy,'" and it can in some circumstance be "appropriate to look to cases involving

15   public entities or public immunities, so long as the policies underlying them are applicable to

16   private parties in the state as well."  *Id.* at 919, 920 (quoting *LaBarge v. Mariposa County*, 798

17   F.2d 364, 367 (9th Cir. 1986)).

18              **1.   Claims Based on ICE's Conduct**

19        Plaintiffs claim that ICE acted negligently in failing to detain Lopez-Sanchez pursuant to

20   8 U.S.C. § 1226(c), which provides that the "Attorney General shall take into custody" aliens

21   meeting certain criteria.  No party disputes that Lopez-Sanchez met those criteria.  The United

22   States contends that ICE exercises discretion in apprehending aliens, even those who meet the

23   criteria of § 1226(c), and that the discretionary function exception to the FTCA therefore applies

24   here.

25        The FTCA does "not apply to . . . [a]ny claim . . . based upon the exercise or performance

26   or the failure to exercise or perform a discretionary function or duty on the part of a federal agency

27   or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C.

28   § 2680.  Because the discretionary function exception negates the FTCA's waiver of sovereign

United States District Court
Northern District of California

34

immunity, "federal courts do not have subject matter jurisdiction over tort actions based on federal defendants' performance of discretionary functions." *Lesoeur v. United States*, 21 F.3d 965, 967 (9th Cir. 1994).  Although a plaintiff normally bears the burden of establishing subject matter jurisdiction, in an FTCA case "[t]he government bears the burden of demonstrating that the discretionary function exception applies." *Gonzalez v. United States*, 814 F.3d 1022, 1027 (9th Cir. 2016).[13]

The Supreme Court has established a two-part test for analyzing the discretionary function exception.  *Gonzalez*, 814 F.3d at 1027 (citing *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)).  The first step is to determine whether the action in question was discretionary, i.e., whether it involved an exercise of judgment rather than merely execution of a duty set by law.  *Id.* "The discretionary function exception does not apply to '[a]n action specifically prescribed by a federal statute, regulation, or policy,' because such an action is not within an agent's discretion." *Xue Lu v. Powell*, 621 F.3d 944, 950 (9th Cir. 2010) (quoting *Marlys Bear Med. v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001)).  "In such cases, 'the employee has no rightful option but to adhere to the directive' . . . ." *Gonzalez*, 814 F.3d at 1027 (quoting *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002)).[14]

The second prong of the test is to determine "whether that judgment is of the kind that the discretionary function exception was designed to shield," i.e., "governmental actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 536–37.  The question is not "'the agent's subjective intent'" or whether a decision was "'*actually* . . . grounded in policy considerations,'" but instead whether it was the type of decision that could be "'susceptible to policy analysis.'" *Gonzalez*, 814 F.3d at 1027–28 (quoting *United States v. Gaubert*, 499 U.S.

---

[13] Plaintiffs' opposition brief does not meaningfully address the discretionary function exception to the FTCA.  The authorities that Plaintiffs cite applying California's discretionary immunity statute, *see* Opp'n to U.S. Mot. at 6–10 (discussing Cal. Gov't Code § 820.2), have no bearing on the application of the federal doctrine at issue.

[14] It is perhaps worth clarifying that, while the United States argues that federal law cannot form the basis for a duty in the context of a California negligence claim brought under the FTCA, *see* U.S. Mot. at 13–14, that is a separate inquiry from the threshold question of whether an act falls within the discretionary function exception.  The United States does not dispute that a mandatory duty under federal law would negate the exception.  *See id.* at 6.

United States District Court
Northern District of California

1    315, 325 (1991); *GATX*, 286 F.3d at 1174).  This element is somewhat derivative of the first—if a

2    law grants an agent or agency discretion, that alone creates a strong presumption that the exercise

3    of that discretion is grounded in policy.  *See id.* at 1028.

4         In *Xue Lu*, for example, the Ninth Circuit held that the discretionary function exception

5    encompassed claims based on failure to detect an asylum officer's severe misconduct (including

6    sexually assaulting and soliciting bribes from asylum applicants) despite the fact that the officer

7    had violated regulations by keeping an asylum file for more than a year.  621 F.3d at 946, 950.

8    Because no law created a mandatory duty to discipline the officer for retaining the file, such

9    discipline was a discretionary function outside the scope of the FTCA's waiver of sovereign

10   immunity.  *Id.* at 950.

