**FRANK M. PITRE** (SBN 100077)
fpitre@cpmlegal.com
**ALISON CORDOVA** (SBN 284942)
acordova@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JAMES STEINLE**, individually and as heir to **KATHRYN STEINLE,** deceased; **ELIZABETH SULLIVAN**, individually, and as heir to **KATHRYN STEINLE,** deceased; and **JAMES STEINLE** and **ELIZABETH SULLIVAN**, as co-representatives of the Estate of **KATHRYN STEINLE**, <br><br> Plaintiffs, <br><br> v. <br><br> **THE UNITED STATES OF AMERICA**, a governmental entity; **CITY AND COUNTY OF SAN FRANCISCO**, a governmental entity; **ROSS MIRKARIMI**, an individual; and **JUAN FRANCISCO LOPEZ-SANCHEZ**, an individual. <br><br> Defendants. | Case No.:  16-cv-02859 JCS <br><br> **DECLARATION OF ALISON E. CORDOVA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing Date:  December 20, 2019 <br> Time:  9:30 AM <br> Judge: Hon. Joseph C. Spero <br> Dept.: Courtroom G, 15th Floor |

**DECLARATION OF ALISON E. CORDOVA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT, Case No.: 16-cv-02859 JCS**

I, ALISON E. CORDOVA, declare as follows:

1.    I am an attorney duly licensed to practice law before this Court.  I am a partner with the law firm of Cotchett, Pitre & McCarthy, LLP, attorneys of record for Plaintiffs James Steinle, Elizabeth Sullivan, and James Steinle and Elizabeth Sullivan, as co-representatives of the Estate of Kathryn Steinle.  I submit this declaration in support of Plaintiffs' Opposition to Defendant United States of America's Motion for Summary Judgment.  If called as a witness, I could and would competently testify to all facts herein.

2.    Attached hereto as **EXHIBIT 1** is a true and correct copy of the United States Department of the Interior Memorandum dated June 9, 2016 contained in defendant USA's Production of Documents, bates labeled USA000089 – USA000091.

3.    Attached hereto as **EXHIBIT 2** is a true and correct copy of excerpts from the Deposition Transcript of John Woychowski dated December 13, 2019.

4.    Attached hereto as **EXHIBIT 3** is a true and correct copy of Attorney General Xavier Becerra's Firearm Safety webpage.

5.    Attached hereto as **EXHIBIT 4** is a true and correct copy of excerpts from the Deposition Transcript of Julia Rascon dated May 6, 2019.

6.    Attached hereto as **EXHIBIT 5** is a true and correct copy of Exhibit 3 to the deposition of Officer Frank Olcomendy dated June 13, 2019.

7.    Attached hereto as **EXHIBIT 6** is a true and correct copy of the 2015 Buick Enclave Catalogue.

8.    Attached hereto as **EXHIBIT 7** is a true and correct copy of excerpts from the Deposition Transcript of James Steinle dated April 22, 2019.

9.    Attached hereto as **EXHIBIT 8** is a true and correct copy of the BLM Manual contained in defendant USA's Production of Documents bates labeled USA000025- USA000031.

10.    Attached hereto as **EXHIBIT 9** is a true and correct copy of the 2014 BLM Handbook 1112-1 contained in defendant USA's Production of Documents bates labeled USA000033- USA000043.

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**DECLARATION OF ALISON E. CORDOVA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT, Case No.: 16-cv-02859 JCS**                                                          1

1        11.     Attached hereto as **<u>EXHIBIT 10</u>** is a true and correct copy of Exhibit 4 to the

2    deposition Transcript of John Woychowski dated December 13, 2019.

3

4        I declare under penalty of perjury under the laws of the state of California that the

5    foregoing is true and correct.  Executed this 1st day of November 2019, in Burlingame, California.

6

7                                    Respectfully submitted,

8

9                                    _____/s/ Alison E. Cordova_____
                                       Alison E. Cordova
10                                     *Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT, PITRE
& McCARTHY, LLP

**DECLARATION OF ALISON E. CORDOVA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT, Case No.: 16-cv-02859 JCS**                    2

# CERTIFICATE OF SERVICE

I am employed in the County of San Mateo; I am over the age of 18 years and not a party to the within cause.  My business address is the Law Offices of Cotchett, Pitre & McCarthy, LLP, San Francisco Airport Office Center, 840 Malcolm Road, Suite 200, Burlingame, California, 94010. On this day, I served the following document(s) in the manner described below:

**DECLARATION OF ALISON E. CORDOVA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

**✗  VIA FIRST CLASS MAIL:** I am readily familiar with this firm's practice for collection and processing of correspondence for mailing.  Following that practice, I placed a true copy of the aforementioned document(s) in a sealed envelope, addressed to each addressee, respectively, as specified below.  The envelope was placed in the mail at my business address, with postage thereon fully prepaid, for deposit with the United States Postal Service on that same day in the ordinary course of business.

Margaret W. Baumgartner
Deputy City Attorney
Office of the City Attorney
1390 Market Street, 6th Floor
San Francisco, California 94102
Tele:  (415) 554-3859
Fax:  (415) 554-3837
E-Mail:  margaret.baumgartner@sfgov.org

***COUNSEL FOR DEFENDANTS:***
***CITY AND COUNTY OF SAN FRANCISCO & ROSS MIRKARIMI***

Brian J. Stretch
*US Attorney*

***COUNSEL FOR DEFENDANT:***
***UNITED STATES OF AMERICA***

Sara Winslow
*Chief, Civil Division*

Robin M. Wall
*Assistant US Attorney*

450 Golden Gate Ave., Box 36055
San Francisco, CA 94102-3495
Tel: (415) 436-7071
Fax:  (415) 436-6748
Email:  Robin.Wall@usdoj.gov

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.  Executed at Burlingame, California, on November 1, 2019.

_/s/  Alejandra Prado_

LAW OFFICES COTCHETT, PITRE & McCARTHY, LLP

# EXHIBIT 1



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Office of Law Enforcement and Security
1849 C St NW, Room 5612
Washington, DC 20240



June 9, 2016

In Reply Refer To:
9260 (WO120) I

Memorandum

To:      Tim Lynn
            Acting Director, DOI Office of Law Enforcement and Security

From:    Daniel Fowler
            Deputy Director, BLM Office of Law Enforcement and Security

Subject:  Request for Details Concerning a Stolen BLM Firearm Used in the
            Commission of a Crime

On July 8, 2015, the United States (U.S.) Department of the Interior (DOI), Bureau of Land Management (BLM), Office of Law Enforcement and Security (OLES), Office of Professional Responsibility (OPR) received notification that a news media article reported that authorities were investigating whether a gun associated with a BLM employee was used in the fatal shooting of a woman on a tourist-heavy pier in San Francisco, California. The reporting appeared connected to the June 27, 2015, theft of a BLM issued handgun from the personally owned vehicle (POV) of a BLM Law Enforcement Officer (LEO) in downtown San Francisco. Investigation by the BLM, OLES, on July 8, 2015, revealed that the serial number of the BLM LEO's issued handgun matched the serial number of a handgun recovered from the water near a pier along the San Francisco waterfront. Investigation by the OPR revealed the following:

The BLM LEO was in San Francisco on the night of June 27, 2015, with his family, en route to work a Fourth of July detail in Helena, Montana with a BLM Montana LEO. The BLM LEO chose to drive his POV, a 2015 Buick Enclave, a mid-size sport utility vehicle (SUV) with no isolated, lockable trunk compartment, so his family could accompany him. For his detail, the BLM LEO intended to use a law enforcement vehicle made available at his temporary duty location. The BLM LEO and his family began traveling one day in advance of his official travel period, on his day off, in order to see the California coast. Delayed several hours due to traffic, they stopped in San Francisco to have dinner at approximately 9:45 p.m., parking along The Embarcadero, near Pier 5 of the waterfront. The BLM LEO parked his POV in an uncovered, curbside, metered parking area and spoke with a uniformed security officer who advised he would be in the area until 11:00 p.m. The BLM LEO left his secondary handgun, a Sig Sauer P239 .40 caliber pistol, and law enforcement credentials in a backpack, which he placed under his driver's seat. The BLM LEO did not disclose his identity as a law enforcement officer. His primary weapon and other duty gear were hidden in the spare tire compartment in the rear cargo area of the vehicle, with the family luggage stacked on top. The BLM LEO

advised there was no lockable compartment in his vehicle.  The BLM LEO and his family walked to a restaurant approximately one and one-half blocks away.

The BLM LEO returned to his POV at exactly 10:59 p.m. to find it had been broken into. He discovered the backpack containing his secondary handgun and credentials was missing, as was a duffel bag containing three sets of his BLM uniforms and other clothing.  A case to one of his children's game systems was missing, and a few of the BLM LEO's personal items were soon located at the base of a nearby fence.  The BLM LEO immediately notified San Francisco Police Department (SFPD) and the BLM OLES California Duty Officer, the Acting State Chief Ranger, DOI, BLM, OLES, Region 1.

SFPD arrived at the BLM LEO's location at 11:14 p.m. and conducted an investigation of the theft, including an unsuccessful search for available video surveillance in the area. The BLM LEO estimated SFPD was on-scene for approximately one hour and twenty minutes.  The BLM LEO requested the stolen firearm be entered into the National Crime Information Center (NCIC) immediately.  Thereafter, he and his family began driving toward Sacramento, California, to find a hotel room.  Approximately 45 minutes after leaving San Francisco, the BLM LEO received a call from SFPD advising his backpack had been recovered, but not the firearm.  The BLM LEO returned to SFPD Central Station to claim the backpack which had been recovered from another car that had been burglarized in the same area.  He found his credentials, government credit cards, spare pistol magazine, a knife and other items, with the exception of his handgun and some "tough-ties," were present.  The BLM LEO advised, and included in his incident report, that the officer who returned him his property said thefts were a common occurrence in the area the BLM LEO had parked, but acknowledged there were no signs alerting visitors to that risk.

The Acting State Chief Ranger sent initial e-mail notification to the BLM Duty Officer at 12:23 a.m., Pacific Daylight Time (PDT) on June 28, 2015, which read:  "Just got a call from [the BLM LEO] reference his backup firearm, credentials, and government credit card. They were stolen from his POV while on travel status. Police just arriving."  The Acting State Chief Ranger sent a second e-mail to the BLM duty officer at 6:12 a.m. (PDT) on June 28, 2015, which read: "PD recovered cred and credit cards.  Firearm is still missing."

A Serious Incident Report (SIR) regarding the incident was sent to the BLM Duty Officer e-mail account on June 29, 2015 at 8:28 p.m. (PDT).  Entry of information on the stolen firearm into NCIC was made by SFPD on June 30, 2015.  A BLM Incident Management, Analysis, and Reporting System (IMARS) report was initiated on June 28, 2015 and completed July 8, 2015.

The BLM LEO arrived in Helena on July 1, 2015, and completed his assigned detail after purchasing replacement uniform clothing at a local store.

On July 7, 2015, the BLM LEO was contacted by SFPD and learned that a weapon recovered from the San Francisco waterfront near Pier 14 was possibly the weapon stolen

USA000090

from his vehicle, and was possibly connected to a separate investigation. Early on July 8, 2015, news media began reporting that the gun used in a July 1, 2015, shooting of a young woman on Pier 14 was a BLM Ranger's service pistol, stolen from his vehicle four days earlier.

A Special Agent, DOI, BLM, OLES, Hollister Field Office, Hollister, California, met with SFPD investigators on July 8, 2015, and viewed photographs of the weapon SFPD recovered from the waterfront near Pier 14. The Special Agent advised the serial number of the recovered weapon matched the serial number for the BLM LEO's issued Sig Sauer P239. On July 10, 2015, a news article reported SFPD's announcement that ballistic testing confirmed "the fatal round that struck the victim was from the gun recovered in S.F. Bay."

On July 9, 2015, the OPR was notified that the San Francisco District Attorney's Office would not file charges against the BLM LEO.

The OPR Case Agent interviewed the BLM LEO on July 13, 2015. On the same date, the BLM LEO was contacted by SFPD and asked to submit any items from the theft incident that could potentially contain fingerprint evidence.

The OPR, during its investigation, ensured SFPD was aware of the information that the BLM LEO provided regarding the uniformed security officer with whom he interacted while parking.

# EXHIBIT 2

1      IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

2                      DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4     ------------------------------------x
                                          )
5     JAMES STEINLE, individually, and    )
      as heir to KATHRYN STEINLE, deceased;)
6     ELIZABETH SULLIVAN, individually,    )
      and as heir to KATHRYN STEINLE,      )
7     deceased; and JAMES STEINLE, and     )
      ELIZABETH SULLIVAN, as co-           )
8     representatives of the Estate of     )
      KATHRYN STEINLE,                     )
9                                          )
               Plaintiffs,                 )CASE NO.
10                                         )16-CV-02859 JCS
      v.                                   )
11                                         )
      THE UNITED STATES OF AMERICA, a      )
12    government entity,                   )
                                           )
13             Defendant.                  )
                                           )
14    ------------------------------------x

15

16          Videotaped deposition of JOHN WOYCHOWSKI

17                      Burlingame, CA

18              Thursday, December 13, 2018

19                      10:21 a.m.

20

21

22

23    Job No.:  215877

24    Pages:  1-255

25    Reported by:  Marcie Walsh, CSR 14201

Transcript of John Woychowski
Conducted on December 13, 2018                    66

| | | |
|---|---|---|
| 1 | Mr. Woychowski, whether or not that is an accurate | 11:46:43 |
| 2 | description of where you believe you parked that | 11:46:47 |
| 3 | night? | 11:46:49 |
| 4 | A    On this one? | 11:46:49 |
| 5 | Q    Yes.  Of where the police have documented | 11:46:50 |
| 6 | it. | 11:46:52 |
| 7 | A    No, I wouldn't know just by reading this. | 11:46:53 |
| 8 | Q    And that's what I meant. | 11:46:56 |
| 9 | Do you have a specific recollection from | 11:46:57 |
| 10 | that night of seeing a street sign and saying to | 11:46:59 |
| 11 | yourself, I've parked at the corner of Embarcadero | 11:47:01 |
| 12 | and Washington? | 11:47:03 |
| 13 | A    No. | 11:47:04 |
| 14 | Q    No.  Do you recall looking around you to | 11:47:04 |
| 15 | identify any -- any landmarks to help yourself orient | 11:47:08 |
| 16 | with where you'd parked? | 11:47:15 |
| 17 | A    No.  Not -- I don't remember back then, no, | 11:47:19 |
| 18 | sitting here now, no. | 11:47:22 |
| 19 | Q    Okay.  As you sit here right now, do you | 11:47:23 |
| 20 | remember landmarks by your car that were -- that | 11:47:27 |
| 21 | stuck out to you? | 11:47:30 |
| 22 | A    The only thing I remember is on the | 11:47:31 |
| 23 | passenger's side, the fence line, the fence was lined | 11:47:34 |
| 24 | with some type of a tarp.  I do remember that. | 11:47:38 |
| 25 | Q    Okay.  Okay.  So, generally, if you'll see | 11:47:40 |

Transcript of John Woychowski
Conducted on December 13, 2018                    69

| | | |
|---|---|---|
| 1 | something was open. | 11:50:51 |
| 2 | I remember it didn't appear as though a lot | 11:50:52 |
| 3 | of restaurants were open.  It looked more of a bar | 11:50:54 |
| 4 | scene and I didn't -- I don't drink much and I didn't | 11:50:56 |
| 5 | want to take my kids to a bar, so -- and so it looked | 11:50:59 |
| 6 | like it was a restaurant. | 11:51:04 |
| 7 | I don't know remember if it was because it | 11:51:05 |
| 8 | had an open sign lit up.  I'm not sure, but so once I | 11:51:06 |
| 9 | thought I identified a would-be restaurant -- | 11:51:10 |
| 10 | Q    Yeah. | 11:51:13 |
| 11 | A    -- I then began looking for a place to park | 11:51:13 |
| 12 | within close proximity to that restaurant.  And so | 11:51:17 |
| 13 | that's how I started that -- looking for that. | 11:51:21 |
| 14 | Q    Okay.  And is it accurate that you were | 11:51:23 |
| 15 | parked on the curb of a public street? | 11:51:36 |
| 16 | A    Yes. | 11:51:42 |
| 17 | Q    Okay.  And it sounds like your -- the pass | 11:51:42 |
| 18 | -- was it accurate the passenger's side was curb | 11:51:49 |
| 19 | side? | 11:51:51 |
| 20 | A    Yes. | 11:51:51 |
| 21 | Q    Okay.  And from what you can recall you can | 11:51:52 |
| 22 | recall that there was some sort of tarped fence right | 11:51:57 |
| 23 | there? | 11:52:01 |
| 24 | A    Yes. | 11:52:02 |
| 25 | Q    Okay.  Excuse me -- well, we're just going | 11:52:02 |