11        Here, the application of the discretionary function exception turns on whether 8 U.S.C.

12   § 1226(c) mandates that ICE apprehend and detain all immigrants who meet the criteria of the

13   statute, or whether ICE retains discretion to determine which immigrants to apprehend and the

14   means of doing so.  Plaintiffs contend that the statute's language is mandatory—providing that the

15   "Attorney General *shall* take into custody" qualifying aliens "when the alien is released," 8 U.S.C.

16   § 1226(c) (emphasis added)—and that the Supreme Court recognized congressional intent for

17   mandatory detention in *Demore v. Kim*, 538 U.S. 510 (2003).  *See* Opp'n to U.S. Mot. at 6−7.  The

18   United States contends that Shanahan's undisputed declaration demonstrates that ICE must, and

19   does, exercise discretion in determining which aliens to detain and how to go about taking custody

20   of aliens held by state authorities, and also argues that several courts have acknowledged that

21   practical considerations prevent ICE from immediate apprehending every alien subject to

22   detention under § 1226(c).  *See* U.S. Mot. at 8−10.

23        The precise issue of whether § 1226(c) imposes a mandatory duty such that failure to

24   apprehend and detain an alien falls outside the discretionary function exception appears to be one

25   of first impression, although some courts have considered related issues.

26        In a case where an immigrant challenged ICE's purportedly negligent investigation of his

27   citizenship status, the Middle District of Florida concluded that, "[o]perating with limited

28   resources, ICE must weigh various policy considerations in deciding which suspected aliens to

detain, how to detain them, and how to investigate claims of citizenship by detained aliens," and therefore held that the discretionary function exception applied to bar the plaintiff's claim. *Douglas v. United States*, 796 F. Supp. 2d 1354, 1369 (M.D. Fla. 2011). That case did not, however, involve § 1226(c), and thus did not address whether that statute negates the discretionary function exception.

Several courts have also considered the separate issue of whether § 1226(c)'s requirement that the Attorney General take custody "when the alien is released" limits mandatory detention under the statute to circumstances where an alien is taken into ICE custody immediately upon release from state custody, and thus whether aliens who are instead apprehended by ICE some time after their release by state authorities may apply for bail while their removal proceedings are pending. *See, e.g.*, *Preap v. Johnson*, 831 F.3d 1193 (9th Cir. 2016); *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015). Several courts to consider that issue have held that mandatory detention under § 1226(c) applies regardless of whether an alien is detained by ICE immediately upon release from state custody or some time thereafter, deferring to a decision by the Board of Immigration Appeals in 2001. *E.g.*, *Lora*, 804 F.3d at 611–13; *Sylvain v. Attorney Gen.*, 714 F.3d 150, 157 (3d Cir. 2013); *Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012); *see also In re Rojas*, 23 I. & N. Dec. 117, 125 (B.I.A. 2001). In reaching that conclusion, both the Board of Immigration Appeals and the Second Circuit noted that practical considerations, including resource constraints, prevent federal authorities from apprehending all immigrants who are subject to § 1226(c) at the moment that they are released from state custody. *Lora*, 804 F.3d at 612–13 ("Particularly for criminal aliens in state custody, it is unrealistic to assume that DHS will be aware of the exact timing of an alien's release from custody, nor does it have the resources to appear at every location where a qualifying alien is being released."); *Rojas*, 23 I. & N. Dec. at 124; *see also Rojas*, 23 I. & N. Dec. at 128 (Moscato, Board Member, concurring in part and dissenting in part). In a decision not discussed by either party here, the Ninth Circuit departed from other circuits on the issue of whether aliens not immediately taken into immigration custody after release by state authorities are subject to mandatory detention, holding that they are not. *See generally Preap*, 831 F.3d 1193. Nothing in that decision, however, addresses whether ICE can or must take custody of every alien who falls

37

within the scope of § 1226(c) at the time that he or she is released from state custody.  *See id.*

As Plaintiffs note in their opposition, the Supreme Court addressed the purpose of § 1226(c) in *Demore v. Kim*, 538 U.S. 510.  The Supreme Court recognized that in enacting other immigration laws in the years leading up to the passage of § 1226, Congress intended to limit aspects of the Attorney General's discretion: with respect to an earlier law, the Court concluded that "Congress limited the Attorney General's discretion over custody determinations with respect to deportable aliens who had been convicted of aggravated felonies."  *Id.* at 520–21.  Congress was primarily concerned with decisions by federal authorities to *release* criminal aliens pending deportation, not with failure in the first place to apprehend every criminal alien who is subject to removal.  *See id.* at 521 (quoting S. Rep. No. 104-48, at 32 ("Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond.")).