Transcript of John Woychowski
Conducted on December 13, 2018                    81

| | | |
|---|---|---|
| 1 | How long did you plan on being in Montana? | 12:05:44 |
| 2 | A     I think it was a two-week detail.  I'm not | 12:05:47 |
| 3 | sure without looking at the exact dates. | 12:05:51 |
| 4 | Q     Okay.  And did your -- was your family | 12:05:54 |
| 5 | intending to stay with you those entire two weeks? | 12:05:58 |
| 6 | A     Yes. | 12:06:00 |
| 7 | Q     Okay.  So what luggage did you guys bring | 12:06:08 |
| 8 | with you in the vehicle? | 12:06:13 |
| 9 | A     So I would say that each child packed their | 12:06:15 |
| 10 | own bag, packed a bag.  So, you know, my two older | 12:06:19 |
| 11 | kids had a bag, and my fiancee would have had her | 12:06:22 |
| 12 | large bag, and she would have packed for my youngest | 12:06:26 |
| 13 | daughter. | 12:06:30 |
| 14 | Q     Okay. | 12:06:30 |
| 15 | A     And then I had my -- my bag. | 12:06:30 |
| 16 | Q     So, generally, everybody brought one -- one | 12:06:33 |
| 17 | bag, or one luggage bag? | 12:06:36 |
| 18 | A     Yeah.  And probably a backpack with | 12:06:39 |
| 19 | whatever they wanted to have, like, up front with | 12:06:42 |
| 20 | them. | 12:06:44 |
| 21 | Q     And then did you have additional bags that | 12:06:45 |
| 22 | you were bringing as well? | 12:06:48 |
| 23 | A     I think for myself, I just had the -- my | 12:06:50 |
| 24 | one duffel bag.  I think that's all I had. | 12:06:52 |
| 25 | I don't remember if I had anything else. | 12:06:58 |

Transcript of John Woychowski
Conducted on December 13, 2018                      82

| | | |
|---|---|---|
| 1 | And my backpack. | 12:06:59 |
| 2 | Q    Okay.  And where were those -- the -- where | 12:07:00 |
| 3 | were the -- everyone's luggage bags stored when you | 12:07:13 |
| 4 | left El Centro or your house that -- that morning? | 12:07:18 |
| 5 | A    In the hatchback area, trunk of the | 12:07:20 |
| 6 | hatchback area.  Would be the main -- the bigger | 12:07:24 |
| 7 | bags, like, I said, the backpacks would be -- | 12:07:27 |
| 8 | Q    Up with the kids, I'm assuming. | 12:07:31 |
| 9 | And do you -- where were the -- when you're | 12:07:32 |
| 10 | driving into San Francisco, can you identify for me | 12:07:35 |
| 11 | -- can you identify for me in black pen, Xs where the | 12:07:48 |
| 12 | three kids were sitting? | 12:07:51 |
| 13 | A    I don't remember who was sitting, but I | 12:07:55 |
| 14 | could tell you -- you know what I mean? | 12:07:57 |
| 15 | Q    That's perfect.  Thank you.  Got it.  Okay. | 12:07:59 |
| 16 | And was there anything else that the kids | 12:08:03 |
| 17 | had, for example, for entertainment purposes, with | 12:08:06 |
| 18 | them here in the main cabin compartment while you | 12:08:11 |
| 19 | guys were driving into San Francisco? | 12:08:16 |
| 20 | A    Yes. | 12:08:18 |
| 21 | Q    Okay.  What did they have with them? | 12:08:18 |
| 22 | A    So I had bought my youngest daughter a | 12:08:20 |
| 23 | Nintendo DS game system for this trip, specifically. | 12:08:24 |
| 24 | Q    Okay. | 12:08:24 |
| 25 | A    So she had that, she had an iPad.  And my | 12:08:27 |

Transcript of John Woychowski
Conducted on December 13, 2018                    83

| | | |
|---|---|---|
| 1 | son -- they all had -- so I don't know if he had a | 12:08:32 |
| 2 | phone at that point or not.  I can't remember when I | 12:08:37 |
| 3 | first bought him a phone. | 12:08:38 |
| 4 |     Q    Okay. | 12:08:39 |
| 5 |     A    But, you know, he had phone or an iPad, | 12:08:39 |
| 6 | And my other daughter had an iPad, probably. | 12:08:42 |
| 7 |     Q    Okay. | 12:08:45 |
| 8 |     A    And then on top of that was 2 DVD screens | 12:08:45 |
| 9 | that I attached to the headrest of the front seats. | 12:08:51 |
| 10 |     Q    Okay. | 12:08:54 |
| 11 |     A    Were not part of the vehicle is, I guess, | 12:08:55 |
| 12 | what I'm trying to say. | 12:09:00 |
| 13 |     Q    Yes.  I appreciate that.  DVD screens | 12:09:02 |
| 14 | attached to headrest. | 12:09:05 |
| 15 |     The Nintendo, can you just tell me what | 12:09:06 |
| 16 | that system was again?  The Nintendo -- sorry. | 12:09:08 |
| 17 |     A    I think it's Nintendo DS. | 12:09:10 |
| 18 |     Q    DS.  I'm not a gamer. | 12:09:12 |
| 19 |     Is that a -- is that a -- is that a console | 12:09:15 |
| 20 | that then hooks into a screen, or is it an all in one | 12:09:22 |
| 21 | handheld gaming tool? | 12:09:27 |
| 22 |     A    It's a handheld tool, a game. | 12:09:28 |
| 23 |     Q    Got it.  Thank you.  Okay. | 12:09:30 |
| 24 |     Now, if we go back to the 2015 Buick | 12:09:37 |
| 25 | Enclave owner's manual, and you turn to page 2-11. | 12:09:50 |

Transcript of John Woychowski
Conducted on December 13, 2018                    84

| | | |
|---|---|---|
| 1 | The pages are oddly numbered and they're in | 12:10:02 |
| 2 | the upper right-hand corner. | 12:10:05 |
| 3 | A    Okay. | 12:10:07 |
| 4 | Q    But some of the pages don't -- they don't | 12:10:07 |
| 5 | put a number on them.  I'm not sure why. | 12:10:09 |
| 6 | A    Okay. | 12:10:12 |
| 7 | Q    Okay.  Looks like you found it.  Perfect. | 12:10:13 |
| 8 | So I'm looking in the third column to the | 12:10:15 |
| 9 | right where it says vehicle security.  Okay. | 12:10:18 |
| 10 | And then do you see where it says vehicle | 12:10:24 |
| 11 | alarm system? | 12:10:27 |
| 12 | A    I see that, yes. | 12:10:29 |
| 13 | Q    Okay.  And then I'm going to read beneath | 12:10:30 |
| 14 | it.  It says: | 12:10:30 |
| 15 | On vehicles with an anti-theft alarm | 12:10:33 |
| 16 | system.  To activate the system:  I'm going to stop | 12:10:36 |
| 17 | reading right there. | 12:10:40 |
| 18 | Did I read that correctly? | 12:10:41 |
| 19 | A    Are you -- I'm sorry -- yes, you did. | 12:10:43 |
| 20 | Q    No worries.  Did your vehicle have an | 12:10:45 |
| 21 | anti-theft alarm system, to your knowledge? | 12:10:48 |
| 22 | A    Yes. | 12:10:50 |
| 23 | Q    Okay.  Do you know whether or not you | 12:10:51 |
| 24 | activated that system when you left your vehicle | 12:10:58 |
| 25 | parked in downtown San Francisco on June 27th of | 12:11:03 |

Transcript of John Woychowski
Conducted on December 13, 2018                    85

| # | | Text | Time |
|---|---|------|------|
| 1 | | 2015? | 12:11:08 |
| 2 | A | Yes. | 12:11:09 |
| 3 | Q | Where the child safety locks also -- sorry | 12:11:11 |
| 4 | | -- strike that. | 12:11:11 |
| 5 | | I'm assuming for the -- generally in your | 12:11:18 |
| 6 | | car, did you have the child safety locks engaged? | 12:11:20 |
| 7 | A | No, I don't believe so. | 12:11:23 |
| 8 | Q | Okay.  Then we'll turn to what page that is | 12:11:24 |
| 9 | | -- so on page 2-8, I believe it shows an image of | 12:11:33 |
| 10 | | what it looks like. | 12:11:41 |
| 11 | | Yeah, it starts to get kind of -- | 12:11:42 |
| 12 | | MR. WALL:  I'm sorry -- what page? | 12:11:54 |
| 13 | | MS. CORDOVA:  2-8. | 12:11:57 |
| 14 | Q | So do ever remember seeing something like | 12:12:11 |
| 15 | | this on the inside of the rear doors of the 2015 | 12:12:13 |
| 16 | | Buick Enclave that you owned? | 12:12:17 |
| 17 | A | Not specifically. | 12:12:19 |
| 18 | Q | Okay.  And do you ever remember | 12:12:19 |
| 19 | | specifically adjusting these -- this one way or the | 12:12:23 |
| 20 | | other? | 12:12:27 |
| 21 | A | No. | 12:12:27 |
| 22 | Q | Okay.  Do you remember turning off the | 12:12:28 |
| 23 | | child safety locks? | 12:12:30 |
| 24 | A | No. | 12:12:31 |
| 25 | Q | Do you remember turning them on? | 12:12:32 |

Transcript of John Woychowski
Conducted on December 13, 2018                               97

| | | |
|---|---|---|
| 1 | A    My youngest daughter's iPad was in the | 12:25:20 |
| 2 | vehicle, yes. | 12:25:22 |
| 3 | Q    Okay.  So you recall at least that she left | 12:25:23 |
| 4 | the -- her iPad in the vehicle when you guys went to | 12:25:26 |
| 5 | dinner? | 12:25:29 |
| 6 | A    Yes. | 12:25:30 |
| 7 | Q    Okay.  But it sounds like with the other | 12:25:30 |
| 8 | daughter and with the son, we're not sure? | 12:25:33 |
| 9 | A    Yeah.  Again, because, I don't know if my | 12:25:34 |
| 10 | daughter, at that point, had an iPad or not.  And | 12:25:37 |
| 11 | that's what I was trying to say before.  Like, I | 12:25:39 |
| 12 | don't remember what they had. | 12:25:41 |
| 13 | I think my son at the time was the only who | 12:25:42 |
| 14 | maybe had a phone, if he had a phone, but I don't | 12:25:45 |
| 15 | remember. | 12:25:46 |
| 16 | Q    Okay.  But I think you pretty efficiently | 12:25:46 |
| 17 | said that your son had an iPad. | 12:25:48 |
| 18 | MR. WALL:  Object to form. | 12:25:51 |
| 19 | Q    Do you not recall?  I have it written down | 12:25:54 |
| 20 | and I do recall that I have a question mark for the | 12:25:56 |
| 21 | third daughter, but I thought that you had testified | 12:25:58 |
| 22 | that one of your daughters and your son both had | 12:26:01 |
| 23 | iPads. | 12:26:03 |
| 24 | Is that not accurate? | 12:26:04 |
| 25 | A    No, I don't believe my son has ever had an | 12:26:05 |

Transcript of John Woychowski
Conducted on December 13, 2018                    98

| | | |
|---|---|---|
| 1 | iPad.  I think it was -- so I -- I had an iPad that | 12:26:08 |
| 2 | my -- would be what my daughter was using, but I | 12:26:12 |
| 3 | think if I was -- what I remember saying was that my | 12:26:15 |
| 4 | son was -- either he had a phone or that iPad, if I | 12:26:17 |
| 5 | wasn't clear, clarify on that. | 12:26:21 |
| 6 |     Q    Okay.  So in terms of if we go back through | 12:26:23 |
| 7 | the electronics that were in the vehicle when you | 12:26:26 |
| 8 | guys left El Centro. | 12:26:28 |
| 9 |     A    Mm-hmm. | 12:26:30 |
| 10 |     Q    There was a Nintendo DS? | 12:26:30 |
| 11 |     A    Yes. | 12:26:31 |
| 12 |     Q    There was definitely at least one iPad? | 12:26:32 |
| 13 |     A    Yes.  It was a red iPad.  That was mine, | 12:26:36 |
| 14 | personally. | 12:26:38 |
| 15 |     Q    Okay.  And your son either had another iPad | 12:26:39 |
| 16 | or a phone?  You're not sure which one; is that | 12:26:45 |
| 17 | accurate? | 12:26:48 |
| 18 |     A    I don't think he had an additional iPad.  I | 12:26:48 |
| 19 | think if he was using one, it would have been that -- | 12:26:51 |
| 20 | that was kind of like the shared iPad. | 12:26:52 |
| 21 |     Q    Got it. | 12:26:54 |
| 22 |     A    Or he had his own phone.  I don't remember | 12:26:55 |
| 23 | at the time. | 12:26:58 |
| 24 |     Q    Okay.  So no additional iPad, but | 12:26:58 |
| 25 | potentially a phone? | 12:27:00 |

Transcript of John Woychowski
Conducted on December 13, 2018                    99

| | | | |
|---|---|---|---|
| 1 | A | Correct. | 12:27:00 |
| 2 | Q | Okay.  And then 2 DVD screens that attached | 12:27:01 |
| 3 | to the headrest; correct? | | 12:27:07 |
| 4 | A | Yes, correct. | 12:27:09 |
| 5 | Q | Now, were the DVD screens taken with you | 12:27:09 |
| 6 | guys to dinner? | | 12:27:11 |
| 7 | A | No. | 12:27:12 |
| 8 | Q | Okay.  So they were left in the vehicle? | 12:27:12 |
| 9 | A | Yes. | 12:27:14 |
| 10 | Q | How were they left in the vehicle? | 12:27:15 |
| 11 | A | On the headrest. | 12:27:20 |
| 12 | Q | Okay.  And where was the Nintendo DS left | 12:27:21 |
| 13 | in the vehicle? | | 12:27:31 |
| 14 | A | I don't know, but it was found on the third | 12:27:33 |
| 15 | row seating, I believe. | | 12:27:35 |
| 16 | | So I don't know where it was actually left. | 12:27:38 |
| 17 | Q | Okay.  And then, do you recall where -- it | 12:27:40 |
| 18 | sounds like you don't recall whether or not the red | | 12:27:45 |
| 19 | iPad was left in the vehicle or not. | | 12:27:47 |
| 20 | A | I believe it was left in the vehicle, | 12:27:50 |
| 21 | because that was one of the things I saw when I got | | 12:27:52 |
| 22 | back. | | 12:27:54 |
| 23 | Q | Got it.  Okay.  And where was that when you | 12:27:55 |
| 24 | got back? | | 12:27:56 |
| 25 | A | On the third row seating. | 12:27:57 |

Transcript of John Woychowski
Conducted on December 13, 2018                      111

| | | |
|---|---|---|
| 1 | A    Yes. | 13:53:13 |
| 2 | Q    Perfect.  Okay. | 13:53:13 |
| 3 | Admit that the vehicle did not have any | 13:53:14 |
| 4 | lockable compartment as of June 27, 2015. | 13:53:17 |
| 5 | Response to request for admission No. 17: | 13:53:21 |
| 6 | Defendant objects to this request on the grounds that | 13:53:24 |
| 7 | the term "lockable compartment" is undefined and | 13:53:26 |
| 8 | potentially vague and ambiguous.  Subject to and | 13:53:28 |
| 9 | without waiver of the foregoing general and specific | 13:53:31 |
| 10 | objections, this request is denied. | 13:53:34 |
| 11 | Did I read that accurately? | 13:53:36 |
| 12 | A    Yes. | 13:53:37 |
| 13 | Q    Okay.  Can you identify, as you sit here | 13:53:38 |
| 14 | today, for me any lockable compartments in the 2015 | 13:53:40 |
| 15 | Buick Enclave that you drove to San Francisco on | 13:53:44 |
| 16 | June 27th of 2015? | 13:53:47 |
| 17 | A    Yes.  The passenger compartment of the | 13:53:49 |
| 18 | vehicle itself, and the glove box. | 13:53:53 |
| 19 | Q    And just so -- when you mean passenger, and | 13:53:58 |
| 20 | I appreciate this, it's like you're referring to the | 13:54:05 |
| 21 | main cabin, the fact that the car can be locked? | 13:54:07 |
| 22 | A    Yes. | 13:54:10 |
| 23 | Q    Okay.  Perfect.  And then the second thing | 13:54:10 |
| 24 | is you said the glove box; correct? | 13:54:12 |
| 25 | A    Yes. | 13:54:14 |