While the existence of a mandatory duty to apprehend all aliens subject to the statute seems unlikely, the Court need not decide that issue:  Plaintiffs' claims depend on the assertion that such aliens must be apprehended *immediately* on release from state custody, using whatever methods and resources are necessary to accomplish that detention.  In other words, the issue before the Court is whether the language of § 1226(c) mandates how and when that apprehension occurs, and whether it requires (1) that all such aliens be taken into custody immediately, i.e., at the state or local detention location, as opposed to allowing ICE to arrest such aliens at a later time; and (2) that ICE use specific methods to detain an alien, e.g., seeking a court order, stationing an agent at the state or local detention facility before release, etc.  The district court in *Douglas* recognized that ICE exercises discretion "in deciding which suspected aliens to detain, how to detain them, and how to investigate claims of citizenship by detained aliens."  796 F. Supp. 2d at 1369.  Even if § 1226(c) cabins that discretion as to the first issue identified by that court— which suspected aliens to detain—nothing in the statute compels ICE to devote whatever resources are necessary to detain an alien at the moment the alien is released from state custody.

Undisputed evidence in the record indicates, and other courts have recognized, that resource constraints and other practical considerations prevent ICE from apprehending all aliens

United States District Court
Northern District of California

1    subject to § 1226(c) at the time they are released by state authorities.  *See* Shanahan Decl. ¶ 9

2    (stating that one factor affecting ICE's enforcement priorities is "the differential between the

3    number of people present in the United States illegally and the number of people ICE is resourced

4    to remove each year," and that "[t]his differential necessitates prioritization");[15] *Lora*, 804 F.3d at

5    612–13 ("Particularly for criminal aliens in state custody, it is unrealistic to assume that DHS will

6    be aware of the exact timing of an alien's release from custody, nor does it have the resources to

7    appear at every location where a qualifying alien is being released."); *Douglas*, 796 F. Supp. 2d at

8    1369.

9        The Court therefore concludes that ICE must necessarily exercise discretion in determining

10   what resources it is willing to devote to apprehending a particular alien, even among those aliens

11   subject to § 1226(c).  The question of whether to devote resources—to use an example proposed

12   by Plaintiffs—to send ICE agents to the Sheriff's Department while Lopez-Sanchez was still in

13   custody on the chance that the Sheriff's Department would surrender him to them, *see* Opp'n to

14   U.S. Mot. at 13, necessarily implicates policy questions of whether those resources would be

15   better spent pursuing other criminal aliens who might pose a greater known risk to the public or

16   whom ICE might have a greater chance of successfully apprehending than someone like Lopez-

17   Sanchez, whose release date was unknown.[16]  Under established precedent interpreting the

18   discretionary function exception to the FTCA, the Court need not consider whether ICE decision

19   makers actually weighed such policy considerations; it is enough that the decision at issue was

20   susceptible to policy analysis.  *See Gonzalez*, 814 F.3d at 1027–28; *see also* Shanahan Decl. ¶¶ 8–

21   11 (stating that ICE in fact considers policy implications in deciding how to use the resources

22

23   [15] Despite Plaintiffs' arguments to the contrary, which focus exclusively on motions brought under
     Rule 12(b)(6), the Court may appropriately consider extrinsic evidence such as Shanahan's
24   declaration in resolving the United States' motion to dismiss for lack of subject matter
     jurisdiction—more specifically, contending that this Court lacks jurisdiction because of the United
25   States' sovereign immunity—under Rule 12(b)(1).  *See White*, 227 F.3d at 1242.
     [16] Plaintiffs contend that the detainer request itself demonstrates that "ICE had decided to commit
26   resources to the detainment and deportation of Mr. Lopez-Sanchez," and that its failure to actually
     detain him therefore results not from a policy decision regarding whether to devote resources, but
27   rather from ineffective execution of that decision.  *See* Opp'n to U.S. Mot. at 1, 9.  The Court is
     not persuaded that sending the detainer request evinces a decision to detain Lopez-Sanchez
28   immediately upon release regardless of whether the Sheriff cooperated, and regardless of what
     resources would be required.

39

1    available to it).

2         Accordingly, both prongs of the discretionary function exception are met here: ICE had

3    discretion to determine what methods it would use to pursue Lopez-Sanchez, and the decisions

4    involved in exercising that discretion implicate policy considerations.  The FTCA does not waive

5    the United States' sovereign immunity for claims, such as Plaintiffs' claims here, based on the

6    exercise of that discretion, "whether or not the discretion involved be abused."  28 U.S.C. § 2680.