Transcript of John Woychowski
Conducted on December 13, 2018                          112

| | | |
|---|---|---|
| 1 | Q    Was that by a manual key? | 13:54:14 |
| 2 | A    Yes. | 13:54:16 |
| 3 | Q    Okay.  And do you -- do you have a specific | 13:54:17 |
| 4 | recollection of the glove box being locked when you | 13:54:21 |
| 5 | left the vehicle on June 27th of 2015? | 13:54:24 |
| 6 | A    No. | 13:54:26 |
| 7 | Q    Okay.  Do you know if you have a standard | 13:54:26 |
| 8 | practice about keeping that locked or unlocked? | 13:54:29 |
| 9 | A    No. | 13:54:31 |
| 10 | Q    Okay.  Do you know if it came locked or | 13:54:32 |
| 11 | unlocked when you bought the vehicle? | 13:54:37 |
| 12 | A    I don't remember. | 13:54:38 |
| 13 | Q    Do you remember opening the glove | 13:54:39 |
| 14 | compartment at any time? | 13:54:40 |
| 15 | A    Yes, of course. | 13:54:41 |
| 16 | Q    Okay.  Do you remember using the key to | 13:54:42 |
| 17 | open it, or whether or not you did? | 13:54:45 |
| 18 | A    No. | 13:54:46 |
| 19 | Q    Okay.  And I -- just so we have the record | 13:54:46 |
| 20 | clear, it sounds like you don't recall whether or not | 13:54:49 |
| 21 | you did use the key to unlock it or not? | 13:54:51 |
| 22 | A    When I first bought the vehicle?  Is that | 13:54:53 |
| 23 | what you're asking? | 13:54:55 |
| 24 | Q    Yes. | 13:54:56 |
| 25 | A    Correct, yes.  I don't remember that at | 13:54:56 |

Transcript of John Woychowski
Conducted on December 13, 2018                    114

| | | |
|---|---|---|
| 1 | question. | 13:56:07 |
| 2 | Q    Yeah. | 13:56:07 |
| 3 | A    I mean, I think for that specific vehicle, | 13:56:08 |
| 4 | too, I don't think I had another place to put any | 13:56:11 |
| 5 | documents, or maybe the center console. | 13:56:13 |
| 6 | But it's just always, like, every vehicle | 13:56:16 |
| 7 | I've had, I guess I've always used the glove box for | 13:56:19 |
| 8 | my registration, insurance. | 13:56:21 |
| 9 | Q    Okay.  And the center console, was -- is it | 13:56:22 |
| 10 | -- it's not lockable; correct? | 13:56:24 |
| 11 | A    Correct. | 13:56:25 |
| 12 | Q    On the 2015 Buick? | 13:56:26 |
| 13 | A    Correct. | 13:56:27 |
| 14 | Q    How big is it? | 13:56:28 |
| 15 | A    Small. | 13:56:29 |
| 16 | Q    Small.  Could it have fit a Sig Sauer -- a | 13:56:30 |
| 17 | Sig Sauer 229 .40 caliber firearm? | 13:56:37 |
| 18 | A    I don't believe so, no. | 13:56:39 |
| 19 | Q    Would that size of a firearm have fit in | 13:56:40 |
| 20 | your glove compartment? | 13:56:44 |
| 21 | A    Possibly, yes. | 13:56:46 |
| 22 | Q    Would it have fit if you removed the | 13:56:48 |
| 23 | registration, insurance paperwork, and potential | 13:56:51 |
| 24 | napkins that existed in there? | 13:56:53 |
| 25 | A    Possibly, yes. | 13:56:55 |

Transcript of John Woychowski
Conducted on December 13, 2018                    118

| | | | |
|---|---|---|---|
| 1 | A | I don't think so. | 13:59:57 |
| 2 | Q | Okay. Were there any modifications to that | 13:59:58 |
| 3 | P239, as far as you know? | | 14:00:02 |
| 4 | A | Yes. | 14:00:04 |
| 5 | Q | What were the modifications there? | 14:00:05 |
| 6 | A | The hand grips as well. | 14:00:06 |
| 7 | Q | Okay. And can you remember if it was | 14:00:08 |
| 8 | rubber or polymer? | | 14:00:11 |
| 9 | A | I believe those were rubber. | 14:00:12 |
| 10 | Q | Okay. Excuse me. Okay. | 14:00:14 |
| 11 | | Are you familiar with a trigger locking | 14:01:01 |
| 12 | device? | | 14:01:04 |
| 13 | A | Yes. | 14:01:04 |
| 14 | Q | Do you know whether either one of the | 14:01:05 |
| 15 | firearms that you left in the vehicle on June 27th of | | 14:01:07 |
| 16 | 2015 had a trigger locking device on it? | | 14:01:10 |
| 17 | A | At the time they were left in the vehicle? | 14:01:13 |
| 18 | Q | Yes. Thank you. | 14:01:14 |
| 19 | A | Yes, they did not. | 14:01:15 |
| 20 | Q | They did not. Okay. | 14:01:18 |
| 21 | | Is that something that -- was it standard | 14:01:20 |
| 22 | practice for BLM to issue a trigger locking device | | 14:01:25 |
| 23 | with the firearm, as far as you're aware or not? | | 14:01:29 |
| 24 | A | Yes. | 14:01:32 |
| 25 | Q | Okay. Why does it not have trigger locking | 14:01:32 |

Transcript of John Woychowski
Conducted on December 13, 2018                          119

| | | |
|---|---|---|
| 1 | devices on them? | 14:01:33 |
| 2 | A    Because it wasn't required, and it wasn't | 14:01:34 |
| 3 | general practice. | 14:01:36 |
| 4 | Q    So it was general practice that they were | 14:01:37 |
| 5 | issued, but not general practice that they were used? | 14:01:41 |
| 6 | A    Correct. | 14:01:43 |
| 7 | Q    Okay.  Why is that?  Can I ask? | 14:01:44 |
| 8 | A    I don't know. | 14:01:46 |
| 9 | Q    Okay.  Is there a reason that you didn't | 14:01:48 |
| 10 | like using them? | 14:01:54 |
| 11 | MR. WALL:  Object to form. | 14:01:55 |
| 12 | A    For? | 14:01:57 |
| 13 | Q    Is there a reason that you didn't like | 14:01:58 |
| 14 | using a trigger locking device on your firearm? | 14:02:00 |
| 15 | MR. WALL:  Object to form. | 14:02:03 |
| 16 | A    Yes, because for me it was a decreased time | 14:02:04 |
| 17 | for accessibility, in the event I needed it. | 14:02:07 |
| 18 | Q    Okay. | 14:02:09 |
| 19 | A    Excuse me -- increased the time to have | 14:02:13 |
| 20 | accessibility -- sorry, I said that wrong. | 14:02:15 |
| 21 | Q    Generally what you're trying to say is it | 14:02:18 |
| 22 | made it harder for you to access the weapon; correct? | 14:02:19 |
| 23 | A    Yes. | 14:02:20 |
| 24 | Q    Okay.  Sorry.  Because I couldn't tell with | 14:02:21 |
| 25 | the decrease or the increase, I just wanted to make | 14:02:24 |

Transcript of John Woychowski
Conducted on December 13, 2018                    157

| | |
|---|---|
| 1 | A     No.   I believe I stayed right along the | 14:47:02 |
| 2 | street. | 14:47:04 |
| 3 | Q     Right along the street?   Okay. | 14:47:04 |
| 4 | A     Except for when, like I said, we walked | 14:47:05 |
| 5 | towards the restaurant, which is off the street -- | 14:47:07 |
| 6 | sidewalk area. | 14:47:11 |
| 7 | Q     Okay.   So I'm going to put us kind of | 14:47:12 |
| 8 | over -- so since we already went through that -- and | 14:47:15 |
| 9 | we're back.   Okay.   Excuse me. | 14:47:21 |
| 10 | There is no restaurant on the end of that | 14:48:01 |
| 11 | pier.   Okay.   Actually, let me do it like this -- | 14:48:03 |
| 12 | sorry. | 14:48:56 |
| 13 | Okay.   So I'm going to put this guy down on | 14:49:20 |
| 14 | this side of the intersection at Embarcadero and | 14:49:23 |
| 15 | Washington. | 14:49:26 |
| 16 | So do you remember there being a parking | 14:49:50 |
| 17 | lot next to where you parked? | 14:49:53 |
| 18 | A     Not specifically, no. | 14:49:55 |
| 19 | Q     Okay.   Now, you were saying there was tarp | 14:49:56 |
| 20 | on fence; correct? | 14:50:45 |
| 21 | A     That's what I think I remember, yeah. | 14:50:46 |
| 22 | Q     Okay.   Did it look something like this? | 14:50:48 |
| 23 | A     Perhaps.   I thought it was maybe green, | 14:50:56 |
| 24 | but, I mean, that looks like black to me.   But, I | 14:50:58 |
| 25 | mean, yeah, I mean, it could have been very similar | 14:51:00 |

Transcript of John Woychowski
Conducted on December 13, 2018                    162

| | | |
|---|---|---|
| 1 | A    Yes, I believe so. | 14:55:52 |
| 2 | Q    Were -- was yours the only parking spot | 14:55:53 |
| 3 | that you could find in that area? | 14:55:57 |
| 4 | A    No. | 14:55:59 |
| 5 | Q    Okay.  So were there other open spots along | 14:55:59 |
| 6 | that curb where you parked -- generally in the | 14:56:02 |
| 7 | vicinity where you parked that night? | 14:56:04 |
| 8 | A    Yeah.  It was sporadic parking, I believe, | 14:56:07 |
| 9 | is the best way to say that. | 14:56:10 |
| 10 | Q    Okay. | 14:56:10 |
| 11 | A    But, yes, there was. | 14:56:12 |
| 12 | Q    Okay.  Now, did you try and find a parking | 14:56:14 |
| 13 | garage that night? | 14:56:19 |
| 14 | A    No. | 14:56:20 |
| 15 | Q    Why not? | 14:56:20 |
| 16 | A    Because I wanted to be as close to where I | 14:56:22 |
| 17 | thought I'd find a restaurant, as possible, versus, I | 14:56:24 |
| 18 | mean -- and, you know, my knowledge of the city is | 14:56:28 |
| 19 | very, very limited, so I didn't even know where to | 14:56:31 |
| 20 | begin to find a parking garage. | 14:56:35 |
| 21 | Q    Okay.  You had a phone at the time in 2015; | 14:56:37 |
| 22 | correct? | 14:56:45 |
| 23 | A    Yes. | 14:56:45 |
| 24 | Q    Was it an iPhone? | 14:56:45 |
| 25 | A    I believe so, yes. | 14:56:48 |

Transcript of John Woychowski
Conducted on December 13, 2018                              164

| | | | |
|---|---|---|---|
| 1 | Q | Okay.  Did you have Yelp on your phone? | 14:57:40 |
| 2 | A | No. | 14:57:43 |
| 3 | Q | Okay.  Did you have data? | 14:57:43 |
| 4 | A | As in what -- I'm sorry -- can you explain | 14:57:49 |

1       Q     Okay.  Did you have Yelp on your phone?        14:57:40

2       A     No.                                            14:57:43

3       Q     Okay.  Did you have data?                      14:57:43

4       A     As in what -- I'm sorry -- can you explain     14:57:49

5     that?                                                  14:57:51

6       Q     As in you could get on the Internet versus     14:57:52

7     just sending text messages?                            14:57:55

8       A     Yes.                                           14:57:57

9       Q     Okay.  And was that for both phones -- the     14:57:57

10    BlackBerry and the iPhone, you could get on the        14:57:59

11    Internet?                                              14:58:02

12      A     Yes.                                           14:58:03

13      Q     Okay.  And then I want to go back to the       14:58:03

14    maps, because I kind of took us farther while we were  14:58:11

15    talking and I didn't mean to do that, even though      14:58:19

16    it's just like bushes up along this whole thing.       14:58:22

17            Do you recall these bushes taking over the     14:58:24

18    tarped fence at all?                                   14:58:26

19      A     Not, not necessarily.                          14:58:28

20      Q     The hedge bushes or the ivy -- they're kind    14:58:29

21    of wrapped all around it?                              14:58:32

22      A     Not particularly.                              14:58:33

23      Q     Not particularly?  Looks like more of that     14:58:34

24    hedge.  Oh, and then it looks like that is actually    14:58:42

25    green fence, it appears.                               14:58:49

Transcript of John Woychowski
Conducted on December 13, 2018                    170

| | |
|---|---|
| 1 | Q    Okay.  Okay.  And so I believe you've | 15:04:49 |
| 2 | also -- you've identified for me now the baggage | 15:04:55 |
| 3 | that's left in the trunk. | 15:04:57 |
| 4 |        Could you see out the back rear window with | 15:04:58 |
| 5 | how much baggage was in there when you were driving | 15:05:00 |
| 6 | to San Francisco? | 15:05:02 |
| 7 | A    I think very little at the top, maybe, if | 15:05:03 |
| 8 | any. | 15:05:06 |
| 9 | Q    Okay. | 15:05:06 |
| 10 | A    I don't remember, but I think if anything, | 15:05:06 |
| 11 | it was just a little maybe top portion. | 15:05:08 |
| 12 | Q    Okay.  And then I'd like for you to now -- | 15:05:10 |
| 13 | I want to walk through you parking in San Francisco, | 15:05:17 |
| 14 | and then you've parked, you've turned the car off. | 15:05:23 |
| 15 |        Can you walk me through what you do next? | 15:05:28 |
| 16 | A    Starting turning the car off? | 15:05:30 |
| 17 | Q    Yes. | 15:05:32 |
| 18 | A    Is that correct? | 15:05:32 |
| 19 | Q    Exactly. | 15:05:33 |
| 20 | A    I got out, I read the signs there for the | 15:05:34 |
| 21 | parking, because, again I wasn't familiar. | 15:05:39 |
| 22 | Q    Mm-hmm. | 15:05:41 |
| 23 | A    And so I wanted to know, you know, if I had | 15:05:42 |
| 24 | to pay to park. | 15:05:45 |
| 25 | Q    Yeah. | 15:05:46 |

Transcript of John Woychowski
Conducted on December 13, 2018                    172

| | | | |
|---|---|---|---|
| 1 | Q | Does this window open? | 15:07:08 |
| 2 | A | No. | 15:07:09 |
| 3 | Q | Is this on the door at all, the back rear | 15:07:09 |
| 4 | one? | | 15:07:09 |
| 5 | A | No. | 15:07:12 |
| 6 | Q | Okay.  So generally, probably, it's this | 15:07:12 |
| 7 | window has a door and this window has a door? | | 15:07:14 |
| 8 | A | Correct. | 15:07:16 |
| 9 | Q | Okay.  So I'm just going to, if I -- if | 15:07:17 |
| 10 | it's okay -- put a black dot towards the -- which | | 15:07:18 |
| 11 | ones probably correlate what doors. | | 15:07:21 |
| 12 | A | That's correct. | 15:07:25 |
| 13 | Q | Okay.  Thank you.  And so then, are any of | 15:07:25 |
| 14 | those sliding doors, or do they all open out? | | 15:07:29 |
| 15 | A | There are no sliding doors. | 15:07:32 |
| 16 | Q | Okay.  So you said that all of your kids | 15:07:33 |
| 17 | exited curb side, which was the passenger's side; | | 15:07:36 |
| 18 | correct? | | 15:07:39 |
| 19 | A | Yeah.  And maybe this child went out this | 15:07:39 |
| 20 | way -- I don't remember, but I -- | | 15:07:42 |
| 21 | Q | Okay. | 15:07:42 |
| 22 | A | -- I had them wait for me here as I was | 15:07:44 |
| 23 | getting my stuff out. | | 15:07:46 |
| 24 | Q | Got it.  Okay.  And then -- okay. | 15:07:46 |
| 25 | | So then, I understand you paid at the | 15:07:53 |