7    Plaintiffs' claims against ICE therefore fall outside the jurisdiction of this Court and must be

8    DISMISSED without leave to amend.

9                    **2.   Claims Based on the BLM Ranger's Conduct**

10        Unlike the claims discussed above, which for the purposes of this Order turn on issues of

11   immunity under state and federal law, the parties' arguments regarding Plaintiffs' claims based on

12   the BLM ranger's failure to secure his handgun largely relate to the basic elements of negligence

13   under California law.  As noted above in the context of Plaintiffs' negligence claims against the

14   City Defendants, "[t]he elements of a negligence action are duty, breach of duty, causation, and

15   damages."  *Carrera v. Maurice J. Sopp & Son*, 177 Cal. App. 4th 366, 377 (2009) (citing, *e.g.*,

16   *Paz v. California*, 22 Cal. 4th 550, 559 (2000)).  Specifically, the United States contends that, on

17   the facts alleged, the BLM ranger did not owe a legal duty to Steinle or other members of the

18   public who might be killed or injured by a stolen gun, and that the shooting was not sufficiently

19   connected to the failure to secure the handgun to establish legal causation.  *See* U.S. Mot. at

20   19−23.  The United States also argues that Plaintiffs cannot rely on alleged violations of BLM

21   internal policies to establish a duty, both because the FTCA does not waive sovereign immunity

22   for violations of duties impose by federal law, and because the internal manuals cited by Plaintiffs

23   do not qualify as a source of duty under California Evidence Code section 669.1 because they

24   were not adopted under the Administrative Procedure Act.  *See* U.S. Mot. at 19; U.S. Reply at

25   9−10.  The Court addresses these arguments in turn.

26               a.   Common Law Duty of Care

27        The California Supreme Court has identified several "major" factors relevant to the

28   existence and scope of a common law duty of care:

United States District Court
Northern District of California

40

1

2

3

4

5

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

6   *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968); *see also, e.g.*, *Verdugo v. Target Corp.*, 59 Cal.

7   4th 312, 326 (2014) (citing *Rowland* with approval). Of those factors, the parties' arguments here

8   focus primarily on foreseeability, a "concept [that] plays a variety of roles in tort doctrine,"

9   including in the context of proximate cause, discussed separately below. *See Ballard v. Uribe*, 41

10  Cal. 3d 564, 572 n.6 (1986).

11          California law generally imposes a stringent duty of care for dealing with guns. In light of

12  the "risk incident to dealing with . . . firearms" and other instrumentalities with similar capacity to

13  do harm, "the standard of care required of the reasonable person when dealing with such

14  dangerous articles is so great that a slight deviation therefrom will constitute negligence." *Warner*

15  *v. Santa Catalina Island Co.*, 44 Cal. 2d 310, 317 (1955); *see also Jacoves v. United Merch.*

16  *Corp.*, 9 Cal. App. 4th 88, 116 (1992); *Reida v. Lund*, 18 Cal. App. 3d 698, 704 (1971); U.S. Mot.

17  at 19−20 (acknowledging this standard). Whether a gun owner owes a duty to the public to secure

18  his or her firearm against theft by a stranger, however, appears to be an issue of first impression

19  under California law.

20          In perhaps the closest case, an appellate court held that summary judgment was improper

21  on a negligence claim against the parents of a teenager who used his father's rifle to kill himself

22  and other children. *See generally Reida*, 18 Cal. App. 3d 698. Because that case relied in part on

23  authority regarding duties to keep "deadly instrumentalities" away from children, *id.* at 705−06,

24  and because the father stored both his rifle and the key to his gun cabinet in places where his son

25  knew to find them, *id.* at 701, *Reida* is not directly on point for the case at hand, where the shooter

26  was an adult with no relation to the gun owner and no special access to the gun. Nevertheless, to

27  the extent that that *Reida* is relevant, it weighs in favor of finding a duty.

28          The United States is correct that many courts outside California have held that the owner

United States District Court
Northern District of California

1    of a stolen firearm is not liable for criminal use of such a weapon by the thief.  *See* U.S. Mot. at

2    20.  The majority of the cases cited in the United States' brief, however, were decided on a motion

3    for summary judgment or other procedural posture involving a factual record, not on the

4    pleadings.  *See Jones v. Secord*, 684 F.3d 1 (1st Cir. 2012) (affirming summary judgment based on

5    New Hampshire law); *Romero v. Nat'l Rifle Ass'n of Am., Inc.*, 749 F.2d 77 (D.C. Cir. 1984)

6    (affirming judgment in favor of the defendant notwithstanding the verdict based on District of

7    Columbia law); *Finocchio v. Mahler*, 37 S.W.3d 300 (Mo. Ct. App. 2000) (affirming summary

8    judgment based on Missouri law); *Estate of Strever v. Cline*, 278 Mont. 165 (1996) (affirming

9    summary judgment based on Montana law); *McGrane v. Cline*, 94 Wash. App. 925 (1999)

10   (affirming summary judgment based on Washington law).  Although a handful of cases have

11   dismissed such claims at the pleading stage, the Court is aware of no authority that has considered

12   the issue under California law, regardless of procedural posture.  *See Bridges v. Parrish*, 366 N.C.