Transcript of John Woychowski
Conducted on December 13, 2018                                        174

| | | |
|---|---|---|
| 1 | just so that it's clear. | 15:08:56 |
| 2 | A    Okay. | 15:08:58 |
| 3 | Q    Okay.  So then you opened that door to then | 15:08:59 |
| 4 | put the -- as I understand it, the backpack | 15:09:02 |
| 5 | underneath the front driver's seat; is that correct? | 15:09:05 |
| 6 | A    Yes. | 15:09:08 |
| 7 | Q    Okay.  Was there anything else underneath | 15:09:08 |
| 8 | that front driver's seat? | 15:09:11 |
| 9 | A    No. | 15:09:12 |
| 10 | Q    Okay.  And did any part of the backpack | 15:09:13 |
| 11 | show, to your knowledge, when you put it underneath | 15:09:16 |
| 12 | there? | 15:09:19 |
| 13 | A    If anything, maybe the drag handle.  But to | 15:09:20 |
| 14 | clarify, so -- | 15:09:23 |
| 15 | Q    Yeah. | 15:09:23 |
| 16 | A    -- so this front seat is -- part of this | 15:09:25 |
| 17 | vehicle's make that the front seat retracts, as in | 15:09:27 |
| 18 | a -- to make it easier for you to get out a little | 15:09:30 |
| 19 | more convenient when you get out of the driver's | 15:09:34 |
| 20 | seat. | 15:09:35 |
| 21 | So as soon as the car ignition is turned | 15:09:36 |
| 22 | off -- | 15:09:36 |
| 23 | Q    Yeah. | 15:09:36 |
| 24 | A    -- the seat starts retracting back | 15:09:37 |
| 25 | automatically. | 15:09:40 |

Transcript of John Woychowski
Conducted on December 13, 2018                              175

| | | |
|---|---|---|
| 1 | Q    Oh, wow.  Okay. | 15:09:40 |
| 2 | A    So, you know, you open the door, you have a | 15:09:41 |
| 3 | lot of space. | 15:09:43 |
| 4 | Q    Got it.  Okay. | 15:09:43 |
| 5 | A    So as that retracted all the way back, you | 15:09:45 |
| 6 | know -- and like I said, I didn't have a lot of stuff | 15:09:48 |
| 7 | in my backpack, so I was able to put the backpack, | 15:09:50 |
| 8 | you know, if not the entire way under the seat -- you | 15:09:53 |
| 9 | know, maybe just that drag handle visible showing. | 15:09:56 |
| 10 | Q    Okay.  Okay.  And then -- this may be a | 15:09:59 |
| 11 | silly question -- sorry -- it just came up in my | 15:10:06 |
| 12 | head.  I know that if I was handling a gun, I | 15:10:08 |
| 13 | wouldn't just put it in a bag with other things. | 15:10:11 |
| 14 |        Was it in it's own container or something | 15:10:14 |
| 15 | within a bag, within the backpack? | 15:10:16 |
| 16 | A    In the holster. | 15:10:18 |
| 17 | Q    Okay.  So the holster makes it not go off? | 15:10:19 |
| 18 | A    Well, I would say somebody not pulling the | 15:10:23 |
| 19 | trigger would make it not go off, but in this case, | 15:10:28 |
| 20 | the holster -- it was in the holster, because I put | 15:10:30 |
| 21 | the holster on my waistband. | 15:10:31 |
| 22 | Q    Okay. | 15:10:33 |
| 23 | A    And I routinely would carry it in the | 15:10:33 |
| 24 | holster for the purpose of being able to equip it on | 15:10:36 |
| 25 | my waistband. | 15:10:39 |

Transcript of John Woychowski
Conducted on December 13, 2018                    182

| | | | |
|---|---|---|---|
| 1 | Q | Okay.  Do you recall what kind of uniform? | 15:28:43 |
| 2 | A | No. | 15:28:52 |
| 3 | Q | Do you recall if he was wearing a badge? | 15:28:52 |
| 4 | A | I believe he was, yes. | 15:28:52 |
| 5 | Q | And now I know there's many different kind | 15:28:52 |
| 6 | | of badges, so was it a badge -- a metal badge, to | 15:28:56 |
| 7 | | your recollection? | 15:29:00 |
| 8 | A | I don't remember. | 15:29:01 |
| 9 | Q | Okay.  Let me see.  Was he wearing a hat? | 15:29:02 |
| 10 | A | No, I don't believe so. | 15:29:13 |
| 11 | Q | Okay.  Did he actually get out of the cart? | 15:29:16 |
| 12 | A | No. | 15:29:22 |
| 13 | Q | Okay.  Stayed seated in it the whole time? | 15:29:22 |
| 14 | A | Yes. | 15:29:27 |
| 15 | Q | Okay.  Do you remember what color his | 15:29:27 |
| 16 | | uniform was? | 15:29:36 |
| 17 | A | No. | 15:29:36 |
| 18 | Q | And who initiated the conversation? | 15:29:36 |
| 19 | A | I believe I did. | 15:29:51 |
| 20 | Q | Okay.  And what -- can you please tell me | 15:29:52 |
| 21 | | what you guys discussed, to the best of your | 15:29:59 |
| 22 | | recollection? | 15:30:02 |
| 23 | A | Yeah.  I believe when he -- when I turned | 15:30:02 |
| 24 | | around, he had stopped completely, and I just -- and | 15:30:04 |
| 25 | | I don't know what order, but I know I had asked him | 15:30:13 |

Transcript of John Woychowski
Conducted on December 13, 2018                              183

| | | |
|---|---|---|
| 1 | if I was okay to park there and if I had to pay -- | 15:30:13 |
| 2 | confirming what I saw on the sign. | 15:30:22 |
| 3 | Q    Mm-hmm. | 15:30:22 |
| 4 | A    He had told me that it was metered parking | 15:30:22 |
| 5 | until 11:00 o'clock, and he said that he was going to | 15:30:23 |
| 6 | be driving up and down, you know, I -- he didn't | 15:30:29 |
| 7 | specify, but I assumed it was checking the meters, | 15:30:33 |
| 8 | and that he was going to be out of service at 11:00 | 15:30:37 |
| 9 | p.m., and to be back in my vehicle by then if -- you | 15:30:40 |
| 10 | know. | 15:30:44 |
| 11 |         And that was the extent of the | 15:30:45 |
| 12 | conversation, I believe. | 15:30:47 |
| 13 | Q    Okay.  And he used the term -- or to the | 15:30:49 |
| 14 | best of your recollection, he used the term that he'd | 15:30:53 |
| 15 | be out of service by 11:00 p.m.? | 15:30:55 |
| 16 | A    I think that's just my police talk. | 15:30:59 |
| 17 | Q    Okay. | 15:31:01 |
| 18 | A    I mean, if -- I don't remember, but he | 15:31:02 |
| 19 | insinuated to me he was not going to be in the area | 15:31:05 |
| 20 | after 11:00 o'clock for -- whether he was going out | 15:31:08 |
| 21 | of service is what I interpreted, because the meter | 15:31:11 |
| 22 | stopped at 11:00, but I don't think he specified -- | 15:31:13 |
| 23 | specifically said I'm out of service. | 15:31:16 |
| 24 |         I think that's just my police talk. | 15:31:18 |
| 25 | Q    Thank you for clarifying. | 15:31:20 |

Transcript of John Woychowski
Conducted on December 13, 2018                    191

| | | |
|---|---|---|
| 1 | A     Yeah, because I -- yeah. | 15:37:47 |
| 2 | Q     Absolutely.  So do you recall where you -- | 15:37:50 |
| 3 | did you wait to cross from the bay side to the other | 15:37:53 |
| 4 | side until you were -- to the closest block of your | 15:37:55 |
| 5 | car? | 15:37:57 |
| 6 | A     I believe so.  I think it was the same.  We | 15:37:57 |
| 7 | crossed both the same. | 15:38:00 |
| 8 | Q     At the same location? | 15:38:01 |
| 9 | A     Yes. | 15:38:02 |
| 10 | Q     Got it.  Thank you. | 15:38:03 |
| 11 | And then -- okay.  So when you are -- | 15:38:05 |
| 12 | first -- okay.  Let's go back to when you're leaving | 15:38:15 |
| 13 | the vehicle. | 15:38:17 |
| 14 | Please describe for me what the -- I know | 15:38:18 |
| 15 | we went over what's in the luggage and what's in the | 15:38:23 |
| 16 | trunk compartment. | 15:38:26 |
| 17 | You've described for me some of the | 15:38:27 |
| 18 | electronic devices that were left in the vehicle -- | 15:38:29 |
| 19 | inside the vehicle. | 15:38:32 |
| 20 | Can you please tell me what other items or | 15:38:34 |
| 21 | objects were left in the main passenger cabin of the | 15:38:38 |
| 22 | -- the -- the vehicle that evening? | 15:38:43 |
| 23 | A     Yeah.  I think, if anything, you know, | 15:38:45 |
| 24 | blankets and pillows for the kids, you know, when | 15:38:48 |
| 25 | they were tired.  But -- and that would be what we | 15:38:50 |

Transcript of John Woychowski
Conducted on December 13, 2018                    198

| | | |
|---|---|---|
| 1 | inside the vehicle when you parked? | 15:44:33 |
| 2 | MR. WALL:  Object to form. | 15:44:34 |
| 3 | A    Because, like I said, I would have had to | 15:44:36 |
| 4 | unpack the entire contents of the trunk and | 15:44:39 |
| 5 | accessibility of it when I came back, I would have | 15:44:42 |
| 6 | had to unpack it again, take it out. | 15:44:44 |
| 7 | Q    Okay. | 15:44:46 |
| 8 | A    Doesn't make any sense to me.  And quite | 15:44:47 |
| 9 | frankly, I didn't think about it. | 15:44:49 |
| 10 | Q    Okay.  Were you in unform that day? | 15:44:51 |
| 11 | A    No. | 15:44:53 |
| 12 | Q    Was there anything on you that would | 15:44:53 |
| 13 | identify that you were a BLM ranger that day? | 15:44:55 |
| 14 | A    Nothing at all. | 15:44:58 |
| 15 | Q    Was there anything that would identify you | 15:44:59 |
| 16 | as a law enforcement officer on June 27th of 2015? | 15:45:01 |
| 17 | A    On me? | 15:45:05 |
| 18 | Q    Yeah.  On you. | 15:45:06 |
| 19 | A    Nothing at all. | 15:45:08 |
| 20 | Q    Okay.  And as you said you were off duty; | 15:45:09 |
| 21 | correct? | 15:45:11 |
| 22 | A    Yes. | 15:45:11 |
| 23 | Q    Why did you want your firearms to be easily | 15:45:11 |
| 24 | accessible? | 15:45:15 |
| 25 | A    Because I always have it easily accessible. | 15:45:16 |

Transcript of John Woychowski
Conducted on December 13, 2018                                    199

| | | |
|---|---|---|
| 1 | Q    Okay. | 15:45:19 |
| 2 | A    That's my standard practice.  I always have | 15:45:20 |
| 3 | a gun with me. | 15:45:22 |
| 4 | Q    And was it with you when you went to dinner | 15:45:23 |
| 5 | that night? | 15:45:25 |
| 6 | A    No. | 15:45:26 |
| 7 | Q    Okay. | 15:45:26 |
| 8 | MS. CORDOVA:  We'll enter this as Exhibit | 15:45:33 |
| 9 | 10. | 15:45:33 |
| 10 | (Woychowski Exhibit 10 was marked for | 15:45:33 |
| 11 | identification.) | 15:45:33 |
| 12 | Q    This appears to be an e-mail from you to | 15:46:02 |
| 13 | Stephanie Clark and Salvador Nieblas on June 30th of | 15:46:04 |
| 14 | 2015 at 12:18 a.m. | 15:46:07 |
| 15 | Do you recall sending this e-mail?  And | 15:46:10 |
| 16 | actually now I'm misstating it, because there is an | 15:46:12 |
| 17 | e-mail on the bottom from Stephanie to you.  So for | 15:46:14 |
| 18 | the top half of the e-mail, it appears to be an | 15:46:17 |
| 19 | e-mail from you to Stephanie Clark and Salvador | 15:46:19 |
| 20 | Nieblas on June 30 of 2015. | 15:46:22 |
| 21 | Do you recall sending this e-mail? | 15:46:25 |
| 22 | A    Yes. | 15:46:26 |
| 23 | Q    Okay.  And is that your e-mail address -- | 15:46:26 |
| 24 | J -- or when you were with BLM in 2015, was that your | 15:46:31 |
| 25 | e-mail address? | 15:46:33 |

Transcript of John Woychowski
Conducted on December 13, 2018                    202

| | | |
|---|---|---|
| 1 | Q    Okay.  Now, when you came back to your | 15:48:12 |
| 2 | vehicle, it sounds like the car behind you was also | 15:48:22 |
| 3 | broken into? | 15:48:25 |
| 4 | A    Yes. | 15:48:26 |
| 5 | Q    Is that -- okay.  Had you seen that car | 15:48:26 |
| 6 | when you left your car parked at 9:45 p.m.?  Was | 15:48:28 |
| 7 | there a vehicle behind you? | 15:48:31 |
| 8 | A    Yes. | 15:48:32 |
| 9 | Q    Okay.  Do you recall it being the same | 15:48:32 |
| 10 | vehicle that was also broken into? | 15:48:34 |
| 11 | A    Yes. | 15:48:36 |
| 12 | Q    Okay.  And did you meet those people at | 15:48:36 |
| 13 | all, the people -- the owners of that vehicle? | 15:48:38 |
| 14 | A    Did I meet them by name, no.  Only | 15:48:42 |
| 15 | interaction I had was on the way back when I saw that | 15:48:45 |
| 16 | they had been broken, and I asked them if they called | 15:48:48 |
| 17 | 911. | 15:48:51 |
| 18 | Or I believe a female said to me our car | 15:48:51 |
| 19 | was broken into as well, and I said, did you call | 15:48:54 |
| 20 | 911, she said no.  And I said, well, I already have. | 15:48:56 |
| 21 | Q    Okay.  Perfect.  And so why don't we go | 15:49:00 |
| 22 | through that. | 15:49:03 |
| 23 | When you're -- when you're coming back and | 15:49:04 |
| 24 | you told me you crossed the street from the bay side, | 15:49:06 |
| 25 | you're coming back to your car, walk me through what | 15:49:08 |

Transcript of John Woychowski
Conducted on December 13, 2018                    204

| | | |
|---|---|---|
| 1 | Q    And I know we've done so many colors here | 15:50:19 |
| 2 | that -- if only I'd brought my pink marker with me. | 15:50:22 |
| 3 | Let's try for orange.  If you could just | 15:50:34 |
| 4 | put -- let's do an asterisk -- an orange asterisk | 15:50:35 |
| 5 | next to the two -- two windows that were broken. | 15:50:41 |
| 6 | It's another weird one. | 15:50:46 |
| 7 | A    Is that the marker type? | 15:50:47 |
| 8 | Q    Just use the side tip of it.  It's not a | 15:50:49 |
| 9 | marker, it's a highlighter. | 15:50:52 |
| 10 | A    Okay. | 15:50:52 |
| 11 | Q    They work even though it's like a gel.  I | 15:50:52 |
| 12 | -- I don't know. | 15:50:55 |
| 13 | A    Okay. | 15:50:55 |
| 14 | Q    Oh, you can tell it's orange, though, at | 15:51:03 |
| 15 | least.  That's good.  It's identifiable. | 15:51:06 |
| 16 | And don't worry.  It's not like I want your | 15:51:11 |
| 17 | drawing to, like, scale or anything like that. | 15:51:13 |
| 18 | A    Yeah. | 15:51:13 |
| 19 | Q    I just kind of wanted to know, like, | 15:51:15 |
| 20 | generally. | 15:51:17 |
| 21 | Okay.  So these -- these two back ones. | 15:51:18 |
| 22 | The front one was not broken into? | 15:51:20 |
| 23 | A    Correct. | 15:51:22 |
| 24 | Q    And nothing on the driver's side was broken | 15:51:23 |
| 25 | into? | 15:51:25 |

Transcript of John Woychowski
Conducted on December 13, 2018                          205

| | | |
|---|---|---|
| 1 | A    That's correct. | 15:51:25 |
| 2 | Q    Okay.  And the back window also wasn't | 15:51:25 |
| 3 | broken into? | 15:51:28 |
| 4 | A    Correct. | 15:51:29 |
| 5 | Q    Okay.  And was anything from this back | 15:51:29 |
| 6 | trunk taken? | 15:51:31 |
| 7 | A    Yes. | 15:51:33 |
| 8 | Q    Oh, okay.  Let's keep walking through, then | 15:51:33 |
| 9 | what you see.  You're telling me that you see those | 15:51:36 |
| 10 | two windows are broken? | 15:51:38 |
| 11 | A    Okay.  You want me to use this? | 15:51:40 |
| 12 | Q    Oh, yeah, sure.  If you -- yeah.  Yeah.  If | 15:51:42 |
| 13 | you -- I just want to know, generally, what | 15:51:44 |
| 14 | happened -- | 15:51:46 |
| 15 | A    Oh, okay.  Okay. | 15:51:46 |
| 16 | Q    -- next after you noticed that those | 15:51:46 |
| 17 | windows are broken. | 15:51:48 |
| 18 | A    So saw the window's broken, and I ran to | 15:51:49 |
| 19 | the driver's side of the vehicle, opened the backseat | 15:51:54 |
| 20 | driver's door, looked for my backpack, because that | 15:51:57 |
| 21 | was the thing I was concerned about most when I got | 15:52:00 |
| 22 | back. | 15:52:03 |
| 23 | It was not there where I had put it.  I -- | 15:52:06 |
| 24 | you know, in a kind of frantic mind, you know, like, | 15:52:10 |
| 25 | losing your wallet -- or like, okay, maybe I didn't | 15:52:13 |