13   539 (2013) (affirming dismissal based on North Carolina law); *Valentine v. On Target, Inc.*, 353

14   Md. 544 (1999) (affirming dismissal based on Maryland law in a case where a handgun later used

15   in a shooting had been stolen from a gun store, in part on the basis that regulating gun dealers

16   should be left to the legislature).  Some of the cases on which the United States relies involved

17   guns stolen from the owner's home, a fact pattern not present here.  *See, e.g.*, *McGrane*, 94 Wash.

18   App. at 928−29 ("The issues involved in this case implicate a narrow range of . . . issues: should

19   the courts recognize a duty on the part of a firearm owner to prevent the theft of that firearm *from*

20   *his or her residence*, such that liability may be imposed against the owner for subsequent criminal

21   use of that weapon?" (emphasis added)).  Plaintiffs' opposition brief does not address any of the

22   stolen gun cases cited by the United States.  *See* Opp'n to U.S. Mot. at 17−20.

23          At least one case, not cited by either party and again from outside California, has held that

24   a negligence claim could proceed against the operators of a gun show from which minors had

25   stolen firearms later used in a shooting.  *Pavlides v. Niles Gun Show, Inc.*, 93 Ohio App. 3d 46

26   (1994) (reversing a grant of summary judgment based on Ohio law).  Also, as the United States

27   acknowledges, the Montana case cited above held that "the owner of a firearm has a duty to the

28   general public . . . to store the firearm in a safe and prudent manner," although it nevertheless

42

1    affirmed summary judgment on the basis that intervening unforeseeable criminal conduct cut off

2    legal causation. *Estate of Strever*, 278 Mont. at 175, 179.

3          Although California courts do not appear to have addressed gun owners' liability for harm

4    caused by stolen firearms, a number of California cases have considered negligence claims against

5    owners of stolen vehicles. The general rule is that "owners . . . of automobiles or ordinary pickup

6    trucks who leave the key in the ignition of an unattended vehicle [do not have a duty] to prevent

7    harm to third parties caused by a thief," and thus are not subject to claims for negligence under

8    such circumstances. *Carrera*, 177 Cal. App. 4th at 378 (citing *Richards v. Stanley*, 43 Cal. 2d 60,

9    61−63 (1954); *May v. Nine Plus Props., Inc.*, 143 Cal. App. 4th 1538, 1556 (2006); *Avis Rent A*

10   *Car Sys., Inc. v. Superior Court*, 12 Cal. App. 4th 221, 232 (1993)). In "special circumstances,"

11   however, the California courts have recognized such a duty. *Id.* at 379−81.

12         The "special circumstances" doctrine, an exception to the general rule that vehicle owners

13   are not liable for harm caused by thieves' use of their vehicles, is essentially "nothing more than a

14   test of foreseeability of harm." *Palma*, 36 Cal. 3d at 186. Among the factors that courts have

15   considered are "the enormity of the potential harm, and . . . the facility with which a potential

16   wrongdoer could learn of and take advantage of the virtual invitation to theft." *Id.* at 185 (citing

17   *Richardson v. Ham*, 44 Cal. 2d 772 (1955); *Murray v. Wright*, 166 Cal. App. 2d 589 (1958)).

18   "Those circumstances are merely illustrative, however, of conduct which may create foreseeable

19   risk of harm and impose liability if that risk becomes a reality." *Id.*

20         The cases finding the special circumstances doctrine applicable generally involve

21   particularly dangerous vehicles left with the keys in the ignition or otherwise ready to operate. In

22   *Richardson*, the first case to recognize an owner's liability for harm caused by a stolen vehicle, the

23   defendants had failed to equip one of their 26-ton bulldozers with an effective ignition lock, and a

24   group of drunk young men started one of them in the night and, unable to stop it, let it drive itself

25   unattended for about a mile, causing severe injuries and property damage. *Richardson*, 44 Cal. 2d

26   at 774. After a verdict for the defendants, the California Supreme Court held that a new trial was

27   warranted, in part based on the "foreseeable risk of intermeddling" (the record demonstrated

28   considerable public interest in the bulldozers), the fact that a thief would likely not know how to