Transcript of John Woychowski
Conducted on December 13, 2018                        212

| | | |
|---|---|---|
| 1 | car when we were going to the movies when I was | 15:58:15 |
| 2 | little kid.  And there was nothing in the purse, and | 15:58:17 |
| 3 | the whole car got broken into for my little purse. | 15:58:19 |
| 4 | You know, that was a big lesson.  So after that, | 15:58:23 |
| 5 | every time, my parents beat that into my head? | 15:58:25 |
| 6 | Okay.  So you -- you see that.  You see -- | 15:58:29 |
| 7 | are the pillows and blankets still there? | 15:58:31 |
| 8 | A    Yes. | 15:58:34 |
| 9 | Q    I know that you didn't know exactly kind of | 15:58:34 |
| 10 | where they were, but they were still there in the | 15:58:35 |
| 11 | car? | 15:58:37 |
| 12 | A    Yes.  I don't remember any of that stuff | 15:58:37 |
| 13 | missing. | 15:58:39 |
| 14 | Q    Okay.  And none of the other bags were | 15:58:39 |
| 15 | missing from the vehicle either? | 15:58:41 |
| 16 | A    The Nintendo DS case was missing.  So it's | 15:58:44 |
| 17 | a small bag that -- you know, we're talking a game | 15:58:47 |
| 18 | system like this small. | 15:58:50 |
| 19 | Q    Okay. | 15:58:51 |
| 20 | A    And it would be a bag, you know, with a | 15:58:51 |
| 21 | little strap on it that I bought.  And that was | 15:58:52 |
| 22 | missing. | 15:58:54 |
| 23 | Q    So I was wondering about that, because when | 15:58:55 |
| 24 | I read what was described as missing, it -- it made | 15:58:58 |
| 25 | it sound like it was the -- the game disc that you | 15:59:00 |

Transcript of John Woychowski
Conducted on December 13, 2018                                    213

| | | |
|---|---|---|
| 1 | would stick into the Nintendo. | 15:59:05 |
| 2 | A    Correct.  So -- | 15:59:06 |
| 3 | Q    So, yeah.  Please, please describe. | 15:59:06 |
| 4 | A    So the game case held, like, you know, two | 15:59:09 |
| 5 | or three games.  And the games are -- I mean, we're | 15:59:12 |
| 6 | talking, you know, the old floppy disks? | 15:59:15 |
| 7 | Q    Oh, yeah. | 15:59:18 |
| 8 | A    Smaller than that. | 15:59:18 |
| 9 | Q    Okay.  I've seen the little plastic, like, | 15:59:19 |
| 10 | almost, like, it's like an -- | 15:59:21 |
| 11 | A    Correct. | 15:59:22 |
| 12 | Q    An inch and a half by an inch and a half, | 15:59:23 |
| 13 | small? | 15:59:24 |
| 14 | A    And that's what I'm talking about.  That | 15:59:24 |
| 15 | was inside the case that was taken. | 15:59:25 |
| 16 | Q    It was inside the case.  So the case that | 15:59:26 |
| 17 | was taken would have actually held the entire | 15:59:29 |
| 18 | Nintendo game console? | 15:59:31 |
| 19 | A    It's intended to.  I don't know if she had | 15:59:34 |
| 20 | it in there. | 15:59:36 |
| 21 | Q    It sounds like she didn't, because they | 15:59:37 |
| 22 | didn't take it. | 15:59:39 |
| 23 | A    Right, but I'm -- | 15:59:39 |
| 24 | Q    Okay. | 15:59:39 |
| 25 | A    -- you know, I didn't know if you were | 15:59:40 |

Transcript of John Woychowski
Conducted on December 13, 2018                     214

| | | |
|---|---|---|
| 1 | saying that all that stuff was in there.  So I know | 15:59:40 |
| 2 | the games were in there, because the games are | 15:59:44 |
| 3 | missing, but the bag is missing.  But the Nintendo, I | 15:59:45 |
| 4 | don't know if it was or wasn't in there, because it's | 15:59:48 |
| 5 | still not missing. | 15:59:50 |
| 6 | Q    It was still -- it was sitting on the seat | 15:59:51 |
| 7 | when you came back? | 15:59:52 |
| 8 | A    Correct. | 15:59:53 |
| 9 | Q    And generally where you drew where the | 15:59:53 |
| 10 | Nintendo and iPad were in Exhibit 5, is that where | 15:59:56 |
| 11 | they were when you came back to the car, generally? | 15:59:59 |
| 12 | A    Yes.  I believe they were over here, | 16:00:03 |
| 13 | because I was able to see them from here when I was, | 16:00:06 |
| 14 | you know -- so looking into the car this way, I was | 16:00:09 |
| 15 | seeing so -- you know, if it was a little more | 16:00:13 |
| 16 | centered, I don't know. | 16:00:16 |
| 17 | But I know -- | 16:00:17 |
| 18 | Q    Yeah. | 16:00:17 |
| 19 | A    -- it was somewhere on this half, you know, | 16:00:18 |
| 20 | half over versus this half over. | 16:00:19 |
| 21 | Q    Yeah. | 16:00:22 |
| 22 | A    I believe. | 16:00:22 |
| 23 | Q    Okay.  And now sometimes in these cars when | 16:00:23 |
| 24 | they have this middle seating area where there's two | 16:00:25 |
| 25 | separate seats, there is sometimes, like, a coffee | 16:00:27 |

Transcript of John Woychowski
Conducted on December 13, 2018                    231

| | | | |
|---|---|---|---|
| 1 | A | No.  I -- I don't believe so. | 16:14:31 |
| 2 | Q | Okay.  And was anything ever recovered from | 16:14:33 |
| 3 | | your duffel bag? | 16:14:36 |
| 4 | A | Not that I know of, no.  It was -- I asked. | 16:14:38 |
| 5 | Q | Yeah.  The duffel bag was just never | 16:14:40 |
| 6 | | found -- | 16:14:40 |
| 7 | A | Gone. | 16:14:40 |
| 8 | Q | And never recovered? | 16:14:42 |
| 9 | A | Yeah. | 16:14:43 |
| 10 | Q | Got it.  Okay.  And what else was -- what | 16:14:44 |
| 11 | | was in the duffel bag? | 16:14:49 |
| 12 | | Was there anything of note besides your | 16:14:50 |
| 13 | | personal, like, clothing and stuff like that I don't | 16:14:53 |
| 14 | | care about? | 16:14:55 |
| 15 | A | Yes, of course.  My uniforms. | 16:14:56 |
| 16 | Q | Okay. | 16:14:57 |
| 17 | A | My duty wear uniforms. | 16:15:00 |
| 18 | Q | Anything else? | 16:15:04 |
| 19 | A | No.  Aside from personal clothes, no. | 16:15:07 |
| 20 | Q | Okay.  Was the duffel bag labeled as your | 16:15:09 |
| 21 | | bags? | 16:15:22 |
| 22 | | Like, is there anything on that identifies | 16:15:22 |
| 23 | | it as yours? | 16:15:24 |
| 24 | A | Excuse me -- no. | 16:15:25 |
| 25 | Q | Okay. | 16:15:26 |

Transcript of John Woychowski
Conducted on December 13, 2018                    232

| | | |
|---|---|---|
| 1 | A     It was just -- just the brand name was on | 16:15:27 |
| 2 | it, that's it. | 16:15:29 |
| 3 | Q     That's it.  Okay. | 16:15:30 |
| 4 | Now, who interviewed you as part of the OPR | 16:15:38 |
| 5 | investigation? | 16:15:45 |
| 6 | A     Glenn Van Airsdale. | 16:15:45 |
| 7 | Q     Did anyone else? | 16:15:47 |
| 8 | A     No.  I don't believe so. | 16:15:50 |
| 9 | Q     Do you know when that -- when were you | 16:15:52 |
| 10 | interviewed, do you recall? | 16:15:56 |
| 11 | A     No.  Not the date, no. | 16:15:57 |
| 12 | Q     Do you recall if it was more than once? | 16:15:59 |
| 13 | A     I think -- I think we had the initial | 16:16:03 |
| 14 | interview and he called me on the phone to ask a | 16:16:06 |
| 15 | followup question or two. | 16:16:09 |
| 16 | I was at a gas station, I remember | 16:16:10 |
| 17 | specifically, and it was very short. | 16:16:12 |
| 18 | Q     Okay. | 16:16:14 |
| 19 | A     But that -- I believe that's it. | 16:16:15 |
| 20 | Q     Do you recall what those followup questions | 16:16:16 |
| 21 | were? | 16:16:18 |
| 22 | A     I don't. | 16:16:19 |
| 23 | Q     Okay.  Do you know what the results of the | 16:16:19 |
| 24 | investigation were? | 16:16:23 |
| 25 | A     Yes. | 16:16:24 |

Transcript of John Woychowski
Conducted on December 13, 2018                          255

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2        I, Marcie Walsh, Certified Shorthand Reporter,

 3   the officer before whom the foregoing deposition was

 4   taken, do hereby certify that the foregoing

 5   transcript is a true and correct record of the

 6   testimony given; that said testimony was taken by me

 7   stenographically and thereafter reduced to

 8   typewriting under my supervision; that reading and

 9   signing was requested; and that I am neither counsel

10   for or related to, nor employed by any of the parties

11   to this case and have no interest, financial or

12   otherwise, in its outcome.

13        IN WITNESS WHEREOF, I have hereunto set my hand

14   this 26th day of December, 2018.