43

operate a bulldozer, and the "extreme danger created" by an uncontrolled bulldozer. *Id.* at 776. In *Hergenrether v. East*, the defendants left a two-ton truck parked on the street unlocked with the key in the ignition, the truck was stolen, and late that night it collided with another car, causing serious injuries. 61 Cal. 2d 440, 441−42 (1964). The California Supreme Court reversed the trial court's entry judgment for the defendants notwithstanding a jury verdict for the plaintiffs, relying on the following "significant circumstances":

> (1) the vehicle was left in a neighborhood which was frequented by persons who had little respect for the law and the rights of others; (2) the neighborhood was heavily populated by drunks and near drunks; (3) the vehicle was intended to be left there for a relatively long period of time—from midafternoon to the following morning—and, of particular importance, it was intended that it would be left for the entire night; and (4) the vehicle was a partially loaded two-ton truck, the safe and proper operation of which was not a matter of common experience, and which was capable of inflicting more serious injury and damage than an ordinary vehicle when not properly controlled.

*Id.* at 445. In *Palma*, the California Supreme Court reversed an entry of summary judgment, holding that considerations similar to those in *Hergenrether* warranted allowing a claim to proceed where the defendants had left a large commercial truck unlocked with the keys inside in a lot near the street in a high crime neighborhood, and a former employee stole the truck and ran over the plaintiff. *Palma*, 36 Cal. 3d at 176, 184−86. In *Carrera*, a California appellate court reversed a grant of summary judgment in favor a defendant who had left a tow truck unattended with the key in the ignition in a high crime area, emphasizing that "(1) the tow truck . . . was a powerful vehicle capable of inflicting more serious injury and damage than an ordinary vehicle when not properly controlled and the safe operation of the tow truck was not a matter of common experience; and (2) the tow truck was unattended and accessible to thieves within the meaning of the special circumstances doctrine." *Carrera*, 177 Cal. App. 4th at 370−71.

The principles underlying California's special circumstances exception for stolen vehicles weigh against dismissing, at the pleading stage, Plaintiffs' claim here for liability based on a stolen firearm. The California Court of Appeal in *Reida* noted a case decided under that doctrine in reaching its conclusion that a father could be held liable for his son's use of the father's rifle. *Reida*, 18 Cal. App. 3d at 706 (citing and describing as "somewhat analogous" *Hergenrether*, 61

1   Cal. 2d 440).[17]  The United States concedes that the special circumstances doctrine "[p]resumably

2   . . . also applies in the context of firearm possession and storage," but argues that the

3   circumstances of this case do not fall within the doctrine.  *See* U.S. Mot. at 22.  The Court

4   disagrees.

5         A handgun is indisputably capable of inflicting serious injury and damage—as a deadly

6   weapon, that is its very purpose.  *See Reida*, 18 Cal. App. 3d at 704 ("A Swedish Mauser military

7   rifle is a lethal weapon whose sole function is to kill human beings and animals of comparable

8   size.").  Leaving a gun loaded makes that capability for harm readily accessible in the same way as

9   leaving the key in the ignition of a vehicle.  Plaintiffs allege that the handgun was left loaded and

10  unlocked in a vehicle in downtown San Francisco, parts of which are well known to have high

11  rates of car break-ins and similar petty theft.  Compl. ¶¶ 44, 56.  Even assuming for the sake of the

12  argument that the car was locked and the gun itself was not visible,[18] the Court holds that, at the

13  pleading stage, the complaint includes sufficient allegations to support a claim that leaving a

14  loaded gun in a backpack visible on the seat of an unattended vehicle in San Francisco "create[s]

15  foreseeable risk of harm" comparable to that posed by a dangerous vehicle, and that the BLM

16  ranger therefore had a duty to better secure his handgun against theft.  Whether the ranger in fact

17  had such a duty, and if so, the precise nature of that duty, depends on circumstances better

18  addressed on a more complete factual record at summary judgment or at trial.

19            b.  Causation

20        The causation element of a negligence claim "has two aspects": (1) whether the

21  defendant's action or inaction was a "cause in fact" of the plaintiff's injury, also known as "but

22  for" causation; and (2) whether, based on "the degree of connection between the conduct" and

23  _____

24  [17] Conversely, at least one of the out-of-state stolen gun decisions cited by the United States
    reached its conclusion that the gun owner was not liable in part based on the "overwhelming

25  weight of authority" under Missouri law "that the owner of an automobile who parks the car in a
    public area with the keys in the ignition is not liable to a motorist or a pedestrian injured by the

26  negligent driving of a thief."  *See Finocchio*, 37 S.W.3d at 303.
    [18] The parties dispute how the Court should interpret the allegations of the complaint as to these