15

16

17

18

19   _____

20   CERTIFIED SHORTHAND REPORTER IN

21   AND FOR THE STATE OF CALIFORNIA

22

23

24

25
```

# EXHIBIT 3

State *of* California Department *of* Justice

   



# XAVIER BECERRA
## *Attorney General*

Search

Translate Website | Traducir Sitio Web

# Firearm Safety

Home   /   Firearms   /   *Firearm Safety*

## Links to Topics below

The Six Basic Gun Safety Rules

Additional Safety Points

Guns and Children--Firearm Owner Responsibilities

Rules for Kids

Methods of Childproofing your Firearm

Firearm Safety Certificate Study Guide

## THE SIX BASIC GUN SAFETY RULES

There are six basic gun safety rules for gun owners to understand and practice at all times:

1. Treat all guns as if they are loaded. Always assume that a gun is loaded even if you think it is unloaded. Every time a gun is handled for any reason, check to see that it is unloaded. If you are unable to check a gun to see if it is unloaded, leave it alone and seek help from someone more knowledgeable about guns.

2. Keep the gun pointed in the safest possible direction. Always be aware of where a gun is pointing. A "safe direction" is one where an accidental discharge of the gun will not cause injury or damage. Only point a gun at an object you intend to shoot. Never point a gun toward yourself or another person.

3. Keep your finger off the trigger until you are ready to shoot. Always keep your finger off the trigger and outside the trigger guard until you are ready to shoot. Even though it may be comfortable to rest your finger on the trigger, it also is unsafe. If you are moving around with your finger on the trigger and stumble or fall, you could inadvertently pull the trigger. Sudden loud noises or movements can result in an accidental discharge because there is a natural tendency to tighten the muscles when startled. The trigger is for firing and the handle is for handling.

4. Know your target, its surroundings and beyond. Check that the areas in front of and behind your target are safe before shooting. Be aware that if the bullet misses or completely passes through the target, it could strike a person or object. Identify the target and make sure it is what you intend to shoot. If you are in doubt, DON'T SHOOT! Never fire at a target that is only a movement, color, sound or unidentifiable shape. Be aware of all the people around you before you shoot.

5. Know how to properly operate your gun. It is important to become thoroughly familiar with your gun. You should know its mechanical characteristics including how to properly load, unload and clear a malfunction from your gun. Obviously, not all guns are mechanically the same. Never assume that what applies to one make or model is exactly applicable to another. You should direct questions

Case 3:16-cv-02850-JCS Document 118 Filed 11/01/19 Page 50 of 107

regarding the operation of your gun to your firearms dealer, or contact the manufacturer directly.

6. Store your gun safely and securely to prevent unauthorized use. Guns and ammunition should be stored separately. When the gun is not in your hands, you must still think of safety. Use a California-approved firearms safety device on the gun, such as a trigger lock or cable lock, so it cannot be fired. Store it unloaded in a locked container, such as a California-approved lock box or a gun safe. Store your gun in a different location than the ammunition. For maximum safety you should use both a locking device and a storage container.

Back To Top

# ADDITIONAL SAFETY POINTS

The six basic safety rules are the foundational rules for gun safety. However, there are additional safety points that must not be overlooked.

- Never handle a gun when you are in an emotional state such as anger or depression. Your judgment may be impaired.

- Never shoot a gun in celebration (the Fourth of July or New Year's Eve, for example). Not only is this unsafe, but it is generally illegal. A bullet fired into the air will return to the ground with enough speed to cause injury or death.

- Do not shoot at water, flat or hard surfaces. The bullet can ricochet and hit someone or something other than the target.

- Hand your gun to someone only after you verify that it is unloaded and the cylinder or action is open. Take a gun from someone only after you verify that it is unloaded and the cylinder or action is open.

- Guns, alcohol and drugs don't mix. Alcohol and drugs can negatively affect judgment as well as physical coordination. Alcohol and any other substance

likely to impair normal mental or physical functions should not be used before or while handling guns. Avoid handling and using your gun when you are taking medications that cause drowsiness or include a warning to not operate machinery while taking this drug.

- The loud noise from a fired gun can cause hearing damage, and the debris and hot gas that is often emitted can result in eye injury. Always wear ear and eye protection when shooting a gun.

Back To Top

---

# GUNS AND CHILDREN--FIREARM OWNER RESPONSIBILITIES

## Summary of Safe Storage Laws Regarding Children

You may be guilty of a misdemeanor or a felony if you keep a loaded firearm within any premises that are under your custody or control and a child under 18 years of age obtains and uses it, resulting in injury or death, or carries it to a public place, unless you stored the firearm in a locked container or locked the firearm with a locking device to temporarily keep it from functioning.

## You Cannot Be Too Careful with Children and Guns

There is no such thing as being too careful with children and guns. Never assume that simply because a toddler may lack finger strength, they can't pull the trigger. A child's thumb has twice the strength of the other fingers. When a toddler's thumb "pushes" against a trigger, invariably the barrel of the gun is pointing directly at the child's face. NEVER leave a firearm lying around the house.

Child safety precautions still apply even if you have no children or if your children have grown to adulthood and left home. A nephew, niece, neighbor's child or a grandchild may come to visit. Practice gun safety at all times.

To prevent injury or death caused by improper storage of guns in a home where children are likely to be present, you should store all guns unloaded, lock them with a firearms safety device and store them in a locked container. Ammunition should be stored in a location separate from the gun.

# Talking to Children About Guns

Children are naturally curious about things they don't know about or think are "forbidden." When a child asks questions or begins to act out "gun play," you may want to address his or her curiosity by answering the questions as honestly and openly as possible. This will remove the mystery and reduce the natural curiosity. Also, it is important to remember to talk to children in a manner they can relate to and understand. This is very important, especially when teaching children about the difference between "real" and "make-believe." Let children know that, even though they may look the same, real guns are very different than toy guns. A real gun will hurt or kill someone who is shot.

# Instill a Mind Set of Safety and Responsibility

The American Academy of Pediatrics reports that adolescence is a highly vulnerable stage in life for teenagers struggling to develop traits of identity, independence and autonomy. Children, of course, are both naturally curious and innocently unaware of many dangers around them. Thus, adolescents as well as children may not be

sufficiently safeguarded by cautionary words, however frequent. Contrary actions can completely undermine good advice. A "Do as I say and not as I do" approach to gun safety is both irresponsible and dangerous.

Remember that actions speak louder than words. Children learn most by observing the adults around them. By practicing safe conduct you will also be teaching safe conduct.

Back To Top

# Safety and Storage Devices

If you decide to keep a firearm in your home you must consider the issue of how to store the firearm in a safe and secure manner. California recognizes the importance of safe storage by requiring that all firearms sold in California be accompanied by a DOJ-approved firearms safety device or proof that the purchaser owns a gun safe that meets regulatory standards established by the Department. The current list of DOJ-approved firearms safety devices and the gun safe standards can be viewed by visiting http://oag.ca.gov/firearms/fsdcertlist.

There are a variety of safety and storage devices currently available to the public in a wide range of prices. Some devices are locking mechanisms designed to keep the firearm from being loaded or fired, but don't prevent the firearm from being handled or stolen. There are also locking storage containers that hold the firearm out of sight. For maximum safety you should use both a firearm safety device and a locking storage container to store your unloaded firearm.

Two of the most common locking mechanisms are trigger locks and cable locks. Trigger locks are typically two-piece devices that fit around the trigger and trigger guard to prevent access to the trigger. One side has a post that fits into a hole in the other side.

They are locked by a key or combination locking mechanism. Cable locks typically work by looping a strong steel cable through the action of the firearm to block the firearm's operation and prevent accidental firing. However, neither trigger locks nor cable locks are designed to prevent access to the firearm.

Smaller lock boxes and larger gun safes are two of the most common types of locking storage containers. One advantage of lock boxes and gun safes is that they are designed to completely prevent unintended handling and removal of a firearm. Lock boxes are generally constructed of sturdy, high-grade metal opened by either a key or combination lock. Gun safes are quite heavy, usually weighing at least 50 pounds. While gun safes are typically the most expensive firearm storage devices, they are generally more reliable and secure.

**Remember: Safety and storage devices are only as secure as the precautions you take to protect the key or combination to the lock.**

Back To Top

---

# RULES FOR KIDS

Adults should be aware that a child could discover a gun when a parent or another adult is not present. This could happen in the child's own home; the home of a neighbor, friend or relative; or in a public place such as a school or park. If this should happen, a child should know the following rules and be taught to practice them.

1. **Stop**
   The first rule for a child to follow if he/she finds or sees a gun is to stop what he/she is doing.

2. **Don't Touch!**

   The second rule is for a child not to touch a gun he/she finds or sees. A child may think the best thing to do if he/she finds a gun is to pick it up and take it to an adult. A child needs to know he/she should NEVER touch a gun he/she may find or see.

3. **Leave the Area**

   The third rule is to immediately leave the area. This would include never taking a gun away from another child or trying to stop someone from using gun.

4. **Tell an Adult**

   The last rule is for a child to tell an adult about the gun he/she has seen. This includes times when other kids are playing with or shooting a gun. Please note that, while there is no better advice at this time for children or adolescents who encounter a gun by happenstance, the California Chapter of the American College of Emergency Physicians reports that such warnings alone may be insufficient accident prevention measures with children and adolescents.

   Back To Top

# METHODS OF CHILDPROOFING YOUR FIREARM

As a responsible handgun owner, you must recognize the need and be aware of the methods of childproofing your handgun, whether or not you have children.

Whenever children could be around, whether your own, or a friend's, relative's or neighbor's, additional safety steps should be taken when storing firearms and ammunition in your home.

- Always store your firearm unloaded.

- Use a firearms safety device AND store the firearm in a locked container.
- Store the ammunition separately in a locked container.

Always storing your firearm securely is the best method of childproofing your firearm; however, your choice of a storage place can add another element of safety. Carefully choose the storage place in your home especially if children may be around.

- Do not store your firearm where it is visible.
- Do not store your firearm in a bedside table, under your mattress or pillow, or on a closet shelf.
- Do not store your firearm among your valuables (such as jewelry or cameras) unless it is locked in a secure container.
- Consider storing firearms not possessed for self-defense in a safe and secure manner away from the home.

Back To Top

## Bureau of Firearms

Firearms Home

Ammunition Purchase Authorization Program

Automated Firearms System Personal Information Update

California Firearms Laws Summary, pdf (revised 2016)

FAQs

Forms and Publications

Becoming a Firearm Dealer and/or Ammunition Vendor in California

Firearms Shipment Verification/California Licensee Check (CFLC) System

Firearm Safety Certificate Program, DOJ Certified Instructor Information and Comparable Entities

Certificate of Eligibility Information and Application Process

Bullet Button Assault Weapon Information and Registration Process

Firearms Reporting & Law Enforcement Gun Release Application

Firearm Regulations/Rulemaking Activities

California Code of Regulations

Roster of Firearm Safety Devices Certified for Sale

Roster of Handguns Certified for Sale

Unique Serial Number Application (USNA) Process

Contact Us



**STATE OF CALIFORNIA DEPARTMENT OF JUSTICE**
**OFFICE OF THE ATTORNEY GENERAL**

| | Search |
|---|---|

### WHO WE ARE

About AG Xavier Becerra

History of the Office

Organization of the Office

## WHAT WE DO

Public Safety

Opinions and Quo Warranto

Research

Children & Families

Civil Rights

Consumer Protection

Environment & Public Health

Tobacco Directory

Tobacco Grants

## OPEN GOVERNMENT

Ballot Initiatives

Conflicts of Interest

Criminal Justice Statistics

Meetings and Public Notices

OpenJustice Initiative

Public Records

Publications

Regulations

## Memorial

Agents Fallen in the Line of Duty

## Vote

Register to Vote

## WHAT WE'RE WORKING ON

21st Century Policing

Children's Rights

Consumer Protection and Economic Opportunity

Environmental Justice

Equality

Health Care

Immigration

OpenJustice

**MEDIA**

Consumer Alerts

Press Releases

Media Library

**CAREERS**

Getting a State Job

Examinations

Job Vacancies

Internships & Student Positions

Attorney General's Honors Program

Earl Warren Solicitor General Fellowship

---

Office of the Attorney General     Accessibility     Privacy Policy     Conditions of Use     Disclaimer

© 2019 DOJ

# EXHIBIT 4

1                 UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                    SAN FRANCISCO DIVISION

4

5   JAMES STEINLE, individually    )
    and as heir to KATHRYN STEINLE, )
6   deceased; ELIZABETH SULLIVAN,   )
    individually, and as heir to    )
7   KATHRYN STEINLE, deceased; and  )
    JAMES STEINLE and ELIZABETH     )
8   SULLIVAN, as co-representatives )
    of the Estate of KATHRYN STEINLE, )
9                                   )
                                    )
10            Plaintiffs,           )
                                    )
11            vs.                   ) Case No.
                                    ) 16-CV-02859 JCS
12  THE UNITED STATES OF AMERICA,   )
    a governmental entity,          )
13                                  )
                                    )
14            Defendant.            )
    _____)
15

16

17        VIDEOTAPED DEPOSITION OF JULIA B. RASCON

18                  EL CENTRO, CALIFORNIA

19                 MONDAY, MAY 6, 2019

20

21

22                         Reported by Nikki Cotton
                                   CSR No. 7311
23

24

25

Transcript of Julia B. Rascon
Conducted on May 6, 2019                               30

1       Q.   Yes.

2       A.   No.

3       Q.   Okay.

4       A.   (In English) John is driving.  He's doing

5    everything.  (The interpreter) John is driving.  He's

6    doing everything.

7       Q.   Okay.  So it sounds like it was kind of like

8    let's just park here and go find a place to eat?

9       A.   I don't know if it was something like that.  He

10   parked and...

11      Q.   Okay.  And all the kids came with you to come

12   eat, correct?

13      A.   Yes.

14      Q.   Okay.  Do you remember any details at all about

15   what happened immediately after you parked your car and

16   before you left your car to go find the restaurant in

17   San Francisco?

18      A.   When we parked, what happened?

19      Q.   Yes.

20      A.   I was in charge of the children, and John spoke

21   to a person -- I don't know, like, this car -- this

22   person had a little car like a policeman.

23      Q.   Okay.

24      A.   John came back to the car and told me that --

25   he told me that the guy or the policeman, you know, from

Transcript of Julia B. Rascon
Conducted on May 6, 2019                          31

1    this -- the parking lot or the parking space, he said

2    that he was going to be there until 11:00 o'clock.

3         Q.   Okay.  Do you remember seeing this person at

4    all?

5         A.   Yes.

6         Q.   Okay.  What was he wearing?

7         A.   I don't recall his clothing.

8         Q.   Do you recall how tall he was?

9         A.   No, I don't.  (In English) It's tall, but I

10   never got attention, but I got attention from my

11   daughter.  Four years since this -- I'm --

12        Q.   What was that?

13        A.   (In English) I'm sorry.  (The interpreter) I

14   was paying attention to my children so I can get them

15   out of the car.  It's like I just, you know, turned and

16   saw him, like, a glare, you know, a glance, and that's

17   it.

18        Q.   Okay.  So did you actually see your husband

19   speak to him in that glance?

20        A.   Yes.  He stepped out, yes.  They were talking,

21   yes.

22        Q.   Okay.  So in that glance you saw that they were

23   talking.  Did you notice any other details about the

24   person that he was talking to?

25        A.   No.  I don't know if it was a police car or it

Transcript of Julia B. Rascon
Conducted on May 6, 2019                              32

1    was one of those people who are in charge of the parking

2    tickets, of, you know -- I don't know.

3        Q.   But you think it was either a police officer or

4    someone in charge of parking tickets?

5        A.   I think it was one of those people, like a

6    security guard, the one that, you know, watches the

7    place.

8        Q.   Why do you think that?

9        A.   Because he told John to come back because he's

10   there until 11:00.

11       Q.   So I would like to know what information made

12   you think that that person was the security guard

13   outside of anything that John told you.

14       A.   I mean, when I saw the car with the lighting,

15   that's what I thought.

16       Q.   Oh, so he -- there was a car with lights on

17   top?

18       A.   I mean, I'm not very sure.  I cannot remember

19   if it was a car, but I do remember seeing the light.

20       Q.   And the light was on?  There was a light that

21   was on that was...

22       A.   No.  No.  (In English) No remember.  (The

23   interpreter) I don't remember.

24       Q.   So I'm trying to remember what you're actually

25   testifying to right now -- or clarify it.

Transcript of Julia B. Rascon
Conducted on May 6, 2019                                    33

```
1            Did you see a car with a light on top that
2    reassembled a police car?
3        A.   It was not a car -- a police car.  It was not.
4        Q.   Okay.  Can you please draw for me what you saw.
5        A.   (In English) I don't -- I don't remember.  (The
6    interpreter) I don't remember.
7        Q.   I would like you --
8        A.   I don't know in San Francisco what kind of cars
9    or...
10       Q.   I'm not asking you to draw what you think a
11   police car looks like in San Francisco.  I'm asking you
12   to draw what you saw.
13           MR. WALL:  Object to form.
14   BY MS. CORDOVA:
15       Q.   If you didn't see something, then you shouldn't
16   draw anything.
17       A.   I saw the man.  And the man told John that he
18   had to come back at 11:00 because he no longer was going
19   to be there.
20       Q.   I don't want to -- I don't understand what
21   you're saying that John told you.  What I'm asking you
22   today is what you remember from what you saw.  And
23   you've stated several times now that you saw a vehicle
24   that had lights on it --
25           MR. WALL:  Object to form.
```

Transcript of Julia B. Rascon
Conducted on May 6, 2019                    34

```
 1  BY MS. CORDOVA:
 2      Q.   -- is that correct or is your testimony
 3  changing?
 4          MR. WALL:  Object to form.
 5          THE WITNESS:  I am trying to remember what I
 6  saw, what it was.  What I am sure of is that I saw a
 7  man.
 8  BY MS. CORDOVA:
 9      Q.   Okay.  What was the man wearing?
10      A.   I don't know.  I don't remember.
11      Q.   Do you remember if he was taller than John?
12      A.   Yes.
13      Q.   Okay.  Do you remember if he had facial hair?
14      A.   No.
15      Q.   Do you remember if he was wearing glasses?
16      A.   No.
17      Q.   Do you remember if he was wearing a hat?
18      A.   I don't recall.
19      Q.   Do you remember if he was in a uniform?
20      A.   No.  I don't recall.
21      Q.   And you don't recall whether or not there was a
22  vehicle with him or not?
23          MR. WALL:  Object to form.
24          THE WITNESS:  I don't recall.
25
```

Transcript of Julia B. Rascon
Conducted on May 6, 2019                    35

```
 1   BY MS. CORDOVA:
 2       Q.   Okay.  So was there anything else at the scene
 3   that gave you the impression that that person had
 4   something to do with security, other than what John told
 5   you?
 6           MR. WALL:  Object to form.
 7           THE WITNESS:  Yes.
 8   BY MS. CORDOVA:
 9       Q.   Please tell me what that was that you
10   personally saw.
11       A.   What I saw is what John told me, not what I
12   saw.
13       Q.   I just want to confirm that that's why your
14   impression was that way, because it was what John told
15   you.
16       A.   What happens is that I do not recall exactly
17   what car or what it was.
18       Q.   I want to know -- I'm really trying to
19   understand everything you personally remember that gave
20   you the impression this person was a security person.  I
21   want to know all facts.
22       A.   I don't recall.
23       Q.   Okay.  If you do recall some -- something at
24   some point during the deposition today, please tell me.
25       A.   Of course.
```

Transcript of Julia B. Rascon
Conducted on May 6, 2019                                    36

1       Q.    Okay.

2       A.    Of course.

3       Q.    Okay.  Now, do you recall whether or not your

4    kids brought anything with them?

5       A.    I don't recall.

6       Q.    Okay.  Do you recall whether or not your

7    daughter brought her Nintendo with her?

8       A.    He -- she didn't take it.

9       Q.    Okay.  Do you recall where she left it in the

10   car?

11      A.    No.  I suppose that she left it on the seat or

12   hidden in the car.

13      Q.    Can you repeat that.  Sorry.

14      A.    I'm sorry.  I do not recall, but I think -- I

15   don't know if my daughter left it on the seat or

16   somewhere hidden in the car.

17      Q.    Okay.  Did you, before leaving the vehicle,

18   rearrange anything inside the vehicle to hide things

19   under seats or put it in the trunk?

20      A.    I don't recall.

21      Q.    Okay.  Do you recall whether or not John did

22   that?

23      A.    I was not paying attention to John.

24      Q.    Okay.  Do you recall whether or not it was dark

25   or light out when you left the vehicle?

Transcript of Julia B. Rascon
Conducted on May 6, 2019                          67

1              DECLARATION UNDER PENALTY OF PERJURY

2

3          I hereby declare under penalty of perjury that

4    I did translate and read the deposition from the English

5    language to the Spanish language; that all corrections

6    and changes requested by the witness were made by me;

7    that upon completion of said reading the witness did

8    confirm to me that she understood the reading.

9              In witness whereof, I hereby subscribe my name

10   this 22nd day of May, 2019.

11

12

13                        *Violeta Tidwell*

14                        _____

15                        SIGNATURE OF INTERPRETER

16

17

18

19

20

21

22

23

24

25

Transcript of Julia B. Rascon
Conducted on May 6, 2019                    68

```
1   STATE OF CALIFORNIA )
                        ) ss.
2   COUNTY OF IMPERIAL  )

3            I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5            That the foregoing proceedings were taken

6   before me at the time and place herein set forth; that

7   any witnesses in the foregoing proceedings, prior to

8   testifying, were duly sworn; that a record of the

9   proceedings were made by me using machine shorthand,

10  which was thereafter transcribed under my direction;

11  that the foregoing transcript is a true record of the

12  testimony given.

13           Further, that if the foregoing pertains to the

14  original transcript of a deposition in a federal case,

15  before completion of the proceedings, review of the

16  transcript [ ] was [ X ] was not requested.

17           I further certify I am neither financially

18  interested in the action nor a relative or employee of

19  any attorney or party to this action.