27  issues.  *See* U.S. Mot. at 22−23, Opp'n to U.S. Mot. at 4; U.S. Reply at 8 n.3.  The Court need not
    resolve that dispute.  Even assuming for the sake of argument that the United States is correct, the

28  Court finds the allegations sufficient at the pleading stage to allege a duty of care under the special
    circumstances doctrine.

considerations of public policy, it would be "unjust to hold [the defendant] legally responsible," often referred to as "proximate" causation. *State Dep't of State Hosps. v. Superior Court*, 61 Cal. 4th 339, 352−53 (2015) (citations and internal quotation marks omitted). "'Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint . . . .  Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact." *Dep't of State Hosps.*, 61 Cal. 4th at at 353 (quoting *Weissich v. County of Marin*, 224 Cal. App. 3d 1069, 1084 (1990)) (ellipsis in original).

The parties' arguments focus primarily on proximate cause rather than cause in fact, and specifically the extent to which the harm to Steinle was a foreseeable result of the BLM ranger's failure to secure the handgun.  Although intervening criminal conduct of a third party can in some circumstances cut off legal causation, a defendant "'is not relieved of liability because of the intervening act of a third person if [the] act was reasonably foreseeable at the time of the original negligent conduct. . . . The foreseeability required is of the *risk of harm*, not of the particular intervening act.'" *Rosecrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1087 (2011) (quoting *Anaya v. Superior Court*, 78 Cal. App. 4th 971, 973 (2000)) (first alteration in original).  For substantially the same reasons discussed above in the context of the "special circumstances" vehicle theft cases, at this early stage of the case, Plaintiffs' allegations sufficiently and plausibly allege that the risk of a thief stealing the handgun and shooting someone, whether intentionally or negligently, was reasonably foreseeable.

The situation here is somewhat less straightforward, however, because Plaintiffs' complaint does not allege that Lopez-Sanchez stole the handgun.  Plaintiffs allege only that the "firearm was stolen from the [BLM ranger's] vehicle, and less than five (5) days later it was used to kill [Steinle]," and that Lopez-Sanchez "was in possession of" the BLM handgun when he shot Steinle.  Compl. ¶ 1, 44.  As far as the Court is aware, all of the stolen vehicle cases that California courts have allowed to proceed under the special circumstances doctrine involved harm caused by the people who stole the vehicles at issue.  It is not clear whether California courts would apply that doctrine where the person causing harm did not steal the vehicle—for example, if a stolen

46

truck had been sold by the thief to a buyer who later negligently caused a serious traffic accident. Here, it is conceivable that the ranger's failure to secure the gun was not even a "but for" cause of Steinle's death: if Lopez-Sanchez had set out to purchase a handgun and chosen the gun at issue from among several comparable handguns sold on the black or grey market, the same outcome might have resulted even if the BLM ranger's gun had never been stolen.

In this case, resolution of these issues at the pleading stage is premature. The Court must construe the allegations of the complaint in the light most favorable to Plaintiffs and draw all reasonable inferences in Plaintiffs' favor to determine whether the complaint plausibly states a claim for relief. *See, e.g.*, *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016); *Ali v. Rogers*, 780 F.3d 1229, 1232 (9th Cir. 2015). The "plausibility" standard does not require that a conclusion be the most probable explanation of the facts alleged. *See, e.g.*, *Twombly*, 550 U.S. at 556; *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 (9th Cir. 2014). Here, based on the allegation that Lopez-Sanchez had the BLM ranger's handgun when he shot Steinle within a few days of its theft, it is plausible, in the context of a motion under Rule 12(b)(6), that Lopez-Sanchez stole the gun from the ranger's vehicle. The Court need not decide at this time whether such an inference would be warranted on summary judgment, or what consequences would result from any intervening steps between the theft of the gun and Lopez-Sanchez taking possession of it.

Accordingly, Plaintiffs' complaint adequately states a claim under California common law that the BLM ranger had a duty to properly secure the handgun, that the ranger breached that duty by leaving the loaded gun in an unattended vehicle, that the failure to secure the handgun proximately caused Steinle's death, and that Plaintiffs suffered damages as a result. Plaintiffs may therefore proceed on their negligence claim against the United States under the FTCA.

### c. Per Se Duty of Care

In addition to a duty under the common law principles discussed above, Plaintiffs also argue that BLM manuals and similar guidance regarding proper storage, transportation, and security of firearms impose a duty of care applicable here under section 669 of the California Evidence Code, which codifies the standard for negligence per se. *See* Compl. ¶¶ 75−82; Opp'n to

47

1  U.S. Mot. at 18−21.  Plaintiffs argue that the manuals qualify as a source of duty under section

2  669.1 of the Evidence Code because they were adopted as regulations pursuant to the

3  Administrative Procedure Act.  Opp'n to U.S. Mot. at 20−21.  The United States contends that the

4  manuals were not in fact adopted under the Administrative Procedure Act and therefore do not

5  create a duty actionable under section 669.  U.S. Reply at 10.