20           IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22  Dated: May 22, 2019

23

24           _____
                        Nikki Cotton
25                      CSR No. 7311
```

# EXHIBIT 5



9/13/19

EXHIBIT 3

olcomendy

Planet Depos, LLC

1.SD561498



ISD561487



3



150561448

4



150561428



# EXHIBIT 6

# ENCLAVE

## 2O15 BUICK



## STANDARD EQUIPMENT

### POWER AND PERFORMANCE

**Drivetrain** Front-Wheel Drive (FWD)
**Engine** 3.6L V6 with VVT and direct injection
**Transmission** 6-speed automatic
**Suspension** Premium ride, 4-wheel independent
**Steering** Power, variable effort
**Brakes** 4-wheel anti-lock, 4-wheel disc
**Traction Control** Full range
**StabiliTrak** Stability control system
**Exhaust** Dual-outlet stainless steel with bright tips integrated in rear fascia

### COMFORT AND CONVENIENCE

**Remote Vehicle Starter System**
**Seating** 7-passenger seating, includes second-row captain's chairs, flat-folding and Smart Slide access to the third-row, flat-folding 60/60 bench
**Driver Seat Adjuster** 8-way power with power recline and lumbar control
**Front-Passenger Seat Adjuster** 2-way power (fore/aft) with manual recline and lumbar
**Instrumentation** Includes Driver Information Center, tachometer, speedometer, fuel, coolant temperature, battery, gear selector, outside air temperature, compass display and Oil Life Monitor
**Rear Park Assist**
**Steering Wheel** Leather-wrapped with mahogany wood accents, tilt and telescopic

**Steering-Wheel-Mounted Controls** For audio and cruise control
**Cruise Control**
**Mirror** Inside rearview, auto-dimming
**Universal Garage-Door Opener**
**Remote Keyless Entry**
**Visors** Driver and front-passenger illuminated vanity mirrors
**Climate Control** Air conditioning, tri-zone automatic, with individual climate settings for driver, front passenger and rear-seat occupants
**Windows** Power with driver express-up and -down, passenger express-down feature
**Quietuning** Buick-pioneered process to reduce, block and absorb noise and vibration to create a quiet cabin

### ENTERTAINMENT SYSTEMS

**Audio System** Buick IntelliLink® with AM/FM, 6.5" diagonal high-resolution color touch-screen, CD player, MP3 playback, auxiliary port and USB port[a]
**Buick IntelliLink®** Smartphone control via voice activation and steering-wheel-mounted controls. It also enables streaming stereo audio from the phone through available services like Pandora® internet radio and Stitcher™ SmartRadio.
**SiriusXM Satellite Radio[3]** Includes 3 trial months of service. For more information, visit siriusxm.com.
**Speakers** 6-speaker system
**USB Port[a]** Connectivity for various digital media devices and iPod® support
**USB Port[a]** 2 charging-only ports, located in the rear of the center console
**Bluetooth®[3]** Personal cell phone connectivity to vehicle audio system

### SAFETY AND SECURITY

**Air Bags[5]** Frontal and side-impact for driver and front passenger, front-center driver inboard seat-mounted side-impact and head curtain side-impact for all rows in outboard seating positions
**Power Door Locks** Programmable with rear child security
**OnStar®** 6 months of Directions & Connections Plan
**Theft-Deterrent System** PASS-Key III, engine immobilizer and content theft alarm
**Rearview Camera System**
**Tire Pressure Monitoring System** Does not monitor spare tire

### STYLING AND FUNCTIONALITY

**Lights** High-Intensity Discharge (HID) xenon, projector-beam headlamps, high/low (functional) with blue-tint lenses and chromed bezels, automatic on/off
**LED Daytime Running Lamps** With automatic exterior lamp control
**Glass** Solar-Ray deep-tinted, rear, side, quarter panel and liftgate
**Outside Mirrors** Heated, power-adjustable, body-color, manual-folding with integrated turn signal indicators
**Wipers** Front and rear intermittent with washers
**Rear Liftgate** Power
**Luggage Rack** Chromed side rails, roof-mounted
**Wheels** 18" painted aluminum
**Tires** P255/65R18 all-season

### AVAILABLE OPTIONS

Trailering Package
Engine Block Heater

## EQUIPMENT GROUPS

### LEATHER GROUP

INCLUDES ALL STANDARD EQUIPMENT PLUS:

Heated Steering Wheel
Leather-Appointed Seating
8-Way Power Heated Front Seats with Driver Memory
Side Blind Zone Alert
Rear Cross Traffic Alert
Wheels 19" aluminum

### PREMIUM GROUP

INCLUDES ALL STANDARD EQUIPMENT PLUS:

Heated Steering Wheel
Leather-Appointed Seating
8-Way Power Heated Front Seats with Driver Memory
Side Blind Zone Alert
Rear Cross Traffic Alert

❶Audio System with Navigation[7]
Wheels 19" chrome-clad aluminum
Power-Folding Heated Outside Mirrors with Memory
Articulating Headlamps
Forward Collision Alert
Lane Departure Warning
Bose Sound System
Cooled (and Heated) Front Seats

---

AVAILABLE OPTIONS FOR LEATHER GROUP:

Forward Collision Alert and Lane Departure Warning
All-Wheel-Drive System
8-Passenger Seating
Bose® Sound System
Trailering Package
Sunroof
Wheels 19" chrome-clad aluminum
Wheels 20" ultra-bright blade silver machined aluminum
❷Audio System with Navigation[7]
❸Audio System with Rear-Seat Entertainment
❹Audio System with Rear-Seat Entertainment and Navigation[7]

AVAILABLE OPTIONS FOR PREMIUM GROUP:

All-Wheel-Drive System
8-Passenger Seating
Trailering Package
Sunroof
Wheels 20" ultra-bright blade silver machined painted aluminum
❸Audio System with Rear-Seat Entertainment
❹Audio System with Rear-Seat Entertainment and Navigation[7]

## AVAILABLE AUDIO SYSTEMS

❷Audio System with Navigation[7] Buick IntelliLink® with AM/FM stereo, high-resolution 6.5" diagonal color touch-screen, Navigation System, CD player, MP3 playback and auxiliary ports. Includes Bose Sound System.

❸Audio System with Rear-Seat Entertainment Buick IntelliLink® with AM/FM stereo, high-resolution 6.5" diagonal color touch-screen, CD/DVD player, MP3 playback and auxiliary port. Includes Bose Sound System with 5.1 surround sound, rear overhead 8" diagonal color screen, rear audio controls with 2 headphone jacks and 2 pairs of wireless headphones and 120-volt household-style outlet.

❹Audio System with Rear-Seat Entertainment and Navigation[7] Buick IntelliLink® with AM/FM stereo, high-resolution 6.5" diagonal color touch-screen, Navigation System, CD player, MP3 playback and auxiliary port. Includes Bose Sound System with 5.1 surround sound, rear overhead 8" diagonal color screen, rear audio controls with 2 headphone jacks and 2 pairs of wireless headphones and 120-volt household-style outlet.

## WHEELS



PZ3
18" PAINTED ALUMINUM

RZA
19" ALUMINUM



P6A
19" CHROME-CLAD ALUMINUM

PEW
20" ULTRA-BRIGHT BLADE SILVER, MACHINED PAINTED ALUMINUM

## SPECIFICATIONS

### DIMENSIONS (INCHES)

| | | | |
|---|---:|---|---:|
| Wheelbase | 118.9 | Shoulder room, first row | 61.6 |
| Overall length | 201.9 | Shoulder room, second row | 61.3 |
| Body width | 79.0 | Shoulder room, third row | 57.4 |
| Overall height, with luggage rack | 71.7 | Hip room, first row | 57.2 |
| Overall height, w/o luggage rack | 70.3 | Hip room, second row | 57.0 |
| Minimum ground clearance, front | 7.6 | Hip room, third row | 48.3 |
| Head room, first row | 40.4 | Leg room, first row | 41.3 |
| Head room, second row, w/o sunroof | 38.7 | Leg room, second row | 36.8 |
| Head room, second row, w/o sunroof | 39.4 | Leg room, third row | 33.2 |
| Head room, third row | 37.8 | | |

### SPECIFICATIONS AND CAPACITIES

| | |
|---|---:|
| Engine Type | 3.6L VVT V-6 direct injection |
| Horsepower | 288 @ 6300 rpm |
| Torque | 270 lb-ft @ 3400 rpm |
| EPA-estimated mpg | 17 city/24 hwy FWD<br>16 city/22 hwy AWD |
| Cargo Volume (cu. ft.)[8] | 115.2 behind first-row seats with second and third rows folded<br>68.9 behind second-row seats with third row folded<br>23.3 behind third-row seats |
| Seating Capacity (front/middle/rear) | 2/2/3 or 2/3/3 |
| Fuel Tank (approx.) | 22 gallons |
| Base Curb Weight | 4,724 FWD<br>4,922 AWD |
| Max. Trailer Weight[9] | 4,500-lbs rating with available Trailering Package (2,000 lbs without package) |

[1]Full functionality requires compatible Bluetooth and smartphone. Some devices require USB connectivity. Data plan rates apply. [2]Not compatible with all devices. [3]If you subscribe after your trial period, subscriptions are continuous until you call SiriusXM to cancel. See SiriusXM Customer Agreement for complete terms at siriusxm.com. Other fees and taxes will apply. All fees and programming subject to change. For more information about NavTraffic, visit siriusxm.com/navtraffic. For more information about Travel Link, visit siriusxm.com/travellink. XM satellite service is available only to those in the 48 contiguous USA and DC. SiriusXM, XM and all related marks and logos are trademarks of SiriusXM Radio, Inc. [4]Go to gmtotalconnect.com to find out which phones are compatible with the vehicle. [5]A NOTE ON CHILD SAFETY: Always use safety belts and the correct child restraint for your child's age and size, even with air bags. Even in vehicles equipped with the Passenger Sensing System, children are safer when properly secured in a rear seat in the appropriate infant, child or booster seat. Never place a rear-facing infant restraint in the front seat of any vehicle equipped with an active frontal air bag. See your vehicle Owner's Manual and child safety seat instructions for more safety information. [6]OnStar services require vehicle electrical system (including battery), wireless service and GPS satellite signals to be available and operating for features to function properly. OnStar acts as a link to existing emergency service providers. Not all vehicles may transmit all crash data. Subscription Service Agreement required. Call 1-888-4ONSTAR (466-7827) or visit onstar.com for OnStar's Terms and Conditions, Privacy Policy, details and system limitations. [7]Map coverage available in the United States, U.S. Virgin Islands, Puerto Rico and Canada. [8]Cargo and load capacity limited by weight and distribution. [9]Maximum trailer weight ratings are calculated assuming a base vehicle, except for any option(s) necessary to achieve the rating, plus driver. The weight of other optional equipment, passengers and cargo will reduce the maximum trailer weight your vehicle can tow. See your dealer for additional details.


FPO

Mixed Sources
FSC

# EXHIBIT 7

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4    - - - - - - - - - - - - - - -

 5    JAMES STEINLE,              )

 6    INDIVIDUALLY AND AS HEIR    )

 7    TO KATHRYN STEINLE,         )

 8    DECEASED, ET AL.,           ) CASE NO.

 9           PLAINTIFFS,          ) 16-CV-02859-JCS

10    V.                          )

11    UNITED STATES OF AMERICA,   )

12    ET AL.,                     )

13           DEFENDANTS.          )

14    - - - - - - - - - - - - - - -

15

16

17            DEPOSITION OF JAMES STEINLE

18              MONDAY, APRIL 22, 2019

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22            BY:  CYNTHIA F. DAMMANN, CSR NO. 10610

23               455 MARKET STREET, SUITE 970

24             SAN FRANCISCO, CALIFORNIA 94105

25                   (415) 597-5600
```

1

1    and support them and listen to all the complaining.

2         Q.  How many salespeople did you manage as a

3    regional sales manager?

4         A.  There was 11 for Good Year, and for Les

5    Schwab it was 14.

6         Q.  And how long were you a regional sales

7    manager for Good Year?

8         A.  Probably 15, 16 years.  It's been a while.

9         Q.  Okay.

10        A.  Does that add up?

11        Q.  Well, that adds up to 11 years plus 15, 16,

12   26, 27 years as a regional sales manager.  Does that

13   make sense?

14        A.  That makes sense.

15        Q.  Any --

16        A.  I was good at it.

17        Q.  I don't doubt it.  Have you been involved in

18   any previous lawsuits?

19        A.  No.

20        Q.  Do you have any felony convictions?

21        A.  No.

22        Q.  Who do you live with currently, if anyone?

23        A.  My wife, Elizabeth.

24        Q.  And how long have you been married?

25        A.  32 years.

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

1      Q.   And who -- how many children did you have
2  together?
3      A.   Two.
4      Q.   Who were those two children?
5      A.   Bradley and Kate.
6      Q.   Is it okay if I refer to her as "Kate"?
7      A.   You may.
8      Q.   Kate was your natural daughter?
9      A.   Yes.
10     Q.   When was Kate born?
11     A.   I don't remember.
12     Q.   Okay.  When was -- is Bradley or Kate the
13  older sibling?
14     A.   Brad's the oldest.
15     Q.   Do you know how many years separated them?
16     A.   14 months.
17     Q.   Okay.  That's pretty quick.  Do you have
18  any --
19     A.   We were in a hurry.
20     Q.   Do you have any siblings?
21     A.   A brother.
22     Q.   And is he still alive?
23     A.   Yes.
24     Q.   What's his name?
25     A.   Steve.

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

```
 1    think may impact your life expectancy?
 2         A.  No.
 3         Q.  Have you talked to your doctor or do you
 4    have any expectation about how long you will live?
 5         A.  We haven't had that conversation.
 6         Q.  During the five years before Kate's passing,
 7    before she was lost, did you ever treat with a
 8    therapist, a counselor, psychologist or
 9    psychiatrist?
10         A.  No.
11         Q.  Have you done so since?
12         A.  Yes.
13         Q.  And we'll get into that in a few minutes.
14             Did Kate have a will?
15         A.  No.
16         Q.  And were there any -- did she have a spouse
17    or children?
18         A.  No.
19         Q.  So do you know who the heirs were to Kate's
20    estate?
21         A.  I assume Liz and I.
22         Q.  And did -- who made that determination?  Was
23    that a probate court or --
24             MS. CORDOVA:  Objection, form.
25    BY MR. WALL:
```

1    from Kate prior to her death?

2         A.   No, no.

3         Q.   Did you expect any in the future?

4         A.   No.

5         Q.   Did Kate --

6         A.   We didn't know.  I mean, we just kind of --

7    whatever happened, happened.

8         Q.   Yeah.  Did you -- did Kate live with you at

9    the time of her death?

10        A.   No.

11        Q.   When was the last time she lived with you?

12        A.   Hm, two years prior to the death.

13        Q.   Okay.  How old was she when she died?  Was

14   she 31?

15        A.   She was 31, yeah.  Thank you.

16        Q.   So she had been living -- when she was 29

17   she was living with you for a period of time?

18        A.   Well, like most siblings, I mean, she was

19   trying to get her feet underneath her and our door

20   was always open to her and Brad.  So yeah, but --

21   yeah.  One time for a period, but then from the rest

22   of the time she was pretty independent, on her own.

23        Q.   Did she go to college?

24        A.   She did.

25        Q.   Did she -- did she live with you when she

1    was in college?

2        A.   No.

3        Q.   After she graduated from college -- do you

4    know when that was?

5        A.   I don't remember.

6        Q.   So was it about 2005, just counting

7    backwards from 31?

8        A.   Yeah.  That would be a good guess.

9        Q.   And did she -- just trying to get a sense of

10   when she lived with you and for how long after

11   college.

12            Did she move back in after college?

13       A.   No.

14       Q.   So she lived on her own after college?

15       A.   Yeah.

16       Q.   Where was she living at the time, do you

17   know?

18       A.   She was living in San Luis Obispo.

19       Q.   Okay.

20       A.   She went to Cal Poly.

21       Q.   Okay.  How long did she live down in San

22   Luis Obispo?

23       A.   Including college and --

24       Q.   And afterwards.

25       A.   Probably five years.

1      Q.  And then where did she move after that?

2      A.  She got a job and moved to the city.

3      Q.  San Francisco?

4      A.  M-hm.

5      Q.  And so as of around 2006 or thereabouts, she

6  moved up to San Francisco?

7      A.  Yes.

8      Q.  And how long did she live in San Francisco

9  after she first moved there?

10     A.  She lived there till she passed.

11     Q.  Okay.  Although there was a period of time

12 when she was -- couple years before her death when

13 she lived with you?

14     A.  You know, I don't recall.  If she did, it

15 was for a short period of time.

16     Q.  Okay.  At the time of her death, what was

17 Kate doing for work?

18     A.  She was a salesperson for Medtronic.

19     Q.  Which is a medical device manufacturer?

20     A.  Yes.

21     Q.  How long had she been doing that?

22     A.  Well, she was with a wholesaler, I'd say,

23 for two years.  She'd been at it four years, give or

24 take a year.

25     Q.  Let me take a step back, going back to her

1    school.

2         Do you know what she got a degree in?

3    A.   Sales administration, business

4    administration.

5    Q.   That was just a bachelor's degree?

6    A.   M-hm.

7    Q.   Four-year degree?

8    A.   Yes.

9    Q.   Did she go back to school and get a masters

10   or Ph.D. or anything else?