6         Section 669 of the California Evidence Code provides that violation of a "statute,

7  ordinance, or regulation of a public entity" satisfies the duty and breach elements of a negligence

8  claim.  *See* Cal. Evid. Code § 669(a)(1).  Section 669.1 clarifies that a "rule, policy, manual, or

9  guideline" does *not* qualify as a source of law under section 669 unless it has been formally

10  adopted as a statute, ordinance, or regulation.  *Id.* § 669.1.  To be considered a regulation, the rule

11  must have been adopted pursuant to either the state or federal Administrative Procedure Act.  *Id.*

12         The complaint does not allege that either of the manuals it cites—the "Department of the

13  Interior Departmental Manual" or "BLM's Manual Handbook 1112-2 on Safety and Health for

14  Field Operations"—was adopted as a regulation under the Administrative Procedure Act.  *See*

15  Compl. ¶¶ 75−82.  Plaintiffs contend that the Department of the Interior manual, an excerpt of

16  which they submit for judicial notice, qualifies based on language therein stating that "[t]hese

17  directives and standards implement statutory provisions, Public Law, and regulations relating to

18  Federal law enforcement."  Opp'n to U.S. Mot. at 20−21; Req. for Judicial Not. in Supp. of Pls.'

19  Opp'n to U.S. Mot. (dkt. 38-1) Ex. D.[19]  That language does not indicate that the manual itself was

20  adopted as a regulation.  If it was not, then regardless of whether it implements other sources of

21  law, Plaintiffs cannot rely on the manual as a source of a negligence per se duty under California

22  law and must instead identify the actual statutes or regulations that create a relevant duty.  *See* Cal.

23  Evid. Code § 669.1.  Because neither the complaint nor documents subject to judicial notice show

24  that the manuals Plaintiffs cite qualify as a source of a duty under sections 669 and 669.1 of the

25  Evidence Code, Plaintiffs' negligence per se claim based on the BLM ranger's conduct is

26  DISMISSED with leave to amend.

27

28  [19] This exhibit is subject to judicial notice both as a public record and as a document referenced and relied on by the complaint.

United States District Court
Northern District of California

The United States also argues that federal agency rules cannot serve as a basis for this claim because "'[f]ailure of a duty to perform mandatory federal functions does not itself give rise to a FTCA claim; rather, the source of substantive liability, under the FTCA, is the law the state in which the cause of action accrued.'" U.S. Mot. at 14, 19 (quoting *Dugard v. United States*, No. 11-cv-4718-CTB, 2013 WL 6228625, at *3 (N.D. Cal. Nov. 27, 2013), *aff'd*, 835 F.3d 915 (9th Cir. 2016)). Plaintiffs argue that section 669 of the California Evidence Code provides a sufficient source of substantive liability under state law regardless of whether the underlying duty is borrowed from federal law. *See* Opp'n to U.S. Mot. at 20−21. The United States does not identify any authority specifically addressing the question of whether the FTCA permits claims under state negligence per se doctrines that incorporate duties established by federal law. *See* U.S. Mot. at 13−14, 19; U.S. Reply at 10. The Court need not reach this issue in light of Plaintiffs' failure to identify a qualifying "statute, ordinance, or regulation" establishing the duty they seek to apply. If Plaintiffs amend their complaint to identify a federal law that governs the BLM ranger's storage of his firearm and creates a duty actionable under section 669, the parties are encouraged to address this issue in more detail in any future motions practice.

## IV.    CONCLUSION

For the reasons stated above, the City Defendants' motion to dismiss is GRANTED, and the United States' motion to dismiss is GRANTED in part and DENIED in part. Plaintiffs' claims are DISMISSED without leave to amend, except for: (1) Plaintiffs' FTCA claim against the United States for general negligence under California common law based on the BLM ranger's conduct, which may proceed; and (2) Plaintiffs' FTCA claim against the United States for negligence per se as codified at section 669 of the California Evidence Code based on the BLM ranger's conduct, which is DISMISSED with leave to amend if Plaintiffs can identify a statute, ordinance, or regulation that establishes a relevant duty. If Plaintiffs wish to amend their complaint to pursue the latter claim, they may do so no later than January 27, 2017.

**IT IS SO ORDERED.**

Dated: January 6, 2017

JOSEPH C. SPERO
Chief Magistrate Judge

49