11   A.   No.

12   Q.   So what did she do when she graduated from

13   school?  What was her first job, if you recall?

14   A.   Well, she was hellbent on being in the

15   medical business, and she went to work for a small

16   wholesaler that sold bone marrow -- I called it

17   glue, but it was -- they would put -- they would put

18   it on spines that had fine breaks.  So that's

19   what --

20   Q.   Interesting.

21   A.   -- it was -- for her, it was her foot in the

22   door, you know.  She'd had no medical experience and

23   didn't have a degree for that, but that didn't slow

24   Kate down.  She figured a way.

25   Q.   And since -- after that first job graduating

1    from school, did she stay in the -- working sales

2    for medical device manufacturers up until her death?

3        A.  Yes.

4        Q.  After -- do you remember the name of the

5    small wholesaler that she worked for?

6        A.  No.  Just a guy selling a little bit of this

7    and a little bit of that that needed -- I mean,

8    there's a story there, but --

9        Q.  And where -- what was her next job after

10   that, do you recall?

11       A.  Medtronics.

12       Q.  Okay.  What kind of devices was she selling

13   for Medtronics, do you know?

14       A.  Again, it was -- it was a spinal chip for a

15   broken spine and -- yeah.  When she was -- when she

16   went to work for the wholesaler -- am I allowed to

17   chatter on?

18       Q.  M-hm.

19       A.  When she went to work for the wholesaler,

20   the guy was -- she just wasn't -- it got her foot in

21   the door.

22       Q.  Yeah.

23       A.  And she'd go to these operating theaters

24   around the Bay Area -- that was her territory -- and

25   the people would -- took to Kate because she knew

```
1   STATE OF CALIFORNIA          )

2                                ) ss.

3   COUNTY OF SAN FRANCISCO    )

4                I hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to testify

6   to the truth, the whole truth and nothing but the

7   truth, in the within-entitled cause; that said

8   deposition was taken at the time and place herein

9   named; that the deposition is a true record of the

10  witness's testimony as reported by me, a duly

11  certified shorthand reporter and a disinterested

12  person, and was thereafter transcribed into

13  typewriting by computer.

14                I further certify that I am not

15  interested in the outcome of the said action, nor

16  connected with, nor related to any of the parties in

17  said action, nor to their respective counsel.

18                IN WITNESS WHEREOF, I have hereunto set

19  my hand this 1st of May, 2019.

20  Reading and Signing was:

21  ___ requested  ___ waived  _X_ not requested

22

23

24        _____

25                CYNTHIA F. DAMMANN, CSR No. 10610
```

118

# EXHIBIT 8



USA000025

H-1112-2
Safety and Health for Field Operations



# Chapter 17

# Firearms Safety

USA000026

## Chapter 17 — Firearms Safety

### 17.1   References

A.  BLM Manual Handbook 1112-1, Chapter 26, Firearms

B.  BLM Manual 9260, Law Enforcement, General Orders

C.  446 DM 10, Law Enforcement, Firearms

D.  State and Local Laws

### 17.2   Procedures. State Directors may authorize non-law enforcement personnel to carry firearms when functions or circumstances related to their official duties necessitate such permission.

Use of firearms by BLM personnel while on official business will be limited to those individuals who have been authorized by the State Director and have successfully completed a firearm safety course.

Authorizations will be in writing and training must be documented. See Illustration 17-1 for an example of a Request to Carry and Use Firearms and training documentation.

Adjustments to program and training requirements will conform to DOI policies relating to the use of non-law enforcement firearms.

### A.  Expiration of Firearms Authorization

The authorization to carry a firearm shall expire:

1)  A maximum of 12 months after the issue date; or

2)  Upon completion of the project; or

3)  When there is a change of duty station, status, or transfer; or

4)  Upon failure to demonstrate shooting proficiency, as required; or

5)  Any domestic violence conviction; or

6)  When rescinded for any other reason.

### B.  Seasonal or Part-Time Employees. Seasonal or part-time non-law enforcement employees, or full-time employees who have only an occasional need to carry firearms, are required to demonstrate proficiency once at the commencement of each term of employment, at the beginning of each field period requiring the use of firearms, and must meet the requirements outlined above in 17.2 A.

### 17.3   Equipment. The Bureau will only issue 12-gauge pump shotguns and solid slug ammunition for animal protection. Employees wishing to use their personal firearms must meet the minimum caliber and power requirements (.30-.06 or equivalent for rifles; .44-caliber magnum or greater for side arms), and complete the firearm

USA000027

training course and a safety check of these firearms by an approved instructor. No reloads allowed.

Bureau policy requires that all firearms be equipped with a child safety lock (trigger lock). This lock must remain in place until such time as the firearm is ready to load and put into service.

## 17.4   Firearms Certification for Non-Law Enforcement Personnel

Only those non-law enforcement personnel who are competent and qualified marksmen and have completed a firearms training program may be authorized to use or carry firearms.

The firearms training program must consist of at least 4 hours of classroom time culminating in a prescribed shooting regimen at a firing range. The instructor administering the firing range component will be a certified Federal Law Enforcement Training Center graduate, Federal Bureau of Investigation officer, or a National Rifle Association instructor.

### A.  Classroom Component, Firearms Training Course

The classroom component of a qualified firearms training course shall consist of the following subjects:

1) Basic firearms safety

2) Legal and moral aspects of firearms use

3) Non-lethal alternatives

4) Animal behavior (optional based on risk assessment)

### B.  Shooting Proficiency, Firearm Training Course

This portion of the firearms training course will take place on the firing range under the control of an authorized instructor.

The target for animal protection will be 8 1/2 inches by 11 inches in size and will be placed a distance of 15 yards from the firing line. Proficiency is achieved when 70 percent of the shots are on the target and when all sequences of shots are fired within the allowable time of 25 seconds. Each sequence will be performed twice to demonstrate proficiency; the shooter must exhibit proper safe handling of the firearm(s).

1) **Pump and semi-automatic shotguns:** two sequences of fire consisting of magazine capacity for the shotgun, plus one (i.e., Remington 870, four rounds in magazine, plus one)

- The shooter will start with a full magazine and empty chamber. The weapon will have the action closed and the safety on.

H-1112-2
Safety and Health for Field Operations

- On the command to fire, the shooter will be required to fire the rounds in the magazine, then reload and fire one additional round.

- Upon completion, the shooter will open the action and make sure the safety is on.

- The time limit will be 25 seconds. This sequence will be repeated.

**2)  Double-barrel shotguns:** two sequences of fire consisting of four rounds per sequence.

- Shooter will start with the shotgun fully loaded and the safety on.

- On the command to fire, the shooter will be required to fire the two rounds of ammunition in the firearm, then load and fire two additional rounds.

- Upon completion, the shooter will open the action and make sure the safety is on.

- The time limit will be 25 seconds. This sequence will be repeated.

**3)  Rifles**: two sequences of fire consisting of magazine capacity for the rifle, plus one round (i.e., a bolt action rifle with magazine capacity of three rounds; the course will be four rounds for each sequence).

- The shooter will start with the magazine fully loaded. The action will be closed on an empty chamber and the safety on.

- On command to fire, the shooter will fire the rounds in the magazine, then reload and fire one additional round.

- Upon completion, the shooter will open the action and make sure the safety is on.

- The time limit will be 25 seconds. This sequence will be repeated.

**4)  Handguns**: two sequences of fire, each consisting of cylinder/magazine capacity for the handgun.

- The shooter will start with a fully loaded handgun.

- On the command to fire, the shooter will fire all rounds contained in the cylinder/magazine.

- Upon completion, the shooter will open the cylinder/slide and make sure the handgun is unloaded.

USA000029

- The time limit will be 25 seconds. This sequence will be repeated.

**17.5 Use of Firearms.** Bureau employees must observe all Federal, state, and local laws in regard to the licensing, use, transportation, etc., of firearms and ammunition. Bureau employees are prohibited at all times from using Government-owned vehicles or equipment for the express or incidental purpose of hunting, shooting, or transporting of game, hunters, firearms, or ammunition. Violators are subject to disciplinary action and/or prosecution under the law.

**A. Firearms in Camp.** The use of firearms is prohibited in camp areas or during working hours by non-law enforcement personnel except when required for the safety of personnel or if in the best interest of the Bureau.

**B. Taking Game in Defense of Life or Property.** As a job requirement, firearms may be carried in work areas and used if necessary for the protection of work parties from dangerous animals. The necessity of taking game animals must not be brought about by harassment or provocation of the animal or the unreasonable invasion of the animal's habitat.

**C. Rabid or Infected Animals.** If Bureau employees are specifically requested by local officials to carry firearms to help curb an epidemic of rabid animals; to reduce the number of undesirable, crippled, or infected animals; or to carry out other authorized activities, such as cone harvesting, the purpose of the action and the caliber of the firearm(s) must be stated in the letter of authorization.

**D. Reporting Requirements.** Game animals taken may become property of the state. Different parts of the animal may have to be provided to the state for administrative reasons. This may have to be done in required time frames. Bureau personnel should check local regulations prior to carrying a firearm.

**17.6 Firearms and Ammunition Storage**

All firearms, when not in active use, shall be stored in a secure place, out of sight, under lock and key. Firearms will be unloaded prior to storage.

USA000030

H-1112-2
Safety and Health for Field Operations

## Illustration 17-1

Form OR-1112-18
(October 1991)

### UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
Oregon State Office

### REQUEST TO CARRY AND USE FIREARMS

Full Name: _____    Date of Birth: _____

Sex: ☐ Female    ☐ Male    _____

District: _____    Area/Division: _____

Duties requiring employee to carry/use firearms: _____
_____
_____
_____
_____
_____

#### Firearms Information

Firearm(s) to be used:  Caliber: _____    Make: _____    Model: _____

Serial No.: _____    Registered owner: _____

#### Employee Safety Requirements

Firearms Safety Course Attended (minimum 4 hours in safety, handling, firing, and legal/moral aspects of the use of firearms):

Course Name: _____    Date Attended: _____

Certifying Official/Instructor: _____

Course Sponsor (NRA, FLETC, FBI): _____

Non-law enforcement employees authorized to carry firearms in the course of employment must demonstrate their shooting proficiency (70% or better); permanent employees twice a year; seasonal or part-time employees once a year or at the commencement of each term of employment.

Proficiency Certification:  _____ by _____
                              Date            Approved Instructor

                              _____ by _____
                              Date            Approved Instructor

Authorization Required (Dates):  From _____  To _____

Location(s) Required: _____
_____

# EXHIBIT 9

Form 1221-2
(June 1969)



<table>
<tr><td rowspan="3"></td><td>UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF LAND MANAGEMENT<br><br>MANUAL TRANSMITTAL SHEET</td><td>Release<br>1-1761</td></tr>
</table>

|  |  |
|---|---|
| UNITED STATES | Release |
| DEPARTMENT OF THE INTERIOR | 1-1761 |
| BUREAU OF LAND MANAGEMENT | Date |
| MANUAL TRANSMITTAL SHEET | 08/04/2014 |

Subject

H-1112-1 Safety and Health Management Handbook  (Internal)

1.  Explanation of Material Transmitted: Explanation of Material Transmitted:  This release transmits the revised H-1112-1 Safety, Health and Emergency Management handbook.  This revision changes the organization, table of contents, section numbers, and pagination used in BLM handbooks.  These changes will make BLM manuals user friendly and compatible with Microsoft Word automatic numbering and reference tools.  Compatibility with Microsoft Word will make revising manuals a more efficient process

2.  Reports Required:  None

3.  Material Superseded: This release supersedes the H-1112-1 Safety Manual Handbook released in November 8, 2001

4.  Filing Instructions:  File as described below.

**REMOVE**

All of H-1112-1 (Rel. 1-1673)

(Total 107 pages)

**INSERT**

All of the revised H-1112-1

(Total 248 pages)

/s/
Carole Carter-Pfisterer
Assistant Director
Human Capital Management

USA000032

BLM

# Safety and Health Management



BLM Handbook 1112-1                    2014

USA000033

deterring aggressive animals.

3) The ethical implications and legal requirements associated with killing a game animal in defense of life and property.

4) Employees choosing to supplement or replace the use of firearms with pepper- based deterrent spray for protection against dangerous wild animals must complete a training program in the use of the spray, taught by a trained and knowledgeable instructor.

j. BLM firearms instruction must be of professional caliber. States are encouraged to promote and fund advanced instructor training relevant to the type(s) of firearms and conditions to which employee(s) will be exposed. Firearms instructors and firearms training coordinators must have significant experience in the use of firearms and must meet one or more of the following requirements prior to independently instructing employees:

1) A Federal Law Enforcement Training Center graduate.

2) A National Rifle Association firearms instructor.

3) Minimum 16 hours of basic firearms instructor training.

4) One block of discipline-specific firearms instructor training, as applicable:

a) Shotgun.

b) Rifle.

c) Handgun.

6. **Transport, Storage, and Maintenance**.

a. All firearms must be completely unloaded except when it is necessary that they be readily available for their intended use. An employee returning a loaded firearm to its place of issue must immediately lose their certificate of firearms authorization and must be subject to disciplinary action.

b. When not under the direct control of an authorized employee, all firearms stored for issue must be secured; unloaded with the action open; and in a locked safe, vault, or other approved firearms storage container. Access to firearms storage containers must be limited to those employees designated and authorized to possess, carry, or use firearms.

c. All firearms in transport or temporary storage must have a functioning trigger locking device in place and locked. The placement of the firearm in a locking gun safe or carrying case does not negate this requirement. The key to the trigger locking device must, at all times, be in the secure possession of the employee that is responsible for the firearm.

d. Firearms and ammunition must not be left unattended in motor vehicles or watercraft unless they are physically secured from theft and out of public view. Transport of firearms on scheduled commercial aircraft must conform to all relevant Federal Aviation Administration and Transportation Security Administration requirements and airline policies. Transport of firearms and ammunition on field aircraft must conform to DOI Office of Aviation Services guidance, which includes the:

1) "Interagency Aviation Transport of Hazardous Materials."

2) "Aerial Capture, Eradication and Tagging of Animals (ACETA) Handbook," (supplement to DOI Departmental Manual, part 351, Chapter 2).

3) DOI National Business Center, AM Operational Procedures Memorandum (OPM) 06-AR-18, "The Use of Firearms in Survival Equipment for Fleet Aircraft."

e. The custodial property officer must ensure that each firearm is inspected, cleaned, and mechanically checked annually and each time upon return from the field to confirm that the firearms are in serviceable condition. A written inspection, maintenance, and repair record must be maintained for each firearm. A visual inspection and safety function check of the firearm and review of the maintenance and repair records must be performed prior to

# EXHIBIT 10



buick.com (U.S.)
buick.gm.ca (Canada)
buick.com.mx (Mexico)





EXHIBIT 12/3/18
JW 4
Planet Depos, LLC

# 2015

# Enclave



## 2-12    Keys, Doors, and Windows

The security light flashes.

When the door is closed, the security light stops flashing and stays on solid for approximately 30 seconds. The content theft-deterrent alarm is not armed until the security light goes off.

If the delayed locking feature is active, the alarm is not activated until all doors are closed and the security light goes off.

- Press 🔒 when the driver door is closed. The security light comes on solid for approximately 30 seconds and then goes off. The content theft-deterrent alarm is not armed until the security light goes off.

The theft-deterrent system will not activate if the doors are locked with the vehicle's key or the manual door lock.

If a locked door is opened without using the RKE transmitter, a 10-second pre-alarm occurs. The

horn chirps and the lights flash. If the key is not placed in the ignition and turned to START or the door is not unlocked by pressing 🔒 during the 10-second pre-alarm, the alarm goes off. The headlamps flash and the horn sounds for about 30 seconds, then turns off to save the battery power.

The vehicle can be started with the correct ignition key if the alarm has been set off.

To avoid setting off the alarm by accident:

- Lock the vehicle with the door key after the doors are closed.
- Unlock the door with the RKE transmitter. Unlocking a door any other way sets off the alarm if the system has been armed.

Press 🔒 or place the key in the ignition and turn it to START to turn off the alarm.

### Testing the Alarm

To test the alarm:

1. From inside the vehicle, lower the driver side window, and open the driver door.
2. Press 🔒.
3. Get out of the vehicle, close the door, and wait for the security light to go out.
4. Reach in through the window, unlock the door with the manual door lock, and open the door. This should set off the alarm.

If the alarm does not sound when it should, but the headlamps flash, check to see if the horn works. The horn fuse may be blown. To replace the fuse, see *Fuses and Circuit Breakers on page 10-28*.

If the alarm does not sound or the headlamps do not flash, see your dealer for service